# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| XRI INVESTMENT HOLDINGS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0619-JTL |
| | ) | |
| GREGORY A. HOLIFIELD and GH BLUE HOLDINGS, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: July 8, 2022
Date Decided: September 19, 2022

A. Thompson Bayliss, John M. Seaman, Eric A. Veres, Daniel J. McBride, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Margaret H. Allen, Yolanda C. Garcia, Angela C. Zambrano, SIDLEY AUSTIN LLP, Dallas, Texas; *Attorneys for Plaintiff.*

Michael W. McDermott, Richard I. G. Jones, Jr., David B. Anthony, Zachary J. Schnapp, BERGER HARRIS LLP, Wilmington, Delaware; *Attorneys for Defendants.*

**LASTER, V.C.**

Defendant Gregory Holifield is a co-founder and member of XRI Investment Holdings LLC ("XRI" or the "Company"). In June 2018, Holifield formed defendant GH Blue Holdings, LLC ("Blue") as a single-member LLC. He then transferred all of his Class B units in XRI to Blue (the "Blue Transfer").

The limited liability company agreement that governs XRI's internal affairs (the "LLC Agreement") contains a provision that generally prohibits members from transferring their member interests (the "No Transfer Provision"). When Holifield engaged in the Blue Transfer, he sought to comply with an exception for a transfer to a "Permitted Transferee," defined in the LLC Agreement to include an entity owned solely by the transferring member (the "Permitted Transferee Exception").

One of the requirements for the Permitted Transferee Exception is that the transfer be made for no consideration. The record shows that Holifield made the Blue Transfer as part of a larger transaction in which Holifield secured a loan of $3.5 million for Entia, LLC ("Entia"), another company he owned. Holifield thus received consideration in connection with the Blue Transfer. That fact is enough to render the Permitted Transferee Exception unavailable and cause the Blue Transfer to violate the No Transfer Provision.

The LLC Agreement specifies that any transfer that violates the No Transfer Provision is "void" (the "Contractual Voidness Provision"). Having shown a violation of the No Transfer Provision, XRI insists that the Blue Transfer was void *ab initio* and never became effective.

Holifield responds that XRI's claim is barred by the equitable defense of acquiescence. Holifield satisfied all of the requirements to prove the defense of

acquiescence. He demonstrated that XRI took a series of actions which caused Holifield to believe—reasonably and in good faith—that XRI did not object to the Blue Transfer, notwithstanding that it was part of a financing transaction. And he demonstrated that XRI took those actions knowing everything that it wanted and needed to know about the Blue Transfer and the associated financing.

The actions and knowledge of Matthew Gabriel, XRI's co-founder and CEO, contribute significantly to the finding of acquiescence. Gabriel worked with Holifield to obtain financing for Entia. He helped Holifield develop the structure for the financing, interacted with the lender who extended the financing, knew the loan was going to close contemporaneously with the Blue Transfer, learned the loan had closed shortly afterward, and took credit for helping Holifield obtain the loan. Through Gabriel, XRI knew all of the material facts about the Blue Transfer and the related financing in June 2018, when the Blue Transfer took place.

The actions that XRI took ten months later, in April 2019, further contribute to the finding of acquiescence. At that point, XRI obtained all of the documents relating to the financing, and XRI's lawyers thoroughly analyzed whether the Blue Transfer violated the LLC Agreement. XRI's lawyers concluded that a violation had occurred, but XRI's governing board made a business decision not to pursue it. XRI did not take the position that the Blue Transfer was void until December 2020. Before then, XRI acted as if it had no intention of challenging the Blue Transfer. And that was understandable, because the Blue Transfer conferred benefits on XRI by isolating the transferred units in a special purpose vehicle and structurally subordinating Holifield's general creditors.

2

XRI now contends that acquiescence cannot apply because Holifield misled XRI about the purpose of the Blue Transfer and failed to reveal that it would facilitate the loan to Entia. The evidence disproves those assertions. Gabriel knew that Holifield was making the Blue Transfer to facilitate Entia's ability to obtain a loan, and a representative of the sophisticated financial institution that controlled XRI represented to Holifield that XRI did not care as long as Holifield kept any financing "on his side of the ledger." Holifield and his lawyers believed—reasonably and in good faith—that they had complied with that directive. They believed—again reasonably and in good faith—that XRI and its controller knew everything that they wanted and needed to know. Holifield and his lawyers believed—also reasonably and in good faith—that XRI and its controller did not want or need to be involved in anything else.

From XRI's perspective, the validity of the Blue Transfer only became worth challenging in November 2020, after XRI purported to seize the Class B units that were the subject of the Blue Transfer (the "Disputed Units"). XRI had made a loan to Entia in 2016 that was secured by the Disputed Units (the "XRI Loan"). When the Blue Transfer took place, XRI made sure that the Disputed Units continued to secure the XRI Loan.

In August 2020, when the XRI Loan came due, Holifield lacked the liquidity to pay it. He asked XRI to work with him, but no resolution was reached.

XRI now claims that in November 2020, it seized the Disputed Units by engaging in a strict foreclosure. Under the Uniform Commercial Code ("UCC"), a strict foreclosure is a procedure in which a secured creditor can agree with its debtor to accept the collateral securing a loan in full or partial satisfaction of the amount due. A strict foreclosure is

3

supposed to be a consensual transaction, but the UCC deems a debtor to have consented to a strict foreclosure if the secured creditor makes an unconditional proposal to accept the collateral in full satisfaction of the loan and the debtor fails to respond within twenty days after the proposal is sent. At that point, the secured creditor takes title to the collateral, and the loan is extinguished. If the collateral is worth less than the loan, the debtor does not owe any deficiency. If the collateral is worth more than the loan, the debtor does not receive any of the surplus.[1]

Before engaging in the strict foreclosure, XRI had been communicating directly with Holifield about the XRI Loan. XRI knew that Holifield believed that the value of the Disputed Units exceeded the balance due on the XRI Loan, and Holifield had informed XRI in writing that he believed XRI needed to pursue a commercially reasonable process to levy on the Disputed Units. XRI also knew that Blue—not Holifield—held the Disputed Units as a result of the Blue Transfer.

Yet when XRI proposed a strict foreclosure, XRI directed its proposal to Holifield, and it used an office address that XRI knew was defunct. XRI did not send a copy of the proposal to Holifield by email, as XRI had done for prior communications. In any event, when the proposal arrived at the defunct office, Holifield was in a city on the opposite coast. Holifield did not learn about the proposal until over a month later, when XRI asserted

---

[1] XRI contends that New York law governed the strict foreclosure. This decision's summary of Section 9-620 is therefore based on New York's version of the UCC. *See* N.Y. U.C.C. Law § 9-620(a). For a similar summary, see *CNL-AB LLC v. Eastern Property Fund I SPE (MS Ref) LLC*, 2011 WL 353529, at *3–4 (Del. Ch. Jan. 28, 2011).

that he was deemed to have accepted it. When XRI took that position, XRI made sure to send its communication to Holifield by email. Holifield immediately caused Blue to object to the strict foreclosure. At that point, XRI asserted clearly for the first time that the Blue Transfer was void.

The parties have divergent views about the value of the Disputed Units. XRI has claimed that the Disputed Units were worth less than the $12 million that Holifield owed on the XRI Loan and that the Company did Holifield a favor by engaging in a strict foreclosure and not pursuing him for the deficiency. Holifield has testified and introduced evidence to support his contention that the value of the Disputed Units exceeded the amount due on the XRI Loan by $40 to $50 million and that XRI deprived him of that value. Although this case provides no opportunity to answer the valuation question, the resources that XRI has invested in this litigation suggest that Holifield's position is closer to the truth.

The parties' real dispute is over the validity of the strict foreclosure, but that transaction is not directly at issue in this litigation. Through this case, XRI is litigating the predicate issue of whether the Blue Transfer validly transferred the Disputed Units to Blue. XRI seeks a ruling that the Blue Transfer was void. If so, then Holifield remained the owner of the Disputed Units, and XRI sent its proposal for a strict foreclosure to the correct party. A victory for XRI in this litigation thus will help XRI prevail in any future litigation over the validity of the strict foreclosure. The question answered in this litigation will not be dispositive in that future litigation, because there will be additional disputes of fact and law

for that litigation to address. At best, therefore, this case is a prelude to another lawsuit. Why would XRI litigate so vigorously if the Disputed Units were worth so little?

The natural inference is that XRI pursued this case precisely because the Disputed Units have significant surplus value. That is why XRI filed this lawsuit over three years after the Blue Transfer took place and at least two years after XRI's governing board made a business decision not to challenge the Blue Transfer. That is why XRI has pushed this lawsuit to a conclusion, even though it is advancing Holifield's legal fees in addition to paying its own.

For XRI, therefore, avoiding the otherwise dispositive defense of acquiescence is critical, and XRI offers two reasons why this court of equity cannot consider it. XRI's first argument asserts that its claim for breach of the No Transfer Provision is a legal claim and that equitable defenses are not available to defeat legal claims. Contrary to XRI's protestations, there are many situations in which a party can raise an equitable defense to defeat a legal claim. History shows that courts of equity originally deployed certain equitable concepts to support the issuance of injunctions against actions at law. Those equitable concepts were, in substance, defenses to actions at law. Acquiescence was one of them. Along with a number of other defenses, acquiescence subsequently crossed the border from equity into law. There is currently no impediment to a defendant raising a defense of acquiescence in response to a legal claim.

XRI's second argument relies on *CompoSecure, L.L.C. v. CardUX, LLC* (*CompoSecure II*), 206 A.3d 807 (Del. 2018).[2] That decision reasons that when parties to an LLC agreement use the word "void" to describe the consequence of a noncompliant act, they have specified that the act is void *ab initio*, with all of the implications that the term carries at common law. Such an act is so egregiously flawed that the parties cannot fix it, whether voluntarily or by conduct. Likewise, in any litigation over the void act, a party cannot invoke equitable defenses to bar the plaintiff from challenging the void act. In short, the act is incurably void.

Under the reasoning of *CompoSecure II*, by using the word "void" to describe the consequence of a breach of the No Transfer Provision, the parties to the LLC Agreement opted for a mandatory and exclusive remedy of incurable voidness. This court is bound by Delaware Supreme Court precedent like *CompoSecure II*. This decision, therefore, must declare that the Blue Transfer was void and grant judgment in favor of XRI.

On the facts of the case, that is an inequitable result, and such an outcome is disquieting to a court of equity. The longstanding role of equity is to ameliorate the occasionally harsh results that a generally sound rule of law can generate. Under

---

[2] There are four decisions in the *CompoSecure* family. *CompoSecure II* affirmed in part and reversed in part this court's decision in *CompoSecure, L.L.C. v. CardUX, LLC* (*CompoSecure I*), 2018 WL 660178 (Del. Ch. Feb. 1, 2018), and remanded the case for further proceedings. The trial court issued its report on remand in the form of *CompoSecure, L.L.C. v. CardUX, LLC* (*CompoSecure III*), 2019 WL 2371954 (Del. Ch. June 5, 2019). The Delaware Supreme Court affirmed *CompoSecure III* in *CompoSecure, L.L.C. v. CardUX, LLC* (*CompoSecure IV*), 213 A.3d 1204 (Del. 2019).

*CompoSecure II*, equity cannot serve that purpose if parties have chosen to use the word "void" to describe the consequence of contractual noncompliance. That approach effectively gives private parties the ability to contract out of equity.

There are reasons to think that the outcome in *CompoSecure II* is not required. In a respectful effort to advance the law, this decision suggests reconsidering the holding of *CompoSecure II* and permitting a court of equity to consider equitable defenses to a breach of contract claim, even when the parties have used the word "void" to describe the consequence of contractual noncompliance. This decision sets out that rationale so that the Delaware Supreme Court may consider it in connection with any appeal. No one should be misled. The approach suggested by this decision does not currently reflect Delaware law.

If the defense of acquiescence were available, then the court would find that XRI acquiesced in the Blue Transfer and could not challenge its validity. The court then would declare that the Blue Transfer caused Blue to become the owner of an assignee interest in the Disputed Units, and the court would grant judgment in favor of Holifield and Blue.

## I. FACTUAL BACKGROUND

Trial took place on June 15, 2022. The parties introduced 292 exhibits and lodged six deposition transcripts. Three fact witnesses testified live. The following factual findings represent the court's effort to distill this record.[3]

---

[3] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the internal page number or, if the document lacked an internal page

**A.      Holifield And Gabriel Form XRI As Part Of A Broader Partnership.**

XRI is a full-cycle water recycling and midstream infrastructure company servicing the energy exploration and production industry. PTO ¶ 8. In 2013, Holifield and Gabriel co-founded XRI's predecessor to explore business uses for non-potable water sources in the oil and gas industry. *Id.*; Gabriel Tr. 63–64. XRI's predecessor was one of approximately a dozen entities that Holifield and Gabriel formed as part of a partnership that pursued business concepts across multiple sectors. *See* PTO ¶¶ 13–14; Holifield Tr. 178–179.

Holifield and Gabriel brought complementary skills to their partnership. Holifield is a scientist with a doctorate in computer engineering. He is also a veteran of the United States Army, having served as an infantry officer, an Explosives Ordinance Disposal officer, and a uniformed scientist. After twenty-two years in the armed services, Holifield retired and began developing new technologies. Holifield Tr. 175–77. He contributed technological, scientific, and analytical ability, as well as defense industry expertise.[4]

---

number, by the last three digits of the JX number. If a trial exhibit used paragraph numbers, then references are by paragraph. The parties reached agreement on a limited number of stipulated facts in the pretrial order. Citations in the form "PTO ¶ —" refer to those stipulated facts. *See* Dkt. 114.

[4] Holifield Tr. 179 ("[M]y strengths are in understanding the core technologies, understanding how those technologies can be applied to a given problem space, and in also understanding how to operationalize those, how to get those into a customer's hands . . . . And then [Gabriel], coming from the private equity world, understood how business structures would work, understood how business organizations would be. He could interface with bankers. He could interface with the outside world in ways that was beneficial to both."); Gabriel Dep. 16 ("It was a good match. He obviously was heavy

Gabriel is a former attorney who spent the majority of his legal career at Kirkland & Ellis LLP. While there, Gabriel practiced corporate law with an emphasis on private equity transactions. Gabriel left the practice of law to join a venture capital client. Through these roles, Gabriel gained "a lot of experience structuring deals as a transaction lawyer and finance guy." Gabriel Tr. 106.

In addition to forming operating entities, Holifield and Gabriel formed Entia as a services company to provide management services and personnel to their operating businesses. At its peak, Entia had about 265 employees. Holifield Tr. 183. Entia itself did not own any interests in the operating businesses; Holifield and Gabriel owned those interests personally. PTO ¶ 14. Holifield controlled Entia, and Gabriel owned a minority stake in the entity. Gabriel Tr. 66; *see also* JX 1.

## B. Holifield And Gabriel Sell A Controlling Interest In XRI To Morgan Stanley.

In August 2016, Holifield and Gabriel sold a controlling interest in XRI's predecessor to funds affiliated with Morgan Stanley (the "Morgan Stanley Sale").[5] XRI emerged from the Morgan Stanley Sale in its current incarnation as a manager-managed Delaware limited liability company with its internal affairs governed by the LLC Agreement. JX 1.

---

science, and I was experienced in working with young start-ups and . . . certainly a lot of experience structuring deals. So it created a nice balance of skills.").

[5] Burt Tr. 6–7; PTO ¶ 15. The specific identities of the funds are not important, and this decision follows the parties' lead in referring to the counterparty as "Morgan Stanley."

Under the LLC Agreement, Morgan Stanley was designated as the "Class A" member and received Class A units. Holifield and Gabriel were designated as the "Class B" members and received Class B units. Holifield's Class B units are what this decision refers to as the Disputed Units. The LLC Agreement established a five-member Board of Representatives (the "Board") to manage the entity. *Id.* § 4.01(a). As the sole Class A member, Morgan Stanley had the right to designate three of the Board members. It named three Morgan Stanley employees: Logan Burt, Mark Bye, and John Moon. The Class B members had the right to designate the other two Board members. Gabriel and Holifield designated themselves.

As part of the consideration for the Morgan Stanley Sale, Holifield arranged for Entia to receive the XRI Loan. Documented by a secured promissory note executed by Entia in favor of XRI, the XRI Loan contemplated a single balloon payment of $10,611,356.88, plus accrued interest, due on August 8, 2020. JX 2 (the "XRI Note"). Holifield executed a personal guaranty in favor of XRI. JX 4. Holifield and XRI also executed a Unit Pledge Agreement, in which Holifield pledged all of the Disputed Units as security for the XRI Note and his guaranty. JX 3; PTO ¶ 18. XRI filed a UCC-1 financing statement with the State of Florida on August 8, 2016, identifying Holifield as the debtor, XRI as the secured party, and the Disputed Units as the collateral. JX 5. Under this structure, if Entia failed to repay the XRI Loan, XRI could levy on the Disputed Units.

After the Morgan Stanley Sale, Gabriel became CEO of XRI. His position reflected the fact that during the years leading up to the transaction, Gabriel had devoted almost all of his time to XRI, while Holifield focused more on their other portfolio companies. *See*

11

Holifield Tr. 189. By becoming CEO, Gabriel achieved a personal goal, and he was proud to "run a company under a financial sponsor the size of someone like Morgan Stanley." Gabriel Tr. 108–09.

The sale of a controlling interest in XRI was a boon to Seth Ellis, the founder and managing partner of a private investment firm that provides capital to middle-market companies. *See* Ellis Dep. 65–66. In late 2015, XRI had obtained a $5 million loan from Penta Mezzanine Fund, which Ellis's firm managed. Holifield and Gabriel used a portion of the proceeds from the Morgan Stanley Sale to repay the loan, and Ellis's firm achieved a return of 65% within ten months. Holifield Dep. 20; Ellis Dep. 74–75. The successful investment cemented a strong professional relationship among Ellis, Gabriel, and Holifield. *See* Gabriel Dep. 42.

## C. Gabriel Helps Holifield Seek Capital For Entia.

In early 2018, Holifield wanted to raise $3.5 million through Entia to provide funding to some of the operating businesses that he and Gabriel co-owned. *See* Holifield Tr. 189–91. Holifield did not have the liquidity to supply the funds personally. Gabriel. Tr. 69–70. Gabriel worked with Holifield to find ways to raise the capital.[6]

_____

[6] Holifield testified credibly that during this period, he and Gabriel had frequent discussions about XRI, Entia, their other portfolio companies, and how to raise capital. Holifield Tr. 190; Holifield Dep. 93–95. Gabriel took a different view, claiming that "at this point the general frequency of [their] conversations was diminishing dramatically." Gabriel Tr. 71. Gabriel's testimony on that point was not credible and reflected his effort throughout the litigation to distance himself from Holifield and align himself with Morgan Stanley. The contemporaneous evidence demonstrates that Gabriel and Holifield were in frequent contact and that Gabriel helped Holifield raise capital. *See, e.g.*, JX 6 (April 26,

As an initial step, Gabriel assigned all of his interests in Entia to Holifield for one dollar. Gabriel was willing to give up his equity for nominal consideration because he believed that Entia was in financial distress. He also thought Holifield would have a better chance of raising capital as the sole owner of Entia. *See* Gabriel Tr. 68–69, 92; JX 50.

More significantly, Gabriel helped Holifield explore how to use the Disputed Units to raise capital. In April 2018, Gabriel spoke with Burt and Moon, two of the Morgan Stanley representatives on the Board, about Morgan Stanley buying some or all of the Disputed Units. Gabriel Tr. 71, 75. After socializing the idea with Morgan Stanley, Gabriel told Holifield to contact Burt, and he provided Holifield with advice about how to pitch Burt on the concept. JX 32; Gabriel Tr. 123–24; Burt Tr. 48–50. Gabriel's guidance was important because Gabriel had a stronger relationship with Morgan Stanley, and dealmaking fell within his skill set. *See* Holifield Dep. 94. Holifield subsequently engaged with Burt, but the two could not agree on a price.

---

2018 email from Gabriel to Bank of America attempting to pull together a loan to buy Holifield's units because Holifield was "in need of cash"); JX 50 (August 24, 2018 email from Gabriel to Holifield "memorializ[ing] in an email some of our verbal exchanges" that the two had over the months since April 6, 2018); Gabriel Tr. 70 ("Through our communication, he had expressed that he was experiencing financial strain."); *id.* at 92 (explaining that Holifield "had been calling [Gabriel] to help think through the interactions with [the] potential buyer" for one of Entia's portfolio companies and describing the points Gabriel raised with Holifield); *see also* Holifield Tr. 192 (explaining that he and Gabriel "would go back and forth on" how Holifield could utilize the excess capital associated with the Disputed Units "without interfering with the existing . . . operating agreements"); *id.* at 203–04 (testifying that Gabriel helped him with "everything from the inception" of the Assurance Loan and "the very ideas around [the structure of the loan] are ones that came out of the exchanges with [Gabriel].").

13

After the conversation with Morgan Stanley went nowhere, Gabriel explored potentially purchasing some of the Disputed Units himself. PTO ¶ 27; Gabriel Tr. 71, 158. On April 26, 2018, Gabriel provided detailed information to a personal contact at Bank of America/Merrill Lynch ("BAML") to facilitate a loan of $2.5 million to purchase 2,502 of the Disputed Units. JX 6; *see also* Gabriel Tr. 71, 110. Gabriel's email included EBITDA projections for XRI, a capitalization table, information about the members' capital accounts, and a "future exit scenario" along with the "implied waterfall" for the Disputed Units based upon a sale of XRI for $400 million. JX 6; Gabriel Tr. 110–11. At trial, Gabriel agreed that the $400 million figure was realistic. *See* Gabriel Tr. 111. Gabriel asked Moon whether Morgan Stanley would support his purchase of some of Holifield's units. When Moon was cool to the idea, Gabriel stopped pursuing it.[7]

A third possibility was another loan from Ellis. Holifield contacted Ellis, and in early May 2018, Ellis raised the topic with Gabriel. Ellis suggested that the two discuss the concept of a loan during a meeting on May 8, when they were scheduled to visit a company that Ellis was considering as a potential investment. *See* PTO ¶ 28; JX 10.

---

[7] *See* Gabriel Tr. 71. Gabriel communicated regularly with Moon about XRI and the events underlying this litigation. During his deposition, Moon had a remarkable failure of memory that prevented him from recalling anything of substance about those events. Moon Dep. 17–20, 22–23, 25–26, 28–29, 31, 33–34, 38–39, 41, 44–45, 47–49, 51, 53, 55, 57, 59–62, 64–73. Moon further claimed that he did not read all of Gabriel's emails and instead relied on Burt for information about the XRI investment. *Id.* at 63, 76. Moon's strategic disavowal of any knowledge about the relevant events weighed against XRI's position in this case.

When they met on May 8, 2018, Ellis raised the subject of the loan and asked Gabriel for his "opinion of [Holifield's] financial status." Gabriel Tr. 112–14, 118. Gabriel told Ellis that Holifield had "got[ten] ahead of himself" financially and that "he needed this loan to help . . . get these other entities up and running." Ellis Dep. 154–55. Ellis understood that Holifield had valuable assets and that Holifield "just needed to get himself in order." *Id.* at 155. Ellis had the impression that Gabriel "wanted [him] to help [Holifield] and help Entia."[8]

On May 9, 2018, Gabriel sent Holifield a detailed spreadsheet that Gabriel had created. JXs 11–11.1. The spreadsheet included a capitalization table, referenced Holifield's $20 million capital account and the XRI Loan, and modeled potential exit scenarios with the associated waterfall of proceeds at valuations ranging from $250 million to $600 million. Gabriel Tr. 118; JX 11.1. Gabriel's spreadsheet showed that the Disputed Units had substantial value in excess of the amount due on the XRI Loan and would support an additional loan like the one that Ellis had discussed with Gabriel. *See* Gabriel Tr. 119 ("Certainly a loan could be constructed where folks are comfortable with [Holifield's] position in XRI."). In credible testimony, Holifield described Gabriel's models as "the most accurate depiction" of what would happen in an exit. Holifield Tr. 211. Based on the

---

[8] Ellis Dep. 89. Ellis testified credibly about the tenor of the meeting, which is consistent with the contemporaneous documents. At trial, Gabriel portrayed the tenor of the meeting differently. He claimed that he warned Ellis that Holifield "was struggling financially and that [Ellis] should proceed with caution." Gabriel Tr. 72. That testimony was another example of Gabriel attempting to downplay his support for Holifield.

context and subject matter of the spreadsheet, it is clear that Gabriel sent the spreadsheet to Holifield to help him secure a loan from Ellis.[9]

**D. Burt Tells Holifield To Keep Any Transaction On His "Side Of The Ledger."**

Holifield and Ellis decided to move forward with a loan to Entia from Assurance Mezzanine Fund III, a fund that Ellis managed (respectively, the "Assurance Loan" and "Assurance"). Holifield knew that Ellis viewed the Disputed Units as an important source of collateral and wanted some form of security interest in them. Holifield also knew that the Disputed Units already provided security for the XRI Loan and that Morgan Stanley would reject any transaction structure that impaired XRI's rights. Gabriel and Holifield brainstormed ways to structure a loan so that the arrangement would be acceptable to Morgan Stanley while providing some degree of protection to Assurance.

The initial plan was for Assurance to receive a pledge of the Disputed Units that would be junior to the pledge that secured the XRI Loan. Before approaching Morgan Stanley about the idea, Holifield consulted with Gabriel. Holifield Tr. 195. Holifield understood that after their discussion, Gabriel "previewed" the concept with Morgan Stanley. *Id.* at 197–98.

On May 21, 2018, after Gabriel had raised the idea with Morgan Stanley, Holifield called Burt. *See* JX 17. Under the LLC Agreement, any formal pledge of the Disputed Units

---

[9] At trial, Gabriel testified that he had sent the spreadsheet because Holifield asked for it and that he never spoke about the spreadsheet with Holifield or Ellis. Gabriel Tr. 117–19. That testimony was not credible.

required Board approval, and Holifield asked Burt to have the Board sign off on Assurance receiving a second-position pledge, junior to XRI's rights. After the call, Holifield sent Burt an email that summarized the proposal and described a draft pledge agreement. Burt Tr. 49; JX 17. Burt forwarded Holifield's email to the other Morgan Stanley representatives on the Board, noting that "[a]ny pledge of these securities would require XRI board approval." JX 17.

Within a few days, Burt informed Holifield that the proposed pledge agreement was unlikely to receive Board approval. PTO ¶ 32; Burt Tr. 25–26. But Burt also reassured Holifield that Morgan Stanley was not attempting to interfere with his efforts to raise capital for Entia. Holifield Tr. 197. Holifield believed that Gabriel and Morgan Stanley "were genuinely trying to think through [the situation] to try to figure out how to make something happen." *Id.* at 197–98.

Holifield asked Burt if Morgan Stanley would support a loan if he "could set something up where [they] completely isolated the loan . . . without affecting the interest, pledging the interest directly." *Id.* at 197. Burt told Holifield that as long as he kept the arrangement "on [his] side of the ledger," then Morgan Stanley "didn't care." *See id.*; JX 28. Holifield reasonably understood Burt to be saying that "effectively, as long as [Holifield] could set up a structure in which there was no direct pledge of the units themselves, and [Holifield] kept all of the risk that was associated with that on [his] side, on the Entia side, then that would be satisfactory." Holifield Tr. 197.

Holifield's recollection of his call with Burt rings true.[10] It makes sense from a business perspective that Morgan Stanley did not want anyone else to have a security interest that could let them foreclose on the Disputed Units, while at the same time not wanting to interfere with Holifield's efforts to raise financing for Entia and his other businesses. Gabriel and Holifield had founded those businesses, and they were key stakeholders in XRI. Morgan Stanley had an interest in keeping them happy, as long as their plans did not prejudice XRI's rights in the Disputed Units.

## E.    The New Structure

After the call with Burt, Gabriel and Holifield brainstormed structures that would keep a loan on Holifield's "side of the ledger." Holifield also worked with his lawyers and with Assurance on a structure that would meet Burt's requirement.

One necessary implication of Burt's comment was that Morgan Stanley would not object if Holifield borrowed the amounts personally, without giving Assurance any security interest specific to the Disputed Units, such that Assurance simply became a general

---

[10] At trial, Burt could not recall making the statement about Holifield keeping the transaction "on [his] side of the ledger." Burt Tr. 26–27, 52. He did not deny saying it; he just could not recall "the exact words that were used." *Id.* at 27. He claimed that Morgan Stanley would not approve the pledge because "it didn't seem to be in the company's interests to have those units further borrowed against." *Id.* at 26. Holifield gave persuasive testimony about the call, supporting the findings of fact in the text. Contemporaneous communications support Holifield's account. After his call with Burt, Holifield told Entia's counsel about the call. In a subsequent email, Entia's counsel repeated the comment back to Holifield. Holifield Tr. 199; *accord* JX 28 ("Remember they said, as long as you keep it on your side of the ledger, [Holifield], we don't care what you do.").

18

creditor of Holifield. Unless Morgan Stanley was OK with that outcome, there was no way for Holifield to keep a loan on his side of the ledger. Under the general creditor scenario, any rights that Assurance received would be unsecured. Not only would Assurance's claim be junior to XRI's secured claim under the XRI Loan, but Assurance would have rights on par with Holifield's other general creditors, such as the banks that issued him credit cards. Like those other creditors, Assurance would be able to pursue Holifield and any of his assets in the event of a default, including the Disputed Units. Moreover, one of the remedies that Assurance and Holifield's other general creditors could obtain was a charging order against the Disputed Units that would give the creditors rights to any distributions that the units generated, including the net proceeds from a sale of the Disputed Units (after payment of the XRI Note). Indeed, under Delaware law, a charging order is the *exclusive* remedy that a judgment creditor can obtain.[11] Assurance would not, however, have any special rights to foreclose on and take possession of the Disputed Units.

---

[11] *See* 6 *Del. C.* § 18-703(d) ("The entry of a charging order is the exclusive remedy by which a judgment creditor of a member or a member's assignee may satisfy a judgment out of the judgment debtor's limited liability company interest . . . ."); Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 5.21[C], at 5-88 (2d ed. 2019) ("The DLLC Act states expressly that the entry of a charging order is the exclusive remedy by which a judgment creditor of a member or of an assignee may satisfy a judgment out of the judgment debtor's limited liability company interest."). The implications of this limited remedy for purposes of asset protection are well understood and explained at length elsewhere. *See generally* Jay D. Adkisson, *The Charging Orders Practice Guide: Understanding Judgment Creditor Rights Against LLC Members* (2018); Jay D. Adkisson, *Charging Orders: The Peculiar Mechanism*, 61 S.D. L. Rev. 440 (2016); Carter G. Bishop, *LLC Charging Orders: A Jurisdictional & Governing Law Quagmire*, 12 Bus. Entities 14 (2010).

Gabriel and Holifield did not think that Assurance would want to be on the same level as Holifield's other general creditors, so they discussed whether Holifield could agree to provide Assurance with an earmarked right to the net proceeds of any sale of the Disputed Units, but only *after* Holifield received them. Under that arrangement, Assurance would not receive any rights in the Disputed Units per se, but if a sale of the units resulted in Holifield receiving money, then Assurance would have a right to that money once it reached Holifield's pocket. Gabriel and Holifield concluded that the structure would work under the LLC Agreement, but Gabriel thought that no creditor would ever go for it. Gabriel told Holifield that "[Holifield would] never be able to find somebody who would get comfortable with that, and that whoever took a transaction like that would be extremely exposed around any number of ways that [Holifield] could divert . . . those funds in debt." Holifield Dep. 71. In other words, once the cash reached Holifield's pocket, it would be a fungible part of Holifield's assets and available for any claims by his other creditors, not just claims by Assurance.

The question then became whether there was a way to elevate Assurance's claim to the proceeds from a sale of the Disputed Units above the claims of Holifield's other general creditors, while still maintaining Assurance's status as an unsecured general creditor so as not to threaten XRI's rights in the Disputed Units. Holifield's counsel thought of isolating the Disputed Units in a special purpose vehicle ("SPV"), such as a newly formed LLC, then having the SPV borrow from Assurance. Assurance would not receive any security interest in the Disputed Units; instead, Assurance would remain a general creditor of the SPV. But as long as Assurance was the *only* general creditor of the SPV, Assurance would

20

have priority over Holifield's other general creditors as to any net proceeds that the SPV received from the Disputed Units, after the payment of the XRI Note. And Assurance could obtain a charging order against the Disputed Units at the level of the SPV, while general creditors only could obtain a charging order against the units of the SPV. By placing the units in the SPV, Holifield would structurally subordinate the claims of his other general creditors. For its part, XRI would be unaffected. By virtue of its security interest in the Disputed Units, XRI would continue to enjoy its exclusive status as the only secured creditor with a perfected security interest, and XRI would be the only creditor that actually could levy on the Disputed Units (as opposed to obtaining a charging order against them). Assurance would end up in an intermediate position between XRI and Holifield's other creditors, but without receiving a separate security interest in the Disputed Units that XRI would need to approve.

For purposes of a loan to Entia, however, the structure required one more twist. Entia needed to be the borrower, not the SPV. The solution was for the SPV to promise to pay over to Entia any net proceeds that the SPV received from a sale of the Disputed Units, putting Entia (rather than Assurance) in the structurally senior position relative to Holifield's other general creditors. Entia, in turn, would grant Assurance a security interest in its assets, including its contractual right to receive any net proceeds generated by a sale of the Disputed Units. Relative to any general creditors of Entia or Holifield, Assurance would have priority in Entia's rights. As a backstop, Holifield and the SPV would guarantee the repayment of the Assurance Loan. Once again, XRI's position would be unaffected. XRI would continue to enjoy its exclusive status as the only secured creditor

21

with the ability to levy on the Disputed Units. Assurance would not have a security interest in the Disputed Units.

On May 24, 2018, Holifield's counsel[12] sent an email to Assurance's counsel that described the concept they had developed:

> [Holifield] would transfer his XRI equity into a new limited purpose SPV and we would get the requisite consents and docs executed to effect [sic] that transfer under the XRI loan docs and XRI LLC Agreement (where it's a Permitted Transfer). Assurance would loan $3.5mm to Entia, secured by an all assets pledge at Entia and the attached Guaranty by [Holifield]. SPV would assign its rights to the proceeds of the XRI equity to Entia. When XRI is sold, the proceeds would first repay XRI in satisfaction of its note and lien on the XRI equity, and the remainder would be transferred to Entia to repay Assurance.

JX 27. The reference to a "Permitted Transfer" recognized that under the LLC Agreement, Holifield was entitled to transfer the Disputed Units to a wholly owned affiliate for purposes of estate planning. JX 1 at § 8.01(a)(iii).

Placing the Disputed Units in an SPV generated other benefits for Holifield, including an enhanced ability to engage in estate planning.[13] It is clear, however, that the

---

[12] Technically, the lawyers were representing Entia, but the distinction is not important for this decision.

[13] Assuming the SPV was an LLC, Holifield could design a bespoke entity that would enable him to assign interests in the entity to his heirs through devices designed to minimize taxes. The use of LLCs for this purpose is well understood and explained at length elsewhere. *See generally* Robert G. Alexander & Dallas E. Klemmer, *Creative Wealth Planning with Grantor Trusts, Family Limited Partnerships, and Family Limited Liability Companies*, 2 Est. Plan. & Cmty. Prop. L.J. 307, 316–19 (2010); Sandra K. Miller, *What Buy-Out Rights, Fiduciary Duties, and Dissolution Remedies Should Apply in the Case of the Minority Owner of A Limited Liability Company?*, 38 Harv. J. on Legis. 413, 420–21, 426–33 (2001); Dale A. Oesterle & Wayne M. Gazur, *What's in A Name?: An*

specific impetus for placing the Disputed Units in an SPV was to facilitate the Assurance Loan. Rothbaum Dep. 121. Holifield had not planned to transfer the Disputed Units to an SPV separate and apart from the Assurance Loan, and he never created any formal estate plan. Holifield Tr. 202.

Through this structure, Holifield and his counsel believed that they would keep the transaction on Holifield's "side of the ledger," just as Morgan Stanley wanted. XRI's rights would be preserved, and XRI would be no differently situated than if no transfer of the Disputed Units had taken place and Assurance had made an unsecured loan to Holifield personally. Relative to Holifield's other general creditors, however, Assurance would gain a priority in any net proceeds from a sale of the Disputed Units, after full payment of the XRI Loan. Relative to XRI, Assurance would remain a junior creditor, and its claim would be unsecured.

## F.    The Blue Transfer

After coming up with the structure that he and his advisors believed would keep the Assurance Loan on his side of the ledger, Holifield informed Gabriel that he planned to obtain additional capital from Assurance. He also told Gabriel that he planned to transfer the Disputed Units to Blue. Gabriel Tr. 121–22. Holifield subsequently explained to Burt that he was making the transfer "for estate planning purposes and that he planned to

---

*Argument for A Small Business "Limited Liability Entity" Statute (with Three Subsets of Default Rules)*, 32 Wake Forest L. Rev. 101, 133 (1997).

23

exercise rights available to him under the documents without a request for board approval."
Burt Tr. 29.

On May 29, 2018, Holifield's counsel sent an email to Assurance's counsel, copying Ellis, Holifield, and other members of the deal team. The email addressed what language to include in the governing documents for Blue. In connection with any Permitted Transfer, the LLC Agreement required that both the transferring member and the Permitted Transferee "execute documentation reasonably acceptable to the Board documenting such Transfer, which may include provisions giving rights of approval with respect to amendments of the governing documents and material contracts (to the extent relating to the relevant Units or other Company Interests) of the Permitted Transferee to the Company." JX 1 at § 8.01(e). The LLC agreement for Blue was a "material contract" that Holifield would have to provide to XRI in connection with a Permitted Transfer.

In the email, Holifield's counsel acknowledged that the parties were "resigned to transferring the XRI equity to the new SPV and jumping through the hoops" necessary to keep the transaction on Holifield's side of the ledger. *See* JX 28; PTO ¶ 33. The question was whether the LLC agreement for Blue should include language documenting that Entia was entitled to receive the net proceeds from a sale of the Disputed Units, after satisfaction of the XRI Loan. Holifield's counsel feared that if the LLC agreement for Blue specifically called out this arrangement, then Morgan Stanley or XRI might slow down the process with questions on issues that ultimately did not concern them. Holifield's counsel reasoned that because the arrangement did not affect XRI's side of the ledger, there was no need for disclosure. She wrote:

24

As a practical matter, XRI will only send on the net proceeds to the SPV (*i.e.*, they will keep the $10mm+ to repay their own loan), so there's no real waterfall, only a repayment of the Assurance loan. But if we flag this in the Operating Agreement that Morgan Stanley and XRI have to approve i/c/w the transfer of the equity into the SPV, then we may be inviting trouble with Morgan Stanley. *Remember they said, as long as you keep it on your side of the ledger, [Holifield], we don't care what you do.* So we'd rather not have any mention of the loan or the repayment in the docs that Morgan Stanley approves. Assurance will have a first and exclusive lien on the Entia assets. Any problem with the Operating Agreement providing that the proceeds go to Entia? *[Morgan Stanley] would have no problem with that and then we keep them out of our loan arrangements, which has been the goal from Day 1.*

JX 28 (emphasis added).

Throughout this litigation, XRI has contended that this email demonstrates an intent by Holifield and his counsel to defraud XRI by withholding information about the structure of the Assurance Loan. That is not how I view the evidence. I find that Holifield and his counsel believed—reasonably and in good faith—that they had created a mechanism that did not affect XRI's side of the ledger. They also believed, based on Burt's comment to Holifield, that Morgan Stanley did not want XRI to be involved in Holifield's efforts to raise capital. Acting in good faith, Holifield and his counsel made a reasonable decision not to include information that they believed would slow down the transaction, but ultimately not affect the deal's structure.

On May 30, 2018, Holifield's counsel sent Holifield an email that attached a set of proposed documents that would transfer the Disputed Units to Blue while preserving all of XRI's rights as a secured creditor. The documents consisted of the following:

1) The formation documents for [Blue].
2) The Contribution and Assumption Agreement wherein [Holifield] transfer[s] [his] XRI interests to [Blue] and, as a condition to that transfer,

25

[Blue] agree[s] to assume the obligations of a Member of XRI, guaranty [sic] the Entia loan and pledge the XRI stock to secure that guaranty.

3) The [Blue] Guaranty and a redline to [the] existing Guaranty of the Entia loan.

4) The [Blue] Pledge Agreement and a redline to [the] existing pledge in support of the Entia loan.

JX 144; *accord* PTO ¶ 35. Holifield's counsel expressed her belief that "the transfer of the [Disputed Units] to [Holifield's] new SPV is a transfer to a Permitted Transferee under Section 8.0l(a)(iii) and the definition of Permitted Transferee in the XRI LLC Agreement, and therefore requires no XRI or Morgan Stanley consent." JX 144.

Holifield's counsel informed Holifield that her email "can be forwarded as is to Matt Gabriel" and was designed "to make it as easy as possible for XRI to expeditiously clear [the transaction]." PTO ¶ 36; JX 144. Holifield forwarded the email with attachments to Gabriel the same day. PTO ¶ 37; JX 168. Gabriel then forwarded it to Burt with the supportive comment that it seemed "well thought through by counsel." PTO ¶ 37; JX 31; Gabriel Tr. 80, 123. Burt promptly forwarded the emails to XRI's lawyers and asked to schedule a phone conference to discuss the documents. JX 32.

On June 5, 2018, after conferring with the Board and XRI's counsel, Gabriel signed off on the transaction. He wrote to Holifield that based on "the understanding that the transfer that you are proposing is indeed a Permitted Transfer, then the consent of [the] Board is not required. Please be advised though that the board consent requirements set forth in the [LLC Agreement] with respect to subsequent Transfers . . . will remain in effect." JX 37.

Gabriel told Holifield that it made sense "to limit the documents that XRI is signing to those for which XRI's signature is strictly required." *Id.* As Holifield's counsel had anticipated, XRI and Morgan Stanley wanted to limit their involvement and only sign the documents that they needed to approve.

With the goal of minimizing XRI's involvement, Gabriel asked Holifield to make modifications to the documents.

> I would kindly request that you please deliver executed copies of the contribution, assignment and assumption agreement (with a provision giving XRI third party beneficiary status), the new guaranty (removing the signature block for XRI), the new pledge (which I will countersign on XRI's behalf as an acknowledgement of receipt), as well as a new financing statement to be filed. Please also confirm when you deliver these documents that your personal guaranty remains in force.

PTO ¶ 38; JXs 37, 167.

Holifield forwarded Gabriel's email to his counsel that same day. She responded that "it's ok to sign the 3 XRI docs and get [Gabriel] to countersign the Pledge Agreement. They're all dated tomorrow but *there's no real uncertainty about closing Assurance* and even if it fell through you'd still have an SPV structure which is preferable to you personally." JX 39 (emphasis added).

The following day, Holifield forwarded the email from his lawyer to Gabriel with revised versions of the identified documents, as well as a signed copy of the Unit Pledge Agreement under which Blue pledged its ownership interest in the Disputed Units as security for the XRI Loan (the "Blue Pledge"). *See* JXs 38, 39.5. Demonstrating that neither Holifield nor his lawyer was trying to hide the Assurance Loan, the forwarded email

included the full email from Holifield's counsel, including the statement that "there's no real uncertainty about closing Assurance."

In a later email on June 6, 2018, Holifield sent Gabriel executed copies of the following additional documents: (i) a Contribution, Assignment and Assumption Agreement executed by Holifield and Blue (the "Contribution Agreement"), (ii) a guaranty executed by Blue for the XRI Note, and (iii) a UCC-1 Financing Statement identifying Blue as the debtor. JX 40; JXs 40.1–0.3 (collectively with the Blue Pledge, the "Blue Transfer Documents"). In the email, Holifield wrote: "I confirm that my personal guarantee remains in force. Please provide the countersigned copy of the pledge agreement at your earliest convenience." JX 40.

The Blue Transfer Documents ensured that XRI retained all of its rights to levy on the Disputed Units, notwithstanding their transfer to Blue. The Blue Pledge made the Disputed Units available to XRI as collateral for the XRI Note. Blue did not make a similar pledge to Assurance in connection with the Assurance Loan.

After receiving the Blue Transfer Documents, Gabriel countersigned the Blue Pledge on behalf of XRI. PTO ¶ 39; JX 42.1. The Blue Pledge was the only document in the package of Blue Transfer Documents that XRI executed.

## G.    Entia Closes The Assurance Loan.

On June 6, 2018, the same day everyone believed that the Blue Transfer became effective, the Assurance Loan closed. PTO ¶ 40. Holifield, Entia, and Assurance executed a number of documents to effectuate the Assurance Loan (the "Assurance Loan Documents"). Key documents included:

28

- A note purchase agreement establishing the terms of the loan that Assurance made to Entia. JX 83.6.

- A note reflecting Entia's obligation to repay $3.5 million to Assurance. JX 83.8.

- A guaranty in favor of Assurance in which Blue guaranteed the repayment of the note. JX. 83.9.

- A guaranty in favor of Assurance in which Holifield guaranteed the repayment of the note. JX 83.10.

- A security agreement in which Entia granted Assurance a first-priority security interest in all of Entia's assets as collateral for the note. JX 83.11.

- A side letter between Assurance, Entia, and Blue that imposed additional restrictions on Blue's use of the Disputed Units and gave Assurance the right to any proceeds from a sale of the Disputed Units, if and when received by Blue. JX 83.7 (the "Side Letter").

All of the documents were dated as of June 6, 2018. *See* JX 83.6–.11.

As noted, the Side Letter granted Assurance the right to receive any net proceeds that Blue, Entia, or Holifield received in the event of a sale of the Disputed Units, after satisfaction of the XRI Note. JX 83.7 § 2. The intent of the Side Letter was to give Assurance a right to "claim the proceeds, [but] not to have any secured interest in the [Disputed Units] itself." Ellis Tr. 264, 271–72 ("[W]hat our loan was based on was simply what proceeds he would get from a sale."). The Side Letter specified that it would "govern and control" in the event of any conflict or inconsistency with any of the Assurance Loan Documents. JX 83.7. Holifield testified that the idea to give Assurance the right to net proceeds "came out of the exchanges with [Gabriel]." Holifield Tr. 204.

The Assurance Loan Documents were carefully drafted *not* to give Assurance any security interest in or direct claim against the Disputed Units. The note purchase agreement

29

gave Assurance a right to proceed against the "Collateral," as defined in the security agreement. JX 83.6 § 3. The latter agreement defined the "Collateral" as only encompassing property owned or acquired by Entia. JX 83.11 § 1. The definition included all "contract rights . . . payment intangibles and general intangibles" as well as any "substitutes or replacements for any Collateral," including "all cash or non-cash proceeds . . . [or] income … receivable on account of the Collateral." *Id.* § 1(h). The Collateral thus extended to Entia's rights under the Side Letter and any amounts Entia received pursuant to those rights, but it did not extend to any assets of Blue, and it specifically did not extend to the Disputed Units.

Neither Holifield nor his counsel provided the Assurance Loan Documents to XRI until April 2019, when XRI requested them. In this litigation, XRI has claimed that Holifield and his counsel hid the documents from XRI because they knew that the Assurance Loan and Blue Transfer were structured in a way that violated the LLC Agreement. That is not how I view the evidence. Here too, I believe that Holifield and his counsel believed—reasonably and in good faith—that they had created a mechanism that did not affect XRI's rights and did not require XRI's approval. Equally important, based on Burt's comment to Holifield about keeping any transaction on his side of the ledger and Gabriel's comment about XRI not wanting to sign any documents that XRI was not required to approve, they believed—reasonably and in good faith—that Morgan Stanley did not want XRI to be involved in any capital-raising efforts by Holifield, unless its approval was contractually required. Holifield and his counsel made a good faith decision not to provide documents to XRI that they believed XRI did not want or need to see.

30

On June 13, 2018, Ellis sent Gabriel an email stating: "We closed on [Holifield's] loan as you know." JX 43; PTO ¶ 41. Gabriel did not express surprise. He did not follow up with Ellis or ask for any relevant details or documents. Gabriel Tr. 129–33. He also did not inform Burt, the Board, or XRI's counsel that the Assurance Loan had closed. *Id.* at 129–33. Gabriel was already in the loop about the Assurance Loan and understood what was going on.[14]

Over the following months, Gabriel emphasized his role in helping Holifield secure financing for Entia as part of his efforts to convince Holifield to restore the equity interest in Entia that Gabriel had transferred to Holifield for one dollar. On August 24, 2018, after a series of discussions, Gabriel sent the following email to Holifield:

> As you know, I sent an email on April 6th proposing the assignment of my ownership interest in certain companies to you. As my cover email to the assignment suggested, I was doing this with the intent of giving you more flexibility to raise additional funds—as it appeared it was necessary for the long-term survivability of the broader set of entities. At the time, you were specifically looking at a capital raise / debt from a group out of New York— the terms of which were not completely transparent. . . . *In the end, however, with my assistance, you were able to move in a different direction and pull in capital from a different source on more appropriate terms.* As we have since discussed by phone multiple times, neither of us in the end believes assigning my interest is the appropriate course of action and our mutual intent [is] to ignore and rescind any prior assignment and continue with our

---

[14] At trial, Gabriel acknowledged that the closing of the Assurance Loan did not come as a surprise to him, but he claimed that he only had a "casual understanding that discussions were being had" and "casual knowledge that [Holifield] was pursuing the loan with Assurance." Gabriel Tr. 76, 89–90, 129. That testimony was not credible. The record as a whole demonstrates that Gabriel had been discussing the loan and its structure with Holifield in real time and had more than casual knowledge about these topics.

partnerships as previously conducted. Please confirm this is how you see it as well.

JX 50 (emphasis added). Gabriel confirmed that the "assistance" he was taking credit for was his assistance with the Assurance Loan. Gabriel Tr. 137. As a result of this email, Gabriel recouped his interests in Entia and its portfolio companies. *Id.* at 136–37.

## H. Entia Needs More Capital.

On January 15, 2019, Entia received an additional $300,000 from Assurance to fund payroll and benefits at the operating businesses. *See* JX 59 at 3. Entia and Assurance amended the note purchase agreement to reflect the increased borrowings. The structure of the Assurance Loan did not change. PTO ¶ 43.

In early March 2019, Entia needed yet more capital. As he had done in 2018, Holifield asked Gabriel whether XRI might purchase some of his units. PTO ¶ 44. As in 2018, Gabriel told Holifield to approach Morgan Stanley. *See* Gabriel Tr. 139.

On March 7, 2019, Holifield drafted an email to Burt about his desire to sell his equity in XRI. Consistent with their normal practice, Holifield sent the draft to Gabriel for him to review. *See* Gabriel Tr. 140; Gabriel Dep. 111–13. Gabriel made a number of edits. Notably, he struck the following sentence: "In conversation about where things stand for me, [Gabriel] mentioned there has been recent interest in Morgan Stanley deploying additional capital." JX 61. He also wrote to Holifield that "[i]f it is no difference to you, I would appreciate it if I was left out by name." *Id.* That email provides direct evidence of Gabriel trying to distance himself from Holifield to preserve his relationship with Morgan Stanley.

Holifield sent the email with Gabriel's edits to Burt on March 8, 2019. JX 62. Holifield and Burt subsequently had a series of discussions. As in 2018, they were unable to reach an agreement on the terms. Gabriel Tr. 141.

As in 2018, another possibility was for Gabriel to purchase some of the Disputed Units himself. *Id.* Gabriel did not have funds readily available for that purpose, but Holifield suggested that Assurance could loan Gabriel the money to purchase some of the Disputed Units using a structure that was similar to the Assurance Loan. *Id.* at 98–99. Ellis also spoke with Gabriel about the structure of the Assurance Loan. *Id.* at 100–01.

Gabriel testified that based on these conversations, he became concerned that the Blue Transfer and the Assurance Loan violated the LLC Agreement. Gabriel Dep. 75–80, 99. Gabriel told Holifield that he intended to inform the Board about his concerns. *Id.* at 99, 141–42. On cross-examination, Gabriel conceded he "had not received any specific information in the form of paperwork to be able to form an opinion." Gabriel Tr. 103. My impression is that Gabriel wanted to be on Morgan Stanley's good side, worried about his personal involvement in facilitating the Assurance Loan, and concluded that his own interests were best served by being the one who provided the information to Morgan Stanley.

Between March 22 and April 1, 2019, Gabriel sent XRI's outside counsel the emails he received in May and June 2018 from Holifield and Assurance about the formation of Blue and the Blue Transfer. JXs 67–70. On April 12, 2019, the XRI lawyers sent Holifield a letter in which they asserted that the Blue Transfer "may be violative of Section 8.01 of the LLC Agreement, and therefore may be void and constitute breach of such agreement."

33

JX 72.1 at 2. XRI's counsel requested all documentation related to the Assurance Loan and the Blue Transfer. PTO ¶ 46.

Holifield was surprised by the April 12 letter. Holifield Tr. 204–06. He believed that Gabriel had been involved in the transaction all along, that XRI and Morgan Stanley knew about the transaction, and that he had done exactly what Morgan Stanley wanted. *Id.* at 205–06. Holifield and his counsel believed that Morgan Stanley was playing "some kind of game" in an effort to acquire the Disputed Units. *Id.* at 206. But after some internal deliberation, Holifield and his counsel concluded that they had nothing to hide, so they sent the documents to XRI's counsel. PTO ¶ 47. In the transmittal letter, Holifield's counsel represented that the Blue Transfer complied with the LLC Agreement. JX 83.12 at 1–2.

Between April 18 and May 6, 2019, XRI's lawyers reviewed the documents for the Assurance Loan. JXs 84–88. During the review, XRI's lawyers formed "a strong opinion" that the Assurance Loan was "a violation" of the LLC Agreement. Gabriel Tr. 144–45.

On May 6, 2019, XRI's lawyers informed Holifield that XRI was continuing "to review the situation to determine the extent to which Mr. Holifield has breached his ongoing obligations." PTO ¶ 49; JX 89. XRI reserved its rights but did not take any further action.

According to Gabriel, XRI's review "stayed in a nonconclusive state" for the next eighteen months. Gabriel Tr. 145–46; Gabriel Dep. 136. That was not credible. In reality, Morgan Stanley decided that the matter was not worth pursuing. Burt candidly conceded that fact: "[W]e had made a business judgment that it wasn't worth the hassle and legal expense to clarify a position that the company didn't need to clarify." Burt Tr. 54. It was

34

not until eighteen months later, in October 2020, that XRI would reverse that decision, and it was not until twenty months later, in December 2020, that XRI would assert that the Blue Transfer was void.

## I.     Holifield Defaults On The XRI Loan.

Over the following months, Entia's financial position worsened. In August 2019, Assurance loaned Entia an additional $472,081.94, and the parties amended the note purchase agreement to reflect the increased borrowings. PTO ¶ 50. By the end of 2019, Entia was unable to pay its debts as they came due. By that point, at least seven lawsuits had been filed against Entia and Holifield for unpaid debts.[15]

The XRI Loan was scheduled to mature on August 8, 2020. As the date approached, Burt and Holifield began to discuss the need for repayment. Holifield expressed concern about his ability to make the payment on the maturity date. To prevent a default, Holifield and Burt engaged in discussions about "how to settle or restructure the debt." Burt Tr. 41. The discussions broke down after Burt threatened that if Holifield did not agree to a deal, then XRI could simply take the Disputed Units. Holifield Tr. 208. Holifield made clear to Burt that he disagreed and that XRI could not take the Disputed Units "without paying

---

[15] *See Bank of Am., N.A. v. Holifield*, No. 35-2020-CC-000016 (filed Dec. 31, 2019); *Belford v. Holifield*, No. 2019-CA-012580 (filed Oct. 14, 2019); *Seacoast Nat. Bank & Trust v. Holifield*, No. 2019-CA-002916-14C-G, (filed Sept. 13, 2019); *The SolidExperts, Inc. v. Entia, LLC*, 2019-CA-002743-16-W (filed Sept. 5, 2019); *Am. Express Nat. Bank v. Holifield*, No. 35-2019-CA-001398 (filed June 28, 2019); *David Jakubs v. Entia, LLC*, No. 2019-CA-000325 (filed Jan. 30, 2019); *Frontier Tech., LLC v. Entia*, No. 2018-CC-003585-20-s (filed Oct. 18, 2018).

35

[Holifield] a fair market price." *Id.* When Burt doubled down, Holifield "decided to leave it at that point."[16]

On August 8, 2020, the XRI Note came due. Holifield did not pay, resulting in a default. PTO ¶ 51.

On August 12, 2020, XRI's lawyers sent Holifield a letter, transmitted by email, that notified him of the default. PTO ¶ 52; JXs 102–2.1. The physical address that appeared in the letter was the address for notice found in the XRI Note. JX 2 § 9. That address was for a building in Lake Mary, Florida, that Holifield and Gabriel previously owned and had used as Entia's headquarters. Gabriel Dep. 10–11. As Gabriel knew, that building had been sold, and Entia had vacated it eight months earlier in January 2020.[17]

Having received the letter by email, Holifield immediately responded. PTO ¶ 53. His response provided the address for his home in Eustis, Florida, and his cover email provided the address for Entia's office in Sanford, Florida. *See* JXs 103–3.1.

---

[16] Holifield Tr. 208. Burt recalled the discussions differently. In a *Rashomon*-like split in narrative, he testified that after XRI proposed to accept a partial payment from Holifield, "[Holifield] did not engage" and "just stopped communicating." Burt Tr. 41. It is possible that both witnesses are accurately reporting their recollections of the same conversation, with each recalling the exchange with a dose of self-justifying spin. Overall, Holifield was the more credible witness, and his account rings truer than Burt's claim that Holifield simply stopped responding for no reason.

[17] Gabriel testified that despite being the owner of the building, he lacked any knowledge of the property's sale or the date that Entia vacated the property. *See* Gabriel Dep. 157. That testimony was not credible.

In his response, Holifield objected to any effort by XRI to foreclose on the units without taking commercially reasonable steps. He stated:

> Based on recent financial performance of XRI Investment Holdings LLC, it is clear that the value of the [Disputed Units] far exceeds the amount of secured debt. Accordingly, I am writing to request your cooperation in a reasonable marketing and sale process so that the actual value of the [Disputed Units] can be realized. Please contact me at your earliest convince [sic] so that we may discuss the terms of a forbearance so that a marketing and sale process can be undertaken as soon as possible.

JX 103.1. The letter specifically referenced the UCC and stated: "To the extent that you seek to exercise remedies and dispose of [the Disputed Units], I expect that you will comply with all applicable requirements of the Uniform Commercial Code, including the requirement to conduct such sale in a commercially reasonable manner." *Id.*

XRI did not respond to Holifield's letter. Gabriel claimed at trial that to have followed a "reasonable marketing and sale process" would have been "horrifically damaging to XRI." Gabriel Tr. 152. He claimed that XRI viewed a sale process "as not a reasonable or viable option to pursue." *Id.*

## J.     The Strict Foreclosure

XRI claims that at some unidentified point in October 2020, the Board decided that the Blue Transfer was invalid and that the proper course of action was to engage in a strict foreclosure of the Disputed Units. PTO ¶ 54; JX 131. There are no contemporaneous documents memorializing or reflecting these decisions or the basis for them. Holifield was a member of the Board at that time, yet no one bothered to tell him about the Board's decision before XRI pursued a strict foreclosure. Gabriel Tr. 150. In fact, Gabriel understood that the members of the Board who made the decision—the Morgan Stanley

37

representatives and Gabriel—decided "not [to] memorialize, in any minutes or other writing, the Board determination about the [Blue Transfer]." *Id.*

Under Section 9-620 of the UCC, a strict foreclosure is supposed to be a consensual transaction, effectuated through an agreement reached between the secured creditor and the debtor after the occurrence of a default. But the UCC deems a non-consumer debtor to have consented to a strict foreclosure if the secured creditor makes an unconditional proposal to the debtor to accept the collateral in full satisfaction of the loan and the debtor fails to respond within twenty days after the proposal is sent.

On October 16, 2020, XRI's lawyers delivered a letter by Federal Express ("FedEx") to Holifield at the defunct Lake Mary address. PTO ¶ 55; JX 105. This time, XRI did not email a copy to Holifield, as it had with its August 12 letter. XRI did not attempt to provide Holifield with notice at any other address either, such as the home address that Holifield had provided in his response or the office address for Entia that appeared in his cover email. In the October 16, 2020 letter, XRI made a proposal to Holifield to accept the Disputed Units in full satisfaction of the XRI Note. JX 105 at 2.

Holifield was in San Diego, California on October 16, 2020. He never received the FedEx. Holifield Tr. 255. He did not sign the FedEx delivery confirmation, which only reflects the handwritten letters "C19" in the signature box. *Id.* at 210, 255–56; JX 158. Under FedEx's procedures, those letters denote that the package was delivered without signature because of Covid-19. As noted, the Lake Mary building had been sold in early 2020 and was unoccupied as of October 16. Holifield Tr. 209.

On November 30, 2020, XRI sent another letter to Holifield, this time sending a copy via email. The letter stated that because Holifield "did not timely object or respond" to the October 16 proposal, XRI had accepted the Disputed Units in satisfaction of the XRI Note. PTO ¶ 56; JX 116. On the same day, XRI sent a letter to Holifield removing him from the Board. *See* JX 176. XRI sent that letter to Holifield at his home address, copied him by email, and also copied Holifield's counsel. *Id.*

On December 15, 2020, Holifield sent a letter to XRI on behalf of Blue in which he objected that the strict foreclosure was "invalid and void." JX 153. He noted that Blue owned the Disputed Units, that Blue had not received a proposal from XRI, and that Blue had not agreed to the strict foreclosure. Hollifield also explained that he had never received the October 16 proposal, and he accused XRI of taking "deliberate steps to conceal the proposal." *Id.* He noted that "XRI delivered the proposal to an address that XRI knew was no longer valid," and that "although XRI's consistent past practice ha[d] been to provide a courtesy copy via electronic mail to Mr. Holifield of any communications or notices, XRI chose not to send the proposal by email." *Id.* The letter directed XRI to send any further communications to Holifield's home address. *Id.*

In a letter dated December 18, 2020 sent via email, XRI's counsel maintained that the strict foreclosure was effective. JX 154. In that letter, counsel argued that XRI had proceeded properly by sending its proposal to Holifield because the Blue Transfer was invalid. *Id.* That was the first time that XRI definitively took the position that the Blue Transfer was void, as opposed to merely suggesting the possibility. According to XRI, the strict foreclosure resulted in XRI owning the Disputed Units, the elimination of Holifield's

39

Class B membership interest, and the zeroing out of Holifield's capital account, which had a positive balance of $20 million. Holifield Tr. 208–09; JXs 116, 154.

## K. Litigation Ensues.

On June 18, 2021, Assurance filed a lawsuit in Texas state court (the "Texas Action"). *Assurance Mezzanine Fund III, L.P. v. XRI Invest. Hldgs. LLC*, No. 2021-36737 (269th Dist. Ct. Harris Cnty., Tex. June 18, 2020). Assurance claimed that it had standing as a creditor of Blue to challenge the strict foreclosure because the Disputed Units were an asset of Blue, Assurance's debtor. Assurance alleged that XRI carried out an invalid foreclosure in order to "hinder, delay, and defraud" Holifield's other creditors. JX 117 ¶ 1. In its petition, Assurance sought a declaratory judgment that the strict foreclosure was null and void because, among other things, XRI proceeded against Holifield rather than Blue and failed to provide notice to all relevant parties. Assurance also asserted claims for fraudulent transfer, for unjust enrichment, and for violation of the provisions in the UCC governing strict foreclosures. *Id.* ¶¶ 46–63. Assurance sought the remedies available under Section 24.008 of the Texas Uniform Fraudulent Transfer Act. *See* Tex. Bus. & Com. Code § 24.008; JX 117 ¶ 60.

XRI responded to the Texas Action by filing this action against Holifield and Assurance on July 19, 2021. Dkt. 1. XRI sought to defeat Assurance's contention that it had proceeded incorrectly against Holifield rather than Blue by establishing that the Blue Transfer was void from the outset. With the benefit of such a declaration, XRI planned to return to the Texas Court and contend that it proceeded properly against Holifield, because Holifield had always owned the Disputed Units as a matter of law.

40

Assurance challenged XRI's ability to sue in this court. On October 27, 2021, XRI amended its complaint, dropped Assurance as a defendant, and added Blue. Dkt. 21.

On November 23, 2021, Holifield and Blue moved to stay this proceeding in favor of the Texas Acton. Dkt. 26. The court denied the motion to stay, making clear that it only would address the issues of Delaware law implicated by this case and would not address the validity of the strict foreclosure. Dkt. 47. On March 3, 2022, Holifield and Blue answered the complaint and invoked the affirmative defenses of waiver, estoppel, acquiescence, laches, and unclean hands. JX 123.

Discovery followed. A one-day trial was held on June 15, 2022. After the conclusion of trial, XRI and Assurance settled the Texas Action. The parties to this case nevertheless insist that a determination of who owns the Disputed Units is critical and will affect any future litigation over the validity of the strict foreclosure.

In this litigation, XRI has claimed to believe that the value of the Disputed Units was less than the amount due on the XRI Note such that Holifield benefited from the strict foreclosure. Holifield, by contrast, testified that the value of the Disputed Units was $40 to $50 million, net of approximately $12.3 million in principal and interest that he owed on the XRI Note. Holifield Tr. 211. The financial information that Gabriel provided to BAML supported Holifield's assessment. *See* JX 11.1.

This decision does not provide any opportunity to opine on the value of the Disputed Units. The fact that both sides have litigated extensively and in multiple jurisdictions over issues that could affect XRI's ability to retain the Disputed Units provides some corroboration for Holifield's testimony that the value of the units far exceeds the amount

41

due on the XRI Loan. The burden of this litigation is all the more significant for XRI, because XRI is advancing Holifield's fees in addition to paying its own.

Morgan Stanley and Gabriel are the only other members of XRI. To the extent XRI can defend the strict foreclosure, then Morgan Stanley and Gabriel capture proportionate shares of any excess value through their ownership interests in XRI. Their gain, of course, comes at Holifield's expense.

## II.    LEGAL ANALYSIS

Section 8.01 of the LLC Agreement establishes a general prohibition on members transferring their member interests, which this decision has labeled the No Transfer Provision. Holifield contends that the Blue Transfer fell within an exception to the general rule that this decision has labeled the Permitted Transferee Exception. Holifield failed to prove that Blue met one of the requirements for a Permitted Transferee. The parties have debated whether Blue met a second requirement, and that issue presents a close question, but this decision does not reach it. One failure is sufficient to cause the Blue Transfer to violate the No Transfer Provision.

Section 8.01 of the LLC Agreement also establishes a general rule that prohibits members from placing any form of encumbrance on their member interests (the "No Encumbrance Provision"). Whether the Blue Transfer violated the No Encumbrance Provision presents another close question, and once again this decision does not reach it. XRI's failure to prove a violation of the No Encumbrance Provision would not cure the violation of the No Transfer Provision, and any breach of the No Encumbrance Provision would be cumulative. One breach of Section 8.01 is sufficient to warrant relief.

42

In response, Holifield asserts that the equitable defense of acquiescence bars XRI's claim of breach and prevents XRI from receiving any relief. Holifield proved all of the elements of acquiescence. If the court can consider the defense, then XRI cannot prevail.

To head off Holifield's defense, XRI first argues that a court of equity cannot consider equitable defenses when the plaintiff has asserted a claim at law. That broad statement misinterprets extant authority and runs contrary to the long-standing relationship between law and equity. Parties can raise many equitable defenses in response to claims at law. The defense of acquiescence is one of them.

XRI next argues that under *CompoSecure II*, when parties to an LLC Agreement use the word "void" to specify the consequences of breach, then they have agreed that the noncompliant act is void *ab initio*. This argument succeeds. Under the common law, a transaction that is void *ab initio* is incurably void, and a party cannot invoke equitable defenses to validate the transaction. So serious are the consequences of incurable voidness that its application is reserved for acts that are egregiously flawed because they are contrary to positive law or a fundamental public policy. The *CompoSecure II* decision allows parties to opt contractually for that outcome.

In an effort to avoid the implications of *CompoSecure II*, Holifield argues that a different provision in the LLC Agreement governs the Blue Transfer. That provision addresses a situation in which a Permitted Transferee initially qualifies as such, then subsequently fails to meet a requirement. That provision mandates that the erstwhile Permitted Transferee return the units to the original member. Holifield argues that because

43

that provision applies and does not use the word "void," he can invoke the equitable defense of acquiescence.

Contrary to Holifield's argument, the validity of the Blue Transfer must be measured as of June 6, 2018, when the Blue Transfer became effective and the Assurance Loan closed. The question in this case is whether the Blue Transfer satisfied the Permitted Transferee Exception as of that date. There were no material events that happened in the months or years after the Blue Transfer, before XRI pursued this litigation, that caused Blue to qualify no longer as a Permitted Transferee. The alternative provision therefore does not apply.

Under *CompoSecure II*, the Blue Transfer was void *ab initio*. This court must follow binding Delaware Supreme Court precedent. This decision therefore holds that the Blue Transfer was void *ab initio* and that the defense of acquiescence cannot be considered.

On the facts of this case, that result is inequitable. The persistent role of equity has been to ameliorate the sometimes harsh consequences that can result from the blanket application of a generally sound rule of law. When a court cannot consider equitable defenses, it cannot fulfill that role.

In an effort to advance the development of the law, this court respectfully submits that the concept of contractually specified incurable voidness is worth re-examining. This decision identifies considerations which suggest that an act only should be void *ab initio* if it exceeds the authority conferred on parties by the state. A contractual restriction, however framed, should not result in the noncompliant act being void. When parties contract for a

44

consequence of invalidity, the consequence should be that the act is voidable, not incurably void. Put differently, parties should not be able to contract out of equity.

## A. Principles Of Contract Interpretation

To evaluate XRI's claims for breach of contract, the court must interpret the LLC Agreement. When engaging in that inquiry, the court "applies the same principles that are used when construing and interpreting other contracts." *Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018). "When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). The "contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (cleaned up). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

45

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley*, 41 A.3d at 385 (footnote omitted). If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity." *Salamone*, 106 A.3d at 374. Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." *Id.* (cleaned up). A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "When the terms of an agreement are ambiguous, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Sun-Times Media Gp. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (cleaned up). "[T]he private, subjective feelings of negotiators are irrelevant and unhelpful to the Court's consideration of a contract's

meaning, because the meaning of a properly formed contract must be shared or common."

*United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (footnote omitted).

**B.      The Claim For Breach Of The No Transfer Provision**

XRI contends that the Blue Transfer violated the No Transfer Provision. In its entirety, that provision states:

> Unless expressly contemplated by another provision of this Agreement, no Member may Transfer any of its Units or other Company Interests except, subject to this Article VIII,
>
> (i) as required by Section 2.02(c), Section 8.04 or Section 8.05,
>
> (ii) to the Company pursuant to an Award Agreement or Section 8.09,
>
> (iii) to a Permitted Transferee,
>
> (iv) with the written consent of the Board or
>
> (v) in the case of a Class A Member, to any Person or group of Persons so long as such Class A Member complies with Sections 8.04 and 8.05, if applicable.

JX 1 § 8.01 (formatting added).

As the party claiming breach of the No Transfer Provision, XRI bore the initial burden of showing a violation. XRI carried it easily, because no one disputes that the Blue Transfer constituted a transfer that would violate the general rule unless an exception

47

applied. Holifield was a "Member"[18] who engaged in a "Transfer"[19] of the Disputed Units to another "Person,"[20] namely Blue.

The question instead is whether the Blue Transfer fell within the Permitted Transferee Exception. As the party relying on the exception, Holifield bore the burden of meeting its requirements.[21]

---

[18] "Member" is defined as "each of the Class A Members, the Class B Members and the Management Members, or any other Person who becomes a member of the Company in accordance with this Agreement, in each case in such Person's capacity as a member of the Company, until such time as such Person ceases to hold any Company Interests." JX 1 § 1.01.

[19] "Transfer" is defined as "any direct or indirect sale, transfer, assignment, pledge or other disposition (whether with or without consideration and whether voluntary or involuntary or by operation of law)." JX 1 § 1.01.

[20] "Person" is defined as "an individual, corporation, partnership, association, trust, limited liability company or any other entity or organization, including a Governmental Authority." JX 1 § 1.01.

[21] *See, e.g.*, *Menn v. ConMed Corp.*, 2022 WL 2387802, at *25 (Del. Ch. June 30, 2022) (holding that where the plaintiff proved that the defendants breached their obligation to make accelerated payments under a provision of a stock purchase agreement, the defendants bore "the burden of proving the existence of [an] exception" to that provision); *Snow Phipps Gp., LLC v. Kcake Acq.*, Inc., 2021 WL 1714202, at *29 (Del. Ch. Apr. 30, 2021) ("Kohlberg bore the initial, heavy burden of proving that an event had occurred that had or would reasonably be expected to have a material adverse effect on DecoPac. If Kohlberg met that burden, then Plaintiffs bear the burden of proving that the relevant event fell within the exception . . . ." (cleaned up)); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *51 (Del. Ch. Nov. 30, 2020) ("Buyer had the burden to prove that Seller suffered an effect that was material and adverse. After that, Seller had the burden to prove that the source of the effect fell within an exception"), *aff'd*,268 A.3d 198 (Del. 2021).

From an evidentiary standpoint, the allocation of the burden to Holifield did not make a difference. Had the burden been allocated to XRI, the factual findings would have

48

The LLC Agreement defines "Permitted Transferee" as follows:

[W]ith respect to any Class B Member or Management Member, any Person meeting all of the following requirements:

(a) such Person is (i) the spouse of such Member, (ii) a lineal descendant of such Member, (iii) any trust, family partnership or limited liability company, the sole beneficiaries, partners or members of which are such Member or Relatives of such Member or (iv) any heir of any such Member who is deceased,

(b) the applicable Transfer to such Person is made without consideration and

(c) such Member or his or her heirs or legatees have at all times (including after the subject Transfer) the exclusive right to exercise and perform all rights and duties under this Agreement associated with the ownership of the applicable Transferred Units.

*Id.* § 1.01 (formatting added). For the Permitted Transferee Exception to apply, Holifield had to show that the Blue Transfer met each requirement.

No one disputes that the Blue Transfer complies with the first requirement, which is satisfied as long as the transferee is "any trust, family partnership or limited liability company, the sole beneficiaries, partners or members of which are such Member or Relatives of such Member." Throughout the time relevant to this decision, Blue was a limited liability company that was and remained wholly owned and controlled by Holifield, *i.e.*, "such Member" who effectuated the transfer.

---

been the same. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012) (holding that allocation of the burden of proof did not constitute reversible error because the allocation had only a "slight" or "modest" effect that only would arise if the evidence "stood in equipoise").

Holifield failed to prove that the Blue Transfer complies with the second requirement, namely that the Blue Transfer was "made without consideration" (the "Without Consideration Requirement"). He failed to make the necessary showing because XRI proved that the Blue Transfer must be considered as part of the Assurance Loan under the step-transaction doctrine, meaning that the Assurance Loan provided consideration for the Blue Transfer.

Holifield also was obligated to prove that the Blue Transfer complied with the third requirement, namely that Holifield retained "at all times (including after the subject Transfer) the exclusive right to exercise and perform all rights and duties under [the LLC Agreement] associated with the ownership applicable Transferred Units" (the "Exclusive Authority Requirement"). Because this decision has determined that Holifield failed to satisfy the Without Consideration Requirement, it does not reach the Exclusive Authority Requirement. To the extent that issue becomes pertinent at a later stage of the case, such as following an appeal, then the court can address it. *CompoSecure III*, 2019 WL 2371954, at *5 (holding on remand that contract violated provision in LLC agreement after Delaware Supreme Court held that the application of the provision could change the outcome), *aff'd*, *CompoSecure IV*, 213 A.3d at 1205.

By failing to prove that the Blue Transfer satisfied the Without Consideration Requirement, Holifield failed to show that Blue was a Permitted Transferee. Accordingly, the Permitted Transferee Exception did not apply, and the Blue Transfer violated the No Transfer Provision.

50

### 1. The Without Consideration Requirement

The Without Consideration Requirement mandates that a transfer be made "without consideration." JX 1 § 1.01(b) Holifield asserts the Blue Transfer was made without consideration because it merely involved a transfer of the Disputed Units from Holifield to Blue. In that transaction, Holifield did not receive anything, and Blue did not pay anything. The Disputed Units simply moved from Holifield to Blue.

The LLC Agreement does not define the term "consideration." A dictionary definition of that term is "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee." *Consideration*, Black's Law Dictionary (11th ed. 2019). Relying on that definition, Holifield argues that he did not receive anything in return for transferring the Disputed Units to Blue. He maintains that the Blue Transfer is a distinct act, separate from any other step that he took. He concludes that the Without Consideration Requirement was met.

Holifield's argument runs contrary to the plain language of the Contribution Agreement. A recital to that document states: "WHEREAS, in exchange for [Holifield's] capital contribution to [Blue] of all of the [Disputed] Units and as a condition thereto, [Blue] has agreed to enter into a guarantee of the Entia Loan . . . and a Pledge Agreement with respect to the [Disputed] Units . . . ." JX 83.2 at 1. The same agreement recites that it was entered into "in consideration of the mutual covenants contained herein and other good and valuable consideration." *Id.* The Contribution Agreement thus demonstrates that Holifield received consideration for the contribution of the Disputed Units in the form of Blue's agreement to provide a guaranty and enter into the Blue Pledge Agreement. At the

51

time, Entia was wholly owned by Holifield, so the consideration that Entia received plainly benefited Holifield. In the guaranty Holifield executed in favor of Assurance, he represented that he was the sole member of Entia and thus "a principal beneficiary of the credit to be extended by [Assurance] to [Entia]." JX 83.10 § 1(f). In the guaranty Blue executed in favor of Assurance, Blue represented that its sole member (Holifield) was also the sole member of Entia and thus "an [sic] direct or indirect beneficiary of the credit to be extended by [Assurance] to [Entia]."[22]

XRI argues that if the language of the Contribution Agreement were not enough, the Blue Transfer nevertheless was obviously part of the Assurance Loan, and it is plain that Holifield received consideration through the Assurance Loan in the form of a capital infusion for Entia of $3.5 million. To make this argument, XRI relies on the step-transaction doctrine. That doctrine "treats the 'steps' in a series of formally separate but

---

[22] JX 83.9 § 1(f). Alternatively, one might argue that as consideration for contributing the Disputed Units to Blue, Holifield received the member interest in Blue, but it is not possible to read the receipt of an equity interest in the Permitted Transferee as a form of consideration that would violate the Without Consideration Requirement. The express language of the definition of a Permitted Transferee encompasses "any trust, family partnership or limited liability company, the sole beneficiaries, partners or members of which are such Member or Relatives of such Member." Such an entity typically will be created in connection with the transfer itself. In that event, the member or the relatives will receive the interest in the entity in conjunction with the transaction. Treating the interest in the entity as consideration that would violate the Without Consideration Requirement would force the member to use an already existing entity, or to create an entity and then allow it to season sufficiently so that the transfer could be viewed as distinct. Such an interpretation would unduly restrict the use of the Permitted Transferee Exception and is not reasonable.

related transactions involving the transfer of property as a single transaction if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan." *Noddings Inv. Gp., Inc. v. Capstar Commc'ns, Inc.*, 1999 WL 182568, at \*6 (Del. Ch. Mar. 24, 1999) (cleaned up), *aff'd*, 741 A.2d 16 (Del. 1999).

### 2.  The Step-Transaction Doctrine

"The purpose of the step transaction doctrine is to ensure the fulfillment of parties' expectations notwithstanding the technical formalities with which a transaction is accomplished." *Coughlan v. NXP B.V.*, 2011 WL 5299491, at \*7 (Del. Ch. Nov. 4, 2011). The step-transaction doctrine is one manifestation of the general equitable principle that a court of equity will "look beyond form to the substance of an arrangement." *Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007). When applying the step-transaction doctrine, this court does not allow "transactional creativity" to "affect how the law views the substance of what truly occurred." *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at \*10 (Del. Ch. Sept. 14, 2007) (quoting *Gatz*, 925 A.2d at 1281).

The step-transaction doctrine applies if the component transactions meet one of three tests. First, under the "end result test," the doctrine will apply "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." *Williams Field Servs. Grp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350, at \*29 (Del. Ch. Sept. 25, 2019) (cleaned up), *aff'd*, 237 A.3d 817 (Del. 2020) (TABLE). Second, under the "interdependence test," the doctrine will apply if "the steps are so interdependent that the legal relations created by one

53

transaction would have been fruitless without a completion of the series." *Noddings*, 1999 WL 182568, at *6 (cleaned up). Third, under the binding-commitment test, "a series of transactions are combined only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps." *Id.* (cleaned up).

As the party seeking to invoke the step-transaction doctrine and treat the Blue Transfer as part of the Assurance Loan, XRI bore the burden of satisfying its requirements. XRI carried its burden under the end result test and the interdependence test.

### a. The End Result Test

The end result test examines whether two nominally separate transactions "were part of a unitary plan cast from the outset to achieve the ultimate result." *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *7 (Del. Ch. Mar. 26, 2018) (cleaned up). Evidence that nominally separate transactions were planned and carried out in unison suggests "a conscious plan to achieve a particular end point." *Liberty Media Corp. v. Bank of N.Y. Mellon Tr. Co.*, 2011 WL 1632333, at *18 (Del. Ch. Apr. 29, 2011), *aff'd*, 29 A.3d 225 (Del. 2011); *see also Twin Bridges Ltd.*, 2007 WL 2744609, at *10 (holding that a merger and amendment to a partnership agreement were two "parts of an integrated two-step transaction" where the actions were "developed by [p]laintiffs to avoid an ongoing stalemate between the general partners" and plaintiffs arranged for the separate transactional documents "to become effective on the same day").

The Blue Transfer was part of a unitary transaction designed to generate a loan in which Assurance held rights as a creditor in the proceeds of any sale of the Disputed Units that were junior to XRI's rights under the XRI Loan but senior to the rights of any general

creditors of Holifield or Entia. The origin, evolution, and ultimate structure of the Assurance Loan demonstrate that the Blue Transfer was part of a single, overarching transaction.

Holifield and Assurance initially attempted to create the priority structure for the Assurance Loan through the straightforward mechanism of a second-priority security interest in the Disputed Units. They contemplated Holifield making a junior pledge of the Disputed Units in favor of Assurance. By virtue of having a second-position security interest in the Disputed Units, Assurance's claim would be senior to Holifield's general creditors, but junior to the XRI Loan. But the straightforward mechanism was no longer available after Morgan Stanley refused to approve the pledge.

Holifield and his counsel therefore developed an alternative that was designed to achieve the same result. The first step was to move the Disputed Units into Blue, thereby structurally subordinating the interests of Holifield's general creditors. Those creditors only would have a right to obtain a charging order against Holifield's member interest in Blue. Such an order would entitle them to receive distributions made on the member interest in Blue. It would not enable them to levy on Blue's assets.

The second step was to create an obligation on behalf of Blue that would have priority over any obligation to distribute amounts to Blue's equity. The lawyers for Holifield and Assurance accomplished that goal in two ways. One mechanism was the obligation that the Side Agreement imposed on Blue to pay over the net proceeds from any sale of the Disputed Units to Entia. *See* JX 83.7 § 2. That meant that instead of any amounts from a sale of the Disputed Units being available to distribute to the holder of Blue's

55

member interest, and potentially to the holders of a charging order attached to those interests, the funds would go to Entia. Once the funds reached Entia, they would be used to repay the Assurance Loan, which was secured by a first-priority security interest in all of Entia's assets. The other mechanism was Blue's guaranty, which Assurance required as a condition precedent to the Assurance Loan. Ellis Dep. 179–81. The guaranty meant that if Entia defaulted on the Assurance Loan, then Assurance would have a direct claim against Blue as a general creditor of Blue. In that capacity, Assurance would have a claim against proceeds of a sale of the Disputed Units that would attach before any funds were available for distribution to the holder of Blue's member interest, and potentially to the holders of a charging order attached to those interests. Notably, the Side Letter prohibited Blue from taking on any other debt without Assurance's consent, so Assurance could prevent any other creditor from obtaining an interest in Blue that would either be senior to or *pari passu* with those claims.

The final step in that structure was for Assurance to loan money to Entia, secured by a first-priority security interest in all of Entia's assets. By virtue of that interest, Assurance gained a first-priority claim on any proceeds that Assurance paid to Entia.

Notably, this structure did not prejudice XRI in any way, because it did not affect the XRI Loan or XRI's interest in the Disputed Units. As the only creditor with a pledge of the units, XRI was the only party that could levy on the Disputed Units themselves. XRI thus held the senior claim on any proceeds from a sale of the Disputed Units and could use those proceeds to satisfy the XRI Loan. The only effect of the structure was to give Assurance priority over Entia and Holifield's general creditors. By forming Blue, engaging

56

in the Blue Transfer, and structuring the Assurance Loan in this fashion, Holifield put Assurance in the same position that it would have occupied if Morgan Stanley had simply approved a second-position pledge of the Disputed Units. Assurance held an interest that was senior to any general creditors of Entia or Holifield, but junior to the first-position lien that XRI held against the Disputed Units themselves. Relative to XRI, Assurance had the same priority that it would have had if Assurance had simply extended an unsecured loan to Entia that Holifield guaranteed. Relative to Holifield and Entia's general creditors, Assurance achieved priority.

As discussed in the Factual Background, the contemporaneous documents demonstrate that this was the plan all along. After Morgan Stanley rejected the second-position pledge, Holifield's counsel described a version of the structure in an email to Assurance, noting that as a result of the structure, "[w]hen XRI is sold, the proceeds would first repay XRI in satisfaction of its note and lien on the XRI equity, and the remainder would be transferred to Entia to repay Assurance." JX 27. Entia's general counsel understood that the Blue Transfer was accomplished to facilitate the Assurance Loan. Holifield Tr. 226–27. When documenting the transaction, counsel for Holifield and Assurance created and updated checklists that tracked the status of the transactional documents for both the Assurance Loan and Blue Transfer.[23] All of the documents for the

---

[23] *See, e.g.*, JX 41 (email thread from June 4–6, 2018 with "list of items deemed to be open in connection with closing"); JX 145.5 (June 4, 2018 draft schedule of closing documents including open items for both the Blue Transfer Documents and Assurance Loan Documents).

Blue Transfer and Assurance Loan were executed on June 6, 2018, and both transactions closed the same day. *See* JX 83.2–.11. Holifield agreed at trial that the Blue Transfer was accomplished to facilitate the Assurance Loan. Holifield Tr. 233. Internally, Ellis referred colloquially to the Disputed Units as part of the security for the Assurance Loan. *See* JX 59 at 4.

The trial evidence demonstrates that Holifield and his counsel developed and implemented a plan to facilitate a loan in which Assurance would have a priority that was junior to XRI but senior to Holifield and Entia's other creditors. That is the outcome that the Blue Transfer and the Assurance Loan achieved. As a result, the transaction satisfies the end result test.

### b. The Interdependence Test

The analysis in the preceding section also shows that the Blue Transfer must be viewed as part of the Assurance Loan under the interdependence test. That test applies when a transaction is "so interdependent" with one or more other transactions that "the legal relations . . . would have been fruitless without a completion of the series." *Noddings*, 1999 WL 182568, at *6 (internal quotation marks omitted).

In this case, Assurance could not have achieved the relative priority that it gained without the Blue Transfer. That step was necessary to create the structure that subordinated Holifield's general creditors and which enabled Entia to hold a creditor's claim against Blue. Without that step, Assurance only could achieve the status of a general creditor of Holifield.

58

### 3. Holifield's Responses

To defeat the application of the step-transaction doctrine, Holifield argues that he would have entered into the Blue Transfer anyway, even without the Assurance Loan. He also argues that Assurance would have extended the Assurance Loan even without the Blue Transfer. These arguments most clearly seek to defeat the interdependence test, but they also undercut the end result test to the extent that the Blue Transfer did not contribute meaningfully to the end result of the Assurance Loan.

According to Holifield, he would have entered into the Blue Transfer anyway because the transaction generated estate-planning and creditor-protection benefits. Those benefits were real, and it is theoretically possible that Holifield might have engaged in a transfer of the Disputed Units to achieve them. In this case, however, they were secondary. As Holifield's lawyer explained, they were nice things to have even if the Assurance Loan did not go through. *See* JX 39. They were not, however, the driving force behind the decision to transfer the Disputed Units. The purpose of that step in the transaction was to create a structure that would subordinate Holifield's general creditors and create a route for any net proceeds generated by a sale of the Disputed Units to flow to Assurance. The impetus for the Blue Transfer was to achieve the business objective of giving Assurance that level of relative priority. The fact that the transfer generated other benefits for Holifield does not defeat the operation of the step-transaction doctrine.

Holifield also maintains that Assurance would have made the Assurance Loan even without the complex structure that the lawyers created, and Ellis testified that Assurance might have extended the loan if Holifield owned the units personally. Ellis Tr. 262–63,

59

277–78. The balance of the evidence outweighs that testimony. Holifield and Assurance went to great lengths to structure the Assurance Loan so that Assurance would have structural priority that was junior to the XRI Loan but senior to all of Entia and Holifield's general creditors. Without that structure, Assurance would have had the same rights against Holifield or Entia as all of their other general creditors. If Holifield and Entia could not pay their bills as they came due, and if they liquidated all of their assets to pay off their debts, then Assurance would have participated *pro rata* with other creditors in any recovery. As Gabriel advised Holifield during their discussions about possible sources of financing, for a lender merely to have the same right to the proceeds from a sale of the Disputed Units as other general creditors was not an attractive prospect. Holifield Dep. 71.

There is no persuasive evidence that Assurance evaluated the possibility of a loan to Holifield based on the strength of his overall balance sheet, taking into account all of his assets and liabilities. Assurance underwrote the loan based on its view of the potential value of the Disputed Units and its expectation that it would have access to the remaining proceeds generated by any sale of XRI after the XRI Loan was satisfied. Ellis Tr. 276–79.

Taken as a whole, the evidence does not make a convincing showing that Assurance would have extended a $3.5 million loan to Holifield for Entia without the structural protections that the lawyers created through the Blue Transfer. The Assurance Loan and the Blue Transfer were closely tied together. They were designed to generate a single result—a loan in which Assurance's interest in any proceeds from a sale of the Disputed Units would be junior to XRI but senior to Holifield's general creditors, and the Blue Transfer was a necessary part of achieving that result.

60

**4.      Holifield Failed To Satisfy The Without Consideration Requirement.**

Because XRI proved that the step-transaction doctrine applies, the Blue Transfer must be viewed as part of the Assurance Loan. That result is consistent with the Contribution Agreement, which provided that as consideration for that contribution, Blue provided Assurance with a guaranty and entered into the Blue Pledge. *See* JX 83.2 at 1.

Viewed through the lens of the Assurance Loan, it is clear that Holifield received consideration in the transaction. He obtained $3.5 million in capital for Entia, plus a structure that could and did support additional borrowings on two occasions. The Blue Transfer, therefore, failed the Without Consideration Requirement. It consequently did not fall within the Permitted Transferee Exception, and it violated the No Transfer Provision.

**C.      The Claim For Breach Of The No Encumbrance Provision**

XRI separately contends that the Blue Transfer violated the No Encumbrance Provision. That provision forbids a member from placing any form of encumbrance on their member interests. In its entirety, the No Encumbrance Provision states:

> Notwithstanding the foregoing or any other provision of this Agreement, no Member shall pledge, borrow against, collateralize, otherwise encumber or allow any Liens to exist on any of the Units or Company Interests except
>
> (x) with the written consent of the Board or
>
> (y) in connection with a pledge of Units to the Company as collateral to secure such Member's obligations under a promissory note or guarantee of indebtedness to the Company approved by the Board.

JX 1 §8.01(a) (formatting added). XRI claims that the Blue Transfer violated the No Encumbrance Provision because Holifield borrowed against, collateralized, encumbered, and allowed "Liens" to exist on the Disputed Units.

61

Holifield disputes that characterization. He distinguishes between a right attached to or associated with the Disputed Units themselves and a right to a share of the proceeds from any distribution generated by a sale of the Disputed Units, after those proceeds reach Holifield's pocket. He insists that Assurance only received the latter.[24] As a result, relative to XRI, Assurance only received rights against the Disputed Units comparable to what a general creditor would have received if Holifield had taken out an unsecured personal loan. He argues with considerable force that the No Encumbrance Provision cannot reasonably be read to extend to the types of rights that a general creditor would receive, because such a reading would mean that Holifield could not take on any debt at all, even ordinary consumer debt like a credit card.

---

[24] Assurance did receive a security interest in Entia's assets, but that interest did not encompass the Disputed Units (which were owned by Blue). At best, therefore, Assurance received a security interest in the contractual right to the net proceeds from any sale of the Disputed Units that the Side Letter created. There is an argument that Entia's right under the Side Letter to the net proceeds from a potential sale of the Disputed Units could not support a security interest, effective as of the date of the Side Letter, because "[a] contract to make a future assignment of a right, or to transfer proceeds to be received in the future by the promisor, is not an assignment." *Restatement (Second) of Contracts* § 330 (Am. L. Inst. 1981 & Supp. 2021) [hereinafter Restatement (Second) of Contracts]; *accord id.* cmt. b ("A promise by an obligee that he will collect money due him and pay over all or part of it to the promisee is not an assignment."). Rather than operating as an assignment that can support a security interest, "the effect of such a contract on the rights and duties of the obligor and third persons is determined by the rules relating to specific performance of contracts." *Id.* § 330. *See generally Comment Contract Rights As Commercial Security: Present and Future Intangibles*, 67 Yale L.J. 847, 853 (1958). Under the rules governing specific performance of contracts, any right to payment that Entia possessed would not ripen and become enforceable until the Disputed Units generated proceeds, and the relative rights of Blue's creditors would be determined at that time. *See id.* at 858. It is thus possible that Assurance did not receive an effective security interest, even against Entia.

Analyzing these issues requires a lengthy journey. The odyssey starts with the plain language of the No Encumbrance Provision, which contains a list of terms—many of them undefined—that warrant a consistent interpretation under the doctrine of *noscitur a sociis.* The next leg is to apply the meaning of those terms to the rights that the Blue Transfer and the Assurance Loan created. That effort requires considering the rights that Blue actually received, because after the Blue Transfer, Blue was never admitted as a member of XRI. The Blue Transfer thus resulted in Blue becoming the holder of an assignee interest shorn of member rights. That effort also requires an examination of the rights that the Assurance Loan actually created, because Holifield, Assurance, and their lawyers took pains to draft around the No Encumbrance Provision by only giving Assurance a claim on the net proceeds once they reached Holifield's pocket, rather than any interest in the Disputed Units themselves.[25] And it requires examining statements that Assurance made and the relief it sought in the Texas Action, because the parties disagree about whether Assurance

---

[25] This court previously addressed a similar issue, and if this decision had reached the No Encumbrance Provision, then the reasoning of that decision would need to be evaluated carefully, because the case explores incompletely the distinction between an interest in a right tied to an ownership interest in an entity, and a right to whatever cash that interest might generate once it reaches a particular person's pocket. *See Cap. Gp. Cos., Inc. v. Armour*, 2005 WL 678564 (Del. Ch. Mar. 15, 2005). A recent Delaware Supreme Court decision has implications for the analysis and calls into question the failure of the *Capital Group* case to distinguish between the two concepts. *See Protech Mins., Inc. v. Dugout Team, LLC*, No. 288, 2021, slip op. (Del. Sept. 2, 2022) (distinguishing between ability of creditor to levy on trust interest and ability of creditor to levy on trust distributions, which constitute personal property subject to garnishment).

63

asserted rights afforded to a secured creditor or rather rights afforded to any general creditor.

This decision and its readers need not take the trip. Finding that XRI failed to prove a violation of the No Encumbrance Provision would not affect the outcome of the case, because XRI already proved a violation of the No Transfer Provision. Finding that XRI succeeded in proving a violation of the No Encumbrance Provision would not affect the outcome either, which turns on the availability of the defense of acquiescence. As with the Exclusive Authority Requirement, if the No Encumbrance Provision becomes pertinent at a later stage of the case, such as following an appeal, then the court can address it. *See CompoSecure III*, 2019 WL 2371954, at *5 (determining on remand that contract did not violate provision in LLC agreement after Delaware Supreme Court held that the application of the provision could change the outcome).

## D. The Equitable Defense Of Acquiescence

XRI proved that the Blue Transfer violated the No Transfer Provision. In response, Holifield failed to prove that the Blue Transfer complied with the Permitted Transferee Exception. XRI therefore proved its claim of breach.

The LLC Agreement addresses the consequences of a noncompliant transfer. The Contractual Voidness Provision states:

> **Transfers In Violation of Agreement.** Any Transfer or attempted Transfer in violation of this <u>Article VIII</u> shall be void, and none of the Company or any of its respective Subsidiaries shall record such purported Transfer on its books or treat any purported Transferee as the owner of such Units.

JX 1 § 8.03. Relying on the Contractual Voidness Provision, XRI seeks a declaration that the Blue Transfer is void.

Holifield contends that the doctrine of acquiescence bars XRI from obtaining the relief it seeks.[26] In addition to disputing whether Holifield proved the defense of acquiescence, XRI advances two legal arguments in an effort to head off the issue. First,

---

[26] Holifield also asserted laches in his pre-trial brief, but he abandoned that defense in his post-trial briefing and therefore waived it. Holifield also invoked the defense of unclean hands, but he placed principal emphasis on his acquiescence defense, and he concedes that the court need not reach unclean hands if acquiescence applies.

Holifield did not prove an unclean hands defense. Holifield asserts that XRI soiled its hands through (i) its decision to delay for an extended period before challenging the Blue Transfer, (ii) its concealment of the Board's undocumented decision in October 2020 to challenge the Blue Transfer as invalid, and (iii) its failure to provide Holifield with actual notice of XRI's strict foreclosure efforts after it had received Holifield's August 13, 2020 letter indicating that he would oppose foreclosure.

These factors fit poorly into the unclean hands mold. That doctrine provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim, regardless of its merit." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008). "The question raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit." *Id.* at 81 (cleaned up).

Of the three issues that Holifield cites, the first two are more appropriately considered under the doctrine of acquiescence. Holifield's complaints about the strict foreclosure better fit the doctrine of unclean hands, but the court will not address the propriety of the strict foreclosure. As the court explained when denying the defendants' motion to stay in favor of the Texas Action, the only issue that this case presents is whether the Blue Transfer breached the LLC Agreement in a way that results in the transfer being void. The court stated clearly that it would not rule on the strict foreclosure. Dkt. 47 at 50–60. The court reiterated that holding when striking a post-trial letter in which XRI attempted to justify its decision to proceed through a strict foreclosure. *See* Dkts. 123, 131. The court will not allow Holifield to litigate the propriety of the strict foreclosure under the guise of unclean hands.

XRI contends that this court cannot consider the defense of acquiescence because an action for breach of contract is a legal claim, and equitable defenses do not apply to legal claims. Second, XRI contends that under the reasoning of *CompoSecure II*, the fact that the Contractual Voidness Provision uses the word "void" means that the Blue Transfer is void *ab initio*—with all of the implications attendant to that term when used to describe conduct that violates a statute or other fundamental rule of law. Under that version of voidness, a void act is incurably void from inception. It cannot be ratified, and equitable defenses do not apply. It is incurably void.

Holifield proved at trial that acquiescence applies, making it necessary to reach XRI's legal arguments. XRI's first contention is misguided, but its second contention finds support in *CompoSecure II*, a binding Delaware Supreme Court precedent. The Blue Transfer is therefore incurably void, and acquiescence cannot save it.

Holifield answers with one last-ditch argument. He maintains that a different provision in the LLC Agreement determines the consequences of a finding that the Blue Transfer was noncompliant. That other provision applies when a transfer meets the requirements of the Permitted Transferee Exception at the time of transfer, then subsequent events cause the Permitted Transferee to cease to qualify under the definition. Holifield argues that the Blue Transfer and Assurance Loan are separate transactions such that Blue originally qualified as a Permitted Transferee, then lost that status when the Assurance Loan closed. This decision has found that the Blue Transfer and the Assurance Loan must be treated as a single transaction. Thus, the proper transactional provision for evaluating the validity of the Blue Transfer is the Contractual Voidness Provision.

### 1. Whether Holifield Proved Acquiescence

Holifield contends that even if the Blue Transfer violated the No Transfer Provision, as this decision has found, then XRI cannot obtain a declaration that the Blue Transfer is void because XRI acquiesced in the transfer. As the party asserting the defense of acquiescence, Holifield bore the burden of proving its elements.

Acquiescence applies when the party who possesses a valid challenge to a particular act, having "full knowledge of his rights and the material facts," engages in conduct that leads the other party to believe reasonably that the act had been approved. *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014). A party may convey the message of approval by (i) remaining inactive for a considerable period of time, (ii) freely acknowledging or taking action that amounts to recognition of the challenged act, or (iii) acting in a manner inconsistent with a repudiation of the act. *Id.* The party invoking the defense of acquiescence must prove that the party asserting the claim "by words or deed, has acknowledged the legitimacy of the defendants' conduct." *Clements v. Rogers*, 790 A.2d 1222, 1238 n.46 (Del. Ch. 2001).

"The doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights." *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014) (TABLE). A party "who participates in or acquiesces in an action has no

standing in a court of equity to complain against it, even though the act be against the permission of the law." *Trounstine v. Remington Rand, Inc.*, 194 A. 95, 99 (Del. Ch. 1937).

The defense of acquiescence turns on the objective manifestations of the plaintiff's conduct. "For the defense of acquiescence to apply, conscious intent to approve the act is not required, nor is a change of position or resulting prejudice." *Klaassen*, 106 A.3d at 1047 (footnote omitted).

### a. XRI's Acquiescence In The Blue Transfer

Holifield proved that XRI acquiesced in the Blue Transfer. Taken as a whole, XRI's initial actions, followed by a subsequent and lengthy period of inactive silence, clearly establish acquiescence. In evaluating XRI's actions for purposes of acquiescence, the focus rests on the individuals who acted on behalf of XRI, including Gabriel, Burt, and XRI's counsel. Based on their conduct, Holifield reasonably believed that XRI had accepted and would not challenge the Blue Transfer.

The evidence of acquiescence starts with the conduct of Gabriel, XRI's CEO. Between April and June 2018, Gabriel and Holifield engaged frequently about how Holifield could use the Disputed Units to raise capital for Entia. *See* Gabriel Tr. 69–70, 92; Holifield Tr. 189–90, 192, 203–04; JXs 6, 50. Initially, Gabriel advised Holifield on how to approach Moon and Burt about having Morgan Stanley buy some or all of the Disputed Units. Gabriel Tr. 70, 123–24. After those discussions went nowhere, Gabriel helped Holifield think through structures that might be acceptable to Morgan Stanley. *See id.* at 70; Holifield Dep. 76–77; Holifield Tr. 192, 203–04. Holifield relied on Gabriel's expertise, consistent with the complementary skill sets that they brought to their business

partnership. Gabriel had greater expertise in corporate finance, developed while practicing as a lawyer for Kirkland & Ellis working on private equity deals, and he also had a closer working relationship with Morgan Stanley. *See* Gabriel Tr. 62; Holifield Dep. 73.

Next, Gabriel explored buying some of the Disputed Units himself. When Morgan Stanley was cool to the idea, Gabriel and Holifield began considering how Holifield could obtain a third-party loan. Holifield contacted Ellis about the possibility, and Gabriel knew that Holifield was working with Ellis, both from Holifield and from Ellis himself, who contacted Gabriel about extending a loan to Holifield. *See* PTO ¶ 28; JX 10 at 2–4; Gabriel Tr. 112–14, 118; Ellis Dep. 154–55. Ellis had the impression that Gabriel "wanted [him] to help [Holifield] and help Entia." Ellis Dep. 89. The day after he spoke with Ellis, Gabriel sent Holifield a spreadsheet depicting the amount of net proceeds that a sale of XRI could generate for Holifield as holder of the Disputed Units. *See* Gabriel Tr. 118; JX 11.1. That information was precisely what Holifield, Ellis, and Assurance needed to evaluate a loan that was structured based on the availability of net proceeds. *See* Gabriel Tr. 119 ("Certainly a loan could be constructed where folks are comfortable with [Holifield's] position in XRI.").

The initial plan was a straightforward structure in which Assurance would receive a second-priority pledge of the Disputed Units that would be junior to the XRI Loan. Holifield consulted with Gabriel about the structure and how to approach Morgan Stanley, and Gabriel previewed the concept with Morgan Stanley. Holifield Tr. 195–98. After hearing from Gabriel, Holifield called Burt, then sent Burt an email that summarized the

69

proposal and described a draft pledge agreement that contained additional protections for XRI's first-position interest. Burt Tr. 49; JX 17.

At this point, Burt contributed to Holifield's reasonable belief that XRI would not oppose a financing structured like the Assurance Loan. When Burt conveyed the message that Morgan Stanley would not provide the required Board approval for a second-position pledge, Burt reassured Holifield that Morgan Stanley was not attempting to interfere with his efforts to raise capital for Entia. Holifield Tr. 197. Holifield asked Burt if Morgan Stanley would support a loan if he "could set up something where [they] completely isolated the loan . . . without affecting the interest, pledging the interest directly." *Id.* Burt told Holifield that as long as he kept the arrangement "on [his] side of the ledger," then Morgan Stanley "didn't care." *See id.*; JX 28. Holifield reasonably understood Burt to be saying that "effectively, as long as [Holifield] could set up a structure in which there was no direct pledge of the units themselves, and [Holifield] kept all of the risk that was associated with that on [his] side, on the Entia side, then that would be satisfactory." Holifield Tr. 197.

After receiving this message from Morgan Stanley, Gabriel and Holifield brainstormed structures that would keep a loan on Holifield's "side of the ledger." Holifield also worked with his lawyers and with Assurance. Gabriel and Holifield discussed whether Holifield could agree to provide Assurance with an earmarked right to the net proceeds from a sale of the Disputed Units, but only *after* Holifield received them. Gabriel and Holifield concluded that the arrangement would work under the LLC Agreement, but Gabriel thought that no creditor would ever go for it. *See* Holifield Dep. 71.

70

The question then became whether there was any way to elevate Assurance's claim to the proceeds from a sale of the Disputed Units above the claims of Holifield's other general creditors, while still structuring the claim as that of an unsecured creditor. Holifield's counsel thought of isolating the Disputed Units in an SPV. That insight led to the eventual structure of the Assurance Loan. *See* JX 27.

After coming up with the structure that he and his advisors believed would keep the Assurance Loan on his side of the ledger, Holifield informed Gabriel that he planned to obtain additional capital from Assurance. He also told Gabriel that he planned to transfer the Disputed Units to Blue, a newly formed SPV. Gabriel Tr. 121–22. That was enough for Gabriel to put two and two together. Having engaged all along in conversations with Holifield about how to use the Disputed Units to secure financing, he necessarily understood that placing the Disputed Units in Blue would help with financing.

Holifield and his counsel admittedly did not disclose the full details of the Assurance Loan. *See* PTO ¶¶ 34–35; JX 144. Holifield and his counsel understood from Burt that they needed to keep the loan on Holifield's side of the ledger and that Morgan Stanley did not want XRI to be involved except if its consent was truly necessary. Holifield and his counsel decided that if they sent the full documentation for the Assurance Loan to Morgan Stanley, or if the LLC agreement for Blue specifically called out Assurance's right to the net proceeds that Blue received, then Morgan Stanley or XRI might delay the transaction with questions on issues that ultimately did not affect them. Their conclusion proved prescient because Gabriel later told Holifield that it made sense "to limit the documents that XRI is signing to those for which XRI's signature is strictly required." JX 37.

71

But while they did not send XRI a full set of the Assurance Loan Documents, Holifield and his lawyers made no effort to hide the involvement of Assurance. Gabriel knew in his capacity as CEO of XRI that Assurance was providing a loan, and Holifield forwarded Gabriel an email from Holifield's counsel in which she referred explicitly to "closing Assurance." JX 39 at 2.

After Holifield sent Gabriel all of the Blue Transfer Documents, Gabriel requested changes to minimize XRI's involvement. Holifield's side made them, and Gabriel signed the Blue Pledge. On June 13, 2018, Ellis sent Gabriel an email stating: "We closed on [Holifield's] loan as you know." JX 43; PTO ¶ 41. Over the following months, Gabriel used the assistance he gave Holifield in securing financing for Entia as part of his efforts to convince Holifield to restore Gabriel's equity interest in Entia, which Gabriel had transferred to Holifield for one dollar in April 2018 in an effort to help Holifield raise financing. *See* JX 50. Gabriel succeeded in convincing Holifield to restore his interest, based in part on the assistance that Gabriel provided to Holifield in securing the Assurance Loan. Gabriel Tr. 136–37.

Given that Gabriel was so deeply involved in the concept of the Assurance Loan and knew that the loan had closed, a finding of acquiescence could be based on XRI not taking any timely steps to undo or contest the Blue Transfer at that point. The court could find that Holifield reasonably believed that XRI had acquiesced to the Blue Transfer without further evidentiary developments. But the court need not make that finding.

Instead, additional events decidedly tip the scales in favor of acquiescence. In April 2019, XRI's lawyers sent Holifield a letter in which they suggested that the Blue Transfer

72

"may be violative of Section 8.01 of the LLC Agreement, and therefore may be void and constitute a breach of such agreement." JX 72.1 at 2. They asked for all documentation related to the Assurance Loan and the Blue Transfer. PTO ¶ 46. Holifield was surprised by the request and suspected that Morgan Stanley was potentially making a play for his interest, but after some internal deliberation, Holifield and his counsel concluded that they had nothing to hide and sent all of the documentation to XRI's counsel. Holifield Tr. 205–06; PTO ¶ 47; JXs 83.1, 83.6–.11.

For three weeks, XRI's lawyers reviewed the documents. JX 84–88. Based on their review, XRI's lawyers formed "a strong opinion" that the Assurance Loan was "a violation" of the LLC Agreement. Gabriel Tr. 144–45. But XRI's lawyers did not say that to Holifield. Instead, on May 6, 2019, XRI's lawyers informed Holifield that XRI was continuing "to review the situation to determine the extent to which Mr. Holifield has breached his ongoing obligations." PTO ¶ 49; JX 89.

XRI did not take any further action. Burt candidly conceded that the members of the Board other than Holifield decided that the matter was not worth pursuing. The Morgan Stanley representatives and Gabriel "made a business judgment that it wasn't worth the hassle and legal expense to clarify a position that the company didn't need to clarify." Burt Tr. 54.

That determination makes complete sense. Nothing about the Blue Transfer or the Assurance Loan impaired XRI's position in the Disputed Units in any way, nor did it affect XRI's ability to levy on the Disputed Units to satisfy the XRI Loan. To the contrary, XRI benefited from the Blue Transfer because by transferring the Disputed Units to Blue,

73

Holifield structurally subordinated his personal creditors. *See* JX 83.12 at 2 (describing how Blue Transfer benefited XRI). XRI conceded at post-trial argument that the Assurance Loan and SPV structure benefitted XRI. Dkt. 140 at 51. If XRI expended the resources to challenge the Blue Transfer successfully, the only result would be to unwind the structural subordination of Holifield's personal creditors.

Over the next eighteen months, with full knowledge of all of the details of the Blue Transfer and the Assurance Loan, XRI did nothing. Holifield reasonably believed that XRI had no issues with the Blue Transfer.

It was not until some unidentified point in October 2020 that the Board determined that the Blue Transfer was invalid and that XRI would pursue a strict foreclosure against Holifield. There are no contemporaneous documents memorializing or reflecting the decision or the basis for it. Holifield was a member of the Board at that time, yet no one on the Board bothered to tell him. Gabriel Tr. 150. But XRI claims that is what happened.

XRI first asserted openly that the Blue Transfer was invalid in December 2020, when it responded to Holifield's contention that the strict foreclosure was invalid. Even then, XRI did not seek to resolve the issue until July 2021, when it filed this action. XRI only did so after Assurance filed the Texas Action, in which Assurance challenged XRI's efforts to effectuate a strict foreclosure against Holifield. *See* JX 117.

XRI thus did not contest the Blue Transfer for three years after it took place in June 2018. XRI did not contest the Blue Transfer for over two years after gaining full information about the Assurance Loan in April 2019. And XRI did not contest the Blue

74

Transfer for nine months after the Board purportedly determined in October 2020 that the Blue Transfer was void and that it was appropriate to pursue a strict foreclosure.

During those periods, Holifield reasonably believed that the Blue Transfer was acceptable to XRI. Gabriel's deep involvement in the process supported that good faith belief. So did Burt's instruction to keep any capital raise on his side of the ledger. So did Gabriel's execution of the Blue Pledge. So did XRI's failure to take any action after receiving full information about the Assurance Loan.

### b. The Benefit Of The Blue Transfer To XRI

Although not necessary to a finding of acquiescence, the fact that the Blue Transfer conferred a benefit on XRI supports that outcome. The acceptance of a benefit "lends additional credence" to a finding that a party reasonably understood the other side's "silence to indicate an acceptance of the transactions." *Lehman Bros.*, 2014 WL 718430, at *12 n.66.

As discussed in the prior section, XRI benefited from the Blue Transfer because by transferring the Disputed Units to Blue, Holifield structurally subordinated his personal creditors. XRI suffered no relative detriment. It remained the only creditor with a security interest in the Disputed Units in the form of the Blue Pledge. It only became advantageous for XRI to challenge the Blue Transfer once the allegations in the Texas Action revealed problems with XRI's attempt to use a strict foreclosure to capture all of the value of the Disputed Units. Before that point, XRI was happy to accept the benefits of the Blue Transfer. That is another factor supporting acquiescence.

75

### c. XRI's Responses

In response to Holifield's showing, XRI claims that it lacked full knowledge of the material facts surrounding the Blue Transfer. XRI also argues that it could not have acquiesced because its lawyers sent a letter that contained a reservation of rights. Neither argument defeats the application of acquiescence.

XRI's claim that it lacked knowledge fails because of the ample knowledge possessed by Gabriel in 2018, together with the full knowledge possessed by Gabriel, XRI's lawyers, and the Board in 2019. "Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005). "[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."[27]

---

[27] *Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006); *see In re Am. Int'l Gp., Inc. Consol. Deriv. Litig.*, 976 A.2d 872, 883 n.25 (Del. Ch. 2009) ("Under basic agency principles, [a corporation] is charged with the knowledge of its agents."), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010) (TABLE); *Metro Commc'n Corp. BVI, v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153–55 (Del. Ch. 2004) (imputing fraud claims to corporation where it designated a manager of a limited liability company and where the manager made fraudulent statements); *Nolan v. E. Co.*, 241 A.2d 885, 891 (Del. Ch. 1968) ("Knowledge of an agent acquired while acting within the scope of his authority is imputable to the principal."), *aff'd*, 249 A.2d 45 (Del. 1969); 18B Am. Jur. 2d *Corporations* § 1413, Westlaw (database updated Aug. 2022) ("[K]nowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself, and this is true whether the officer or agent has actually disclosed the information to the corporation . . . ."); 3 William Meade Fletcher, Fletcher Cyc. Corp. § 790, at 16–20 (vol. 2011 & supp. 2013) [hereinafter Fletcher] ("[T]he general rule is well established that a corporation is charged with constructive knowledge . . . of all material facts of which its officer or agent receives notice or acquires knowledge

76

In June 2018, Gabriel knew the material terms of the Assurance Loan and Blue Transfer. Gabriel admittedly did not have access at that time to all of the Assurance Loan Documents, but he understood the structure of the Assurance Loan and had assisted Holifield in coming up with the idea. He knew that Holifield and Ellis were working on a loan, and he knew that there was no real uncertainty about the loan closing in conjunction with the Blue Transfer. *See* JX 39 at 2; Gabriel Tr. 89–90. He nevertheless signed off on the Blue Transfer. After he did, he learned that the Assurance Loan had closed. *See* JX 43. Gabriel then used the fact that he had assisted Holifield in securing the Assurance Loan to convince Holifield to restore Gabriel's valuable interests in Entia. JX 50.

Assuming for the sake of argument that Gabriel's knowledge was not enough, in April 2019, Gabriel, XRI's lawyers, and the Board gained full knowledge of the Assurance Loan, including all of the Assurance Loan Documents. PTO ¶ 47. XRI and its lawyers knew that Holifield took the position that the Blue Transfer complied fully with the LLC Agreement. JX 83.12 at 1. XRI's lawyers poured over the transaction and, according to Gabriel, concluded that the Blue Transfer violated the LLC Agreement. Gabriel Tr. 144–45.

---

[of] while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation." (cleaned up)).

Despite this knowledge, XRI did nothing, because the Board decided that the issue was not worth pursuing. With full knowledge of its rights, XRI consciously acquiesced to the Blue Transfer.

In its second argument, XRI contends that it could not have acquiesced because XRI reserved the right to enforce the LLC Agreement if it turned out that the No Transfer Provision was violated.[28] On the facts presented, XRI's Glomar responses do not outweigh the evidence of acquiescence. XRI sent letters containing stock language, while at the same time doing nothing in the face of Holifield's clear position that the Blue Transfer was valid.

Holifield proved that XRI acquiesced to the Blue Transfer. XRI had full knowledge of its rights and all material facts about the Blue Transfer, yet remained inactive for more than two years as part of a calculated legal and business strategy. Based on XRI's objective conduct, Holifield believed that the Blue Transfer was valid.

---

[28] *See, e.g.*, JX 37 ("Please note that XRI expressly reserves all of its rights under the XRI LLC Agreement, including if the proposed Permitted Transferee is not a Permitted Transferee or ceases to be a Permitted Transferee."); JX 147 ("The Company continues to review the situation to determine the extent to which Mr. Holifield has breached his ongoing obligations. The foregoing is not intended to be a complete statement of the facts or circumstances giving rise to the Company's rights, claims and position in this matter, all of which are expressly reserved. . . ."); JX 162 ("The Company continues to review the situation to determine whether additional breaches of your ongoing obligations may have occurred. . . . The foregoing is not intended to be a complete statement of the facts or circumstances giving rise to the Company's rights, claims and position in this matter, all of which are expressly reserved . . . .").

## 2. The Availability Of Equitable Defenses In Response To Legal Claims

In a smattering of recent decisions, this court has endorsed to varying degrees the proposition that equitable defenses are not available to defend against legal claims. The initial move in that direction addressed laches and posited that time-bar principles "that originated in equity (laches)" should not apply to legal claims seeking legal relief that happened to be asserted in a court of equity. *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 973–83 (Del. Ch. 2016). The court reasoned that timeliness principles should not generate different results depending on where the action was filed, and it collected earlier decisions touching on the issue. *Id.* The next decision addressed unclean hands and cited New York and Delaware authorities for the proposition that "the 'unclean hands' doctrine bars equitable, but not legal, relief."[29] Generalizing from these precedents, advocates seeking to overcome equitable defenses articulated the rule more broadly, leading this court to state that "[t]ypically, a party may not assert an equitable defense against a purely legal claim, even when the legal claim is pending in a court of equity." *NASDI Hldgs., LLC v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at *6 (Del. Ch. Apr. 8, 2019), *aff'd*, 276 A.3d 463 (Del. 2022). In a more recent decision, the court quoted *NASDI* but dropped the adverb, stating

---

[29] *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *25 n.209 (Del. Ch. Dec. 19, 2017), *aff'd*, 195 A.3d 16 (Del. 2018); *see also In re Liquid. of Indem. Ins. Corp., RRG*, 2019 WL 2152844, at *5 (Del. Ch. May 15, 2019) ("I find that the Receiver's unclean hands and quasi-estoppel theories are unavailable because . . . the claims do not invoke equity and are not, therefore, subject to equitable defenses." (cleaned up)); *Quantlab Gp. GP, LLC v. Eames*, 2019 WL 1285037, at *7 (Del. Ch. Mar. 19, 2019) ("Defendants' unclean hand defense is unavailable because Plaintiff's claims do not invoke equity and are not, therefore, subject to equitable defenses."), *aff'd*, 222 A.3d 580 (Del. 2019).

flatly that "[a] party may not assert an equitable defense against a purely legal claim, even when the legal claim is pending in a court of equity." *In re Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 2180240, at \*20 (Del. Ch. June 16, 2022).

It is frankly tempting to jump on this bandwagon. A bright-line rule that prevents parties from raising any equitable defense in response to legal claims cuts down dramatically on the number of issues that a trial judge must address. But it ignores the nuance that permeates this area of the law.

The reality is that whether a party can raise an equitable defense in response to a legal claim depends on the equitable defense. The weight of authority demonstrates that parties can assert many so-called equitable defenses in response to purely legal claims. Some defenses, like laches, are restricted to equitable claims. Other defenses, like unclean hands, remain in limbo, with some authorities limiting their availability to equitable claims and others taking the position that they should apply more broadly.

When examined through this more granular lens, the Chancery decisions that have declined to apply equitable defenses to legal claims reach defensible results. In virtually every decision, the only equitable defense at play was either laches or unclean hands.[30] The

---

[30] *NASDI*, 2019 WL 1515153, at \*6–7 (unclean hands); *Aerojet*, 2022 WL 2180240, at \*20 (unclean hands); *Quantlab*, 2019 WL 1285037, at \*7 (unclean hands).

The *Indemnity Insurance* case involved both unclean hands and "quasi-estoppel." 2019 WL 2152844, at \*4–5. Quasi-estoppel is one "iteration" of estoppel. *Lehman Bros.*, 2014 WL 718430, at \*9 n.54; *see* 2 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 816, at 1676 (4th ed. 1918) ("Even when [acquiescence] does not work a

problem lies in generalizing from holdings applicable to specific defenses to create a broader rule.

The distinctions among equitable defenses stem from the history of the law-equity divide and the success of some equitable defenses in crossing the barrier between those regimes. While reliance on "law-office history" can go too far,[31] some understanding of history is essential to the proper application of legal principles.

---

true estoppel upon rights of property or of contract, it may operate in analogy to estoppel—may produce a quasi estoppel—upon the rights of a remedy."). It applies

> when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another.

*RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 872–73 (Del. 2015). To the extent quasi-estoppel is a species of estoppel, then it would fall within one of the equitable defenses that would be available in response to an action at law. To the extent it is analogous to the doctrine of acquiescence, it also would be available at an action at law. But this court has commented that one version of quasi-estoppel, which rests on a party remaining silent, is "used nearly synonymously with the doctrine of laches." *Lehman Bros.*, 2014 WL 718430, at *9 n.54. Laches generally is not available for claims at law. It is likely worth drilling into the availability of quasi-estoppel depending on how the defense is invoked in a particular case.

[31] Historian Alfred H. Kelly coined the term "law-office history" in 1965 to describe history as written by legal advocates rather than dispassionate scholars. *See* Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 Sup. Ct. Rev. 119, 122 n.13 (defining "law-office" history as "the selection of data favorable to the position being advanced without regard to or concern for contradictory data or proper evaluation of the relevance of the data proffered"). For more recent takes, see David T. Hardy, *Lawyers, Historians, and "Law-Office History,"* 46 Cumb. L. Rev. 1 (2016), and Neil M. Richards, *Clio and the Court: A Reassessment of the Supreme Court's Uses of History*, 13 J. L. & Pol. 809 (1997). The historical account that this decision presents is more settled, and its application to the

> He who is ill-read in the history of any law must be ill-prepared to know its reasons as well as its effects. The causes or occasions of laws are sometimes as important to be traced out as their consequences. The new remedy to be applied may, otherwise, be as mischievous as the wrong to be redressed. History has been said to be philosophy teaching by examples; and to no subject is this remark more applicable than to law, which is emphatically the science of human experience.

1 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 55, at 46 (12th ed. 1877). Justice Holmes similarly admonished that on some issues, "a page of history is worth a volume of logic." *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). Buckle up for a whirlwind historical tour.

### a. The Original Law-Equity Divide

As this court has recently discussed, the division between law and equity is a historical accident from medieval England. During the early middle ages, a plaintiff seeking relief from a common law court had to first "purchase a royal writ . . . to authorise [sic] the commencement of proceedings." J.H. Baker, *An Introduction to English Legal History* 49 (2d ed. 1979) [hereinafter Baker, *Second Edition*]. Without a writ, a plaintiff could not bring a claim in the common law courts. A plaintiff could not "concoct his own writ" but rather had "either to find a known formula to fit his case, or apply for a new one to be invented." *Id.* at 51; *see* Daniel R. Coquilette, *The Anglo-American Legal Heritage* 151 (2d ed. 2004) (noting that a new writ would be issued only if "consonant with reason

---

question at issue more straightforward, then the contested claims that parties advance on contemporary constitutional battlefields. *See, e.g.*, Andrew L. Seidel, *Bad History, Bad Opinions: How "Law Office History" Is Leading the Courts Astray on School Board Prayer and the First Amendment*, 12 Ne. U.L. Rev. 248 (2020).

and not contrary to the law provided it has been granted by the King and approved by his council" (quoting Henry de Bracton, *De Legibus et Consuetudinibus Regni Angliae* [On the Laws and Customes of England], fol. 413b)).

The selection of a writ had implications beyond its instrumental purpose in commencing a case.

> The choice of writ governed the whole course of litigation from beginning to end, and the plaintiff selected the most appropriate writ at his peril. . . . The classification of writs was therefore more than just a convenience for reference purposes; it was a classification of all the procedures, and in course of time of the substantive principles, of the common law.

Baker, *Second Edition*, at 51–52; *see Garfield v. Allen*, 277 A.3d 296, 358 (Del. Ch. 2022). Because the different writs resulted in the application of different law and procedure, the writs became known as "forms of action." Baker, *Second Edition*, at 52. Two commentators invoked a colorful metaphor to emphasize the consequences of choosing one form over another:

> [The collection of forms] contains every weapon of medieval warfare from the two-handed sword to the poniard. The man who has a quarrel with his neighbor comes thither to choose his weapon. The choice is large; but he must remember that he will not be able to change weapons in the middle of the combat and also that every weapon has its proper use and may be put to none other. If he selects a sword, he must observe the rules of sword-play; he must not try to use his crow-bow as a mace. To drop metaphor, our plaintiff is not merely choosing a writ, he is choosing an action, and every action has its own rules.

2 Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I*, at 588–89 (2d ed. 1898); *see Garfield*, 277 A.3d at 358.

By 1300, the available writs were largely fixed, and if a plaintiff could not find a writ that applied to his situation, then "he was without remedy as far as the king's courts

83

were concerned." Baker, *Second Edition*, at 51.The fixing of the writs meant that some wrongs went unremedied:

> In the King's Bench and Common Pleas[,] [the common law] was circumscribed by the writ system. . . . It was constrained by the forms of pleading, by the rules of evidence, and by the uncertainties of jury trial. The possibilities of mechanical failure were legion. And the strength of the substantive law could also work injustice, because the judges preferred to suffer mischiefs to individuals than to make exceptions to clear rules; hard cases make bad law.

*Id.* at 87.

The minefield of common law writs "furnished both the occasion and the necessity for another tribunal, which should adopt different methods and exhibit different tendencies." 1 Pomeroy, *supra*, § 16, at 20. That tribunal—the Court of Chancery—emerged from the prerogatives of the King as sovereign. If the common law courts could not (or would not) provide a remedy, then a plaintiff would direct "bills in chancery" to the King, who often passed them on to his Chancellor. *See* F.W. Maitland, *Justice & Police* 36 (1885) (noting that early on, "petitions for extraordinary relief in civil cases were addressed to the King and referred by him to his Chancellor"). Originally, the chancellors "did not regard themselves as administering a system of law different from the common law of England." Baker, *Second Edition*, at 87. Instead, the chancellors viewed themselves as "making sure that justice was done in cases where shortcomings in the regular procedure, or human failings, rendered its attainment by due process unlikely." *Id.*

By 1400, "most petitioners had begun to address their complaints" to the chancellor himself. *Id.* This change ushered in the Court of Chancery as its own jurisdictional entity.[32]

The Court of Chancery "approached matters differently" from the law courts and was "free from the rigid procedures under which inconveniences and injustices sheltered, because [it] was free to delve into the facts at large." J.H. Baker, *An Introduction to English Legal History* 111 (5th ed. 2019) [hereinafter Baker, *Fifth Edition*]. It was a "court of conscience, in which defendants could be coerced into doing whatever good conscience required, given all the circumstances of the case."[33] "[E]ach case turned on its own facts, and the chancellor did not dispute or interfere with the general rules observed in courts of law." Baker, *Fifth Edition*, at 112. The Court of Chancery differed from its common-law

---

[32] Scholars debate how and when the English Court of Chancery came into existence. *See* Story, *supra*, §§ 38–45, at 29–38 (recounting competing views). All of the theories agree that "the jurisdiction of chancery was established, and in full operation," by the late 1300s. *Id.* § 46, at 38; *see* Jody S. Kraus & Robert E. Scott, *Contract Design and the Structure of Contractual Intent*, 84 N.Y.U. L. Rev. 1023, 1036–37 (2009) ("Litigants began to anticipate that their bills would be sent to the chancellor and thus eventually addressed their bills directly to him. . . . By the end of the fourteenth century, the Court of Chancery . . . exercised independent, extraordinary jurisdiction to hear cases when the ordinary course of law failed to provide justice." (cleaned up)).

[33] Baker, *Fifth Edition*, at 111 (footnote omitted); *see* 1 Pomeroy, *supra*, § 35 at 38–39 (noting that the common law courts "acquired jurisdiction in each case which came before them by virtue of a delegation from the Crown, contained in the particular writ on which the case was founded," whereas the Court of Chancery had "extraordinary jurisdiction," was not bound by "the positive rules of the common law," and instead based its decisions on "Honesty, Equity, and Conscience"); Story, *supra*, § 49, at 40 (noting that equitable jurisdiction was "principally applied to remedy defects in the common-law proceedings").

counterpart in "the modes of trial, in the modes of proof, and in the modes of relief." Story, *supra*, § 59, at 50.

Unlike a court at law, Chancery issued decrees, not judgments. A Chancellor's decrees operated *in personam*, meaning they bound the parties to the action. Baker, *Fifth Edition*, at 88–89. The distinction was not just semantics. As explained by an early Sergeant at Law,

> A decree is not like a judgment in the King's Bench or Common Bench, for such judgment binds the right of the party; but a decree does not bind the right, but only the person to obedience, so that if the party will not obey, then the Chancellor may commit him to prison until he will obey and this is all that the Chancellor can do.[34]

---

[34] Y.B. 27 Hen. VIII f.15, pl. 6, *quoted in* 1 James Barr Ames, *A Selection of Cases in Equity Jurisdiction* 2 n.1 (1904). As explained by an early treatise:

> The chief differences between decrees in equity and judgments at common law are as follows: The former are pronounced by courts of equity; the latter by courts of law. The former result from an investigation and determination of the rights of the parties by the means provided and according to the principles recognized in equity jurisprudence; the latter result from an investigation and determination made by the more limited means and more inflexible rules of the common law. The former may be adjusted to all the varieties of interest and of circumstance, and may contain such directions as are needed to carry them into effect, both in letter and in spirit; the latter are in an invariable form, general in terms, and absolute for plaintiff or defendant. And the former often enforce rights not recognized by the common law; and which, without the aid of courts of equity, could be enforced only by the consciences of men.

A.C. Freeman, *Treatise on the Law of Judgments: Including All Final Determinations of the Rights of Parties in Actions or Proceedings at Law or in Equity* § 9, at 8 (1873).

The Chancellors also could exercise their authority so as, "to the extent of their power, [to] secure for their decrees the same advantages that judgments have by law . . . [although that] does not mean that a decree is by law equal to a judgment."[35]

By acting *in personam*, Chancery could fashion a remedy to fit the unique needs of the case.

> Equity was able to give specific relief effectively because *of* her method of enforcing decrees *in personam*. . . . The extensive development of modern equity has resulted from a growing appreciation of the superiority of specific relief which gives to each party exactly what he is entitled to, over damages which is a substitutional form of relief, imperfect and incomplete in many cases.

William F. Walsh, *Walsh on Equity* § 9, at 45 (1930) (first emphasis added). The flexibility and breadth of *in personam* decrees also enabled Chancery to "impose its will in other jurisdictions through the fiction of acting only upon the persons before it, even if the required actions impinged or affected another jurisdiction."[36]

---

[35] C.C. Langdell, *A Summary of Equity Pleading* 37 n.4 (2d ed. 1883). In Delaware, by statute, a Chancery decree resulting in monetary award can be transferred to the Superior Court and enforced to the same degree and by the same means as a judgment. *See* 10 *Del. C.* § 4734.

[36] Polly J. Price, *Full Faith and Credit and the Equity Conflict*, 84 Va. L. Rev. 747, 802 (1998) (cleaned up); *see, e.g.*, *Dehon v. Foster*, 86 Mass. 545, 550 (1862) ("The authority of this court as a court of chancery, upon a proper case being made, to restrain persons within its jurisdiction from prosecuting suits either in the courts of this state or of other states or foreign countries, is clear and indisputable. . . . [T]he jurisdiction is founded on the clear authority vested in courts of equity over persons within the limits of their jurisdiction and amenable to process, to restrain from doing acts which will work wrong and injury to others, and are therefore contrary to equity and good conscience."); *Penn v. Lord Baltimore* (1750), 27 Eng. Rep. 1132, 1134–35 (Ch.) (holding that an English court could compel specific performance of article setting boundaries of colonies in Maryland

Most important for present purposes, Chancery had the power to issue injunctions against common-law proceedings or the enforcement of a common-law judgment. "If . . . proceedings in other courts were brought unconscionably, the chancellor would enjoin the plaintiffs to surcease: this was called the 'common injunction.'" Baker, *Fifth Edition*, at 114. Likewise, a "plaintiff who had obtained a judgment in his favour in a court of law might be prevented from enforcing it by a 'common injunction' granted by the Court of Chancery, because in the opinion of the latter court he had obtained the judgment unfairly." T. Leigh Anenson, *Treating Equity Like Law: A Post-Merger Justification of Unclean Hands*, 45 Am. Bus. L.J. 455, 462 & n.37 (2008) [hereinafter *Equity Like Law*] (quoting Robert Megarry & P.V. Baker, *Snell's Principles of Equity* 12 (27th ed. 1973)). This procedure marks the origins of what today we know as equitable estoppel: "Formerly, a defendant, when sued at law, had no defense on the ground of equitable estoppel, but was forced into equity for an injunction to restrain the prosecution of the action." E.W. Hinton, *Equitable Defenses Under Modern Codes*, 18 Mich. L. Rev. 717, 721 (1920). The consequence for disregarding the injunction was imprisonment for contempt. *See* Patrick Devlin, *Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment*, 80 Colum. L. Rev. 43, 60 (1980). As a result, "[t]he common law court

---

and Pennsylvania; stating that "[t]he conscience of the party was bound by this agreement; and being within the jurisdiction of this court, which acts *in personam*, the court may properly decree it as an agreement, if a foundation for it" (citations omitted)).

retain[ed] jurisdiction, but the plaintiff [in the common law action] dare not avail himself of it." *Id.*

The injunctions that the Court of Chancery issued on behalf of petitioners to defend against actions or judgments at law were known as "equitable affirmative relief." *Equity Like Law*, *supra*, at 462 (defined "equitable affirmative relief" as "relief asserted in equity to defend against an action at law"). For obvious reasons, equitable affirmative relief was not required if a respondent in Chancery sought to defend against an equitable claim; the Chancellor simply denied the relief that the petitioner sought.[37] The concept of "equitable affirmative relief" was distinct from the concept of "equitable remedies," which referred to injunctions and other decrees that Chancery issued when providing relief in its own right, rather than in response to a common law action. *See* Walsh, *supra*, § 21, at 99–100.

In practice, early English Chancellors issued equitable affirmative relief "with great freedom, unrestrained by the rules which have since been settled with respect to the injunction." 1 Pomeroy, *supra*, § 37, at 40. As the practice of issuing injunctions against proceedings at law grew more common, the King's Bench resisted. The contest came to a head when two strong personalities—Chief Justice Coke and Lord Ellesmere—took their

---

[37] *Equity Like Law*, *supra*, at 462. The concepts of "equitable affirmative relief" and plain "equitable relief" map onto the categories of "substantive equitable defenses" and "remedial equitable defenses." Eric Fetter, Note, *Laches at Law in Tennessee*, 28 U. Mem. L. Rev. 211, 217 (1997). Substantive equitable defenses are those that, at one time, "formed the basis for an injunction in equity against a claim at law." *Id.* Remedial equitable defenses are those that were "invoked when a plaintiff seeks the extraordinary remedies of equity but is guilty of some inequitable conduct himself." *Id.*

respective positions at the helms of the King's Bench and Chancery. *See* Jill E. Martin, *Modern Equity* 12 (14th ed. 1993) (noting "[t]hat the clash did not come earlier was due partly to the statesmanlike qualities of men like [Chancellor More]; and no doubt also to the reluctance to challenge the powers of royal officers in Tudor times"). Chief Justice Coke went so far as to declare that the Court of Chancery lacked the power to issue equitable affirmative relief against actions at law. In 1614, he responded to an injunction that the Lord Ellesmere had issued against an action at law by declaring "the general maxim in law that, if any court of equity doth inter-meddle with any matters properly triable at the common law, or which concern freehold, they are to be prohibited." *Heath v. Rydley* (1614), 79 Eng. Rep. 286 (KB). Chief Justice Coke is said to have gone further by announcing in open court "that any lawyer who sought an injunction to stay a judgment would be forever barred from presenting cases in King's Bench." David W. Raack, *A History of Injunctions in England Before 1700*, 61 Ind. L.J. 539, 575 (1985–86).

Lord Ellesmere was not deterred; he continued issuing equitable affirmative relief against actions and judgments at law, and he imprisoned those who proceeded in violation of them. Upping the ante, Lord Coke began issuing writs of habeas corpus and releasing parties who had defied the Chancellor's injunctions. *See id.* at 575, 577–78.

It took the intervention of King James I to resolve the dispute, which he did in favor of Chancery. "From this time forward the Chancery had the upper hand. It did not claim to be superior to the courts of law, but it could prevent men from going to those courts, whereas those courts could not prevent men from going to it." F.W. Maitland, *Equity* (2d ed. 1936), *quoted in* Devlin, *supra*, at 50. "The victory of the Chancery was final and

complete—and if we were to have a court of equity at all, it was a necessary victory." F.W. Maitland, *The Constitutional History of England* 270 (1911).

### b.     The Assimilation Of Equitable Principles

Just as common law judges did not meekly accede to chancellors issuing equitable affirmative relief against parties proceeding in the common law courts, the common law judges did not ignore the substantive and procedural superiority of more flexible equitable concepts, and they responded by incorporating them. "Law courts were routinely assimilating equity's substantive ideas." Dan B. Dobbs, *Law of Remedies: Damages—Equity—Restitution*, § 2.6(1), at 103 (2d ed. 1993) [hereinafter Dobbs, *Law of Remedies*]. Examples of the assimilation included law courts "enforcing simple contracts after equity had begun to do so, or by coming to recognize fraud and mistake as defenses to certain claims." Dan B. Dobbs, *Handbook on the Remedies: Damages—Equity—Restitution* § 2.6, at 73 (1973) [hereinafter Dobbs, *Handbook*].

The defense of illegality provides an example of the expansion of the common law to encompass an equitable doctrine. Originally, illegality was "[a] good defense at law only when it appeared on the face of the specialty or negotiable instrument."[38] Absent facial

---

[38] Walsh, *supra*, § 21, at 99 n.1; *see also* James Barr Ames, *Specialty Contracts and Equitable Defences*, 9 Harv. L. Rev. 49, 52 (1895) [hereinafter Ames, *Equitable Defences*] ("If the illegality of a contract under seal appeared on the face of the instrument, no court would sanction the obvious scandal of a judgment in favor of the obligee. But if the specialty was irreproachable according to its tenor, the common law, prior to 1767, did not permit the obligor to defeat the obligee by showing that the instrument was in fact given for an illegal or immoral purpose." (footnotes omitted)).

illegality, a party seeking to avoid a judgment at law had to resort to equity and request a common injunction. That changed in 1767 as a result of the decision in *Collins v. Blantern* (1767) 95 Eng. Rep. 847 (KB). The plaintiff sued for payment on a bond, and he "insisted that the condition of the bond being singly for the payment of a sum of money, the bond is good and lawful; and that no averment shall be admitted that the bond was given upon an unlawful consideration not appearing upon the face of it." *Id.* The defendant responded that "the averment of the wicked and unlawful consideration of giving the bond, might well be pleaded, although it doth not appear upon the face of the deed." *Id.* Finding no common law precedent to support the defendant's position, Chief Justice Wilmot expanded the common law to recognize illegality as a defense at law even when the illegality was not evident from the face of the deed. In doing so, he captured the interest of the common law courts in taking account of equitable principles:

> I should have been extremely sorry if this case had been without remedy at common law. *Est boni judicis ampliare jurisdictionem* [it is good for a judge to expand jurisdiction]; and I say, *est boni judicis ampliare justiam* [it is a good judge to expand justice]; therefore, whenever such cases as this come before a court of law, it is for the public good that the common law should reach them and give relief. I have always thought that formerly there was too confined a way of thinking in the judges of the common law courts, and that courts of equity have risen by the judges not properly applying the principles of the common law, but being too narrowly governed by old cases and maxims, which have too much prevented the public from having the benefit of common law.

92

*Id.* Ever since, illegality has been available as a defense to a legal claim.[39] In Delaware, multiple decisions recognize the availability of the defense in an action at law.[40]

By the turn of the twentieth century, the common law had thoroughly incorporated equitable principles and remedies. Writing in 1905, Roscoe Pound cited "the adoption of equitable principles and introduction of equitable actions and defenses in the common law" and viewed that transition as the "beginning of the end" of distinct systems of law and equity. Roscoe Pound, *Decadence of Equity*, 5 Colum. L. Rev. 20, 25–26 (1905). Pound ranked among a group of scholars who supported "a complete absorption or blending of

---

[39] *See, e.g.*, *Armstrong v. Toler*, 24 U.S. 258, 271–72 (1826) ("Questions upon illegal contracts have arisen very often, both in England and in this country; and no principle is better settled, than that no action can be maintained on a contract, the consideration of which is either wicked in itself, or prohibited by law. How far this principle is to affect subsequent or collateral contracts, the direct and immediate consideration of which is not immoral or illegal, is a question of considerable intricacy, on which many controversies have arisen, and many decisions have been made."); 8 *Williston on Contracts* § 19:12 (4th ed. 2003) [hereinafter Williston], Westlaw (database updated May 2022) (providing test for determining when an apparently legal contract is too proximate to an illegal plan to be enforced).

[40] *See, e.g.*, *Bank of Balt. v. Auto's Plus*, 1994 WL 19937, at *2 (Del. Super. Jan. 4, 1994) ("The court will find a contract illegal if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy." (cleaned up)); *Reeder v. Jones*, 65 A. 571, 571 (Del. Super. 1902) (finding that plaintiff had represented himself as being a realtor without having requisite license and had entered a contract with defendant to act as a realtor; instructing jury to return a verdict for defendant on plaintiff's breach of contract claim because "the law requires that no person shall engage in such business without first procuring a license therefor, we therefore say to you that the plaintiff's action was illegal and that the contract was an illegal contract"); *Kennedy v. Murdick*, 5 Del. (5 Harr.) 458, 458 (Del. Super. 1854) (stating that "[c]ontracts in contravention of public policy, or of a public statute, are illegal, and will not be enforced"; holding that a "note given by one of several bidders for government contracts to another, to induce him to withdraw his bid, is an illegal consideration, and cannot be enforced").

the two systems [of law and equity] into one" and viewed the combination as inevitable. *Id.* at 26.

During the twentieth century, the intersections between law and equity deepened. The federal courts moved steadily towards a procedural merger of law and equity, starting with congressional passage of the Law and Equity Act of 1915.[41] Importantly for present purposes, the Law and Equity Act dispensed with the inefficiency associated with a defendant at law who sought equitable affirmative relief filing a bill in chancery to enjoin the common law proceeding.[42] Through the Enabling Act of 1934, Congress formally

---

[41] Act of March 3, 1915, 38 Stat. 956. The process started earlier in the state courts. One of the principal catalysts was an 1846 amendment to New York's state constitution that eliminated its chancery court and granted a new supreme court "general jurisdiction in law and equity." N.Y. Const. art. VI, § 3 (1846); *see* Bernard E. Gegan, *Is There a Constitutional Right to Jury Trial of Equitable Defenses in New York?*, 74 St. John's L. Rev. 1, 8 (2000). In 1848, the New York Legislature enacted the "Field Code," which codified rules of procedure for the newly unified court system. In a revolutionary development that foreshadowed modern rules of civil procedure, the Field Code stated: "The distinction between actions at law and suits in equity, and the forms of all such actions and suits heretofore existing, are abolished and there shall be in this state, hereafter, but one form of action, for the enforcement or protection of private rights and the redress or prevention of private wrongs, which shall be denominated a civil action." Gegan, *supra*, at 9.

Over the ensuing decades, other states followed New York's lead and created a single court that could hear both law and equity cases. Dobbs, *Handbook*, *supra*, § 2.6, at 65–66. Today, only Delaware, Mississippi, and Tennessee retain a separate Court of Chancery. *About the Trial Courts*, Tenn. State Cts., https://www.tncourts.gov/courts/circuit-criminal-chancery-courts/about; *About the Courts*, State of Miss. Judiciary, https://courts.ms.gov/aboutcourts/aboutthecourts.php.

[42] The innovation was "a procedural change, not a substantive one." Christa J. Laser, *Equitable Defenses in Patent Law*, 75 U. Mia. L. Rev. 1, 11 (2020); *see Liberty Oil Co. v. Condon Nat'l Bank*, 260 U.S. 235, 242 (1922) ("What was an action at law before the Code

94

authorized the procedural merger of law and equity by granting the Supreme Court of the United States the "power to prescribe, by general rules, for the district courts of the United States . . . the forms of process, writs, pleadings, and motions, and the practice and procedure in civil actions at law." 48 Stat. 1064 (1934), 28 U.S.C. §§ 723b, 723c (1935).

The passage of the Enabling Act led to the promulgation of the Federal Rules of Civil Procedure. *See Order of the Supreme Court Appointing the Advisory Committee* (June 3, 1935). The rules completed the procedural merger of law and equity by providing that "[t]here is one form of action—the civil action."[43] But the merger remained only one of procedure. "Notwithstanding the fusion of law and equity by the Rules of Civil Procedure, the substantive principles of Courts of Chancery remain unaffected." *Stainback v. Mo Hock Ke Lok Po*, 336 U.S. 368, 382 n.26 (1949).

---

is still an action founded on legal principles; and what was a bill in equity before the Code is still a civil action founded on principles of equity.").

[43] Fed. R. Civ. P. 2. Meanwhile, in England a series of acts of Parliament melded law and equity. The first was the Common Law Procedure Act of 1854, which "empowered [the Chancery] to decide questions of law, to try issues of fact by jury, and to award damages," and it empowered courts of law to "compel discovery, to grant injunctions, and to a limited extent to allow equitable defences [sic] to be pleaded." Baker, *Fifth Edition*, at 123. That initial step was followed by the Judicature Acts of 1873 and 1875, "in which law and equity were fused, the Courts of Chancery and Common Law absorbed into a Supreme Court, consisting of a High Court with Chancery and Common Law divisions, and over it a Court of Appeal consisting of Lord Justices drawn from both equity and the common law." Devlin, *supra*, at 79. The Judicature Act of 1873 expressed a preference for equity: "Generally, in all matters not hereinbefore particularly mentioned in which there is any conflict or variance between the rules of equity and the rules of common law with reference to the same matter, the rules of equity shall prevail." Supreme Court of Judicature Act 1973, 36 & 37 Vict. c. 32, § 26.

Writing in 1993, Professor Laycock concluded that the assimilation was largely complete: "The distinctive traditions of equity now pervade the legal system. The war between law and equity is over. Equity won." Douglas Laycock, *The Triumph of Equity*, 56 L. & Contemp. Probs. 53, 53 (1993).

### c. The Availability Of Equitable Defenses In Actions At Law

The assimilation of equitable principles by the law courts and the procedural merger of law and equity have produced a legal system in which most equitable defenses are available in actions at law. Describing the current reality, a leading treatise states:

> Most equitable defenses are now available in legal actions as well, even in jurisdictions, such as Delaware, that maintain separate courts of law and equity. Equitable defenses that today may be asserted in both legal actions and in equity include: fraud, mistake, waiver, acquiescence, ratification, failure of consideration, discharge of surety, impossibility, unconscionability, duress, estoppel, rescission, lack of ripeness, and mootness.

Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.01, at 15-3 (2d ed. 2018 & Supp.). Other authorities say the same thing.[44]

---

[44] *See Equity Like Law*, *supra*, at 463–64 ("Defenses like fraud, duress, illegality, unconscionability, and accommodation derived from equity but were converted to law and often considered legal defenses. Others retained their equitable designation but were routinely recognized in actions at law. Such equitable defenses included estoppel, waiver, rescission, ratification, and acquiescence." (footnotes omitted)); Laycock, *supra*, at 70 ("[T]he equitable defenses are now generally available both at law and in equity."); Dobbs, *Handbook*, *supra*, § 2.3 at 44 ("Estoppel, waiver, acquiescence, and perhaps laches, have all worked over into law and are now regularly used in purely legal cases, along with equitable defenses generally."); Bernard E. Gegan, *Turning Back the Clock on the Trial of Equitable Defenses in New York*, 68 St. John's L. Rev. 823, 847 (1994) ("Many matters

Analytically, it is possible to categorize equitable defenses based on whether they originated as a form of equitable affirmative relief. Those that did operated functionally as a defense against a common law claim, albeit one that a party asserted by filing an action in equity. Many of those doctrines migrated into the common law, and in jurisdictions that merged law and equity, there was no impediment to the procedural assertion of these defenses in an action at law.

Estoppel is a classic example of a defense that originated in equity but is now available both at law and equity. Delaware's court of law, the Delaware Superior Court, recognized this fact nearly a century ago. *Colvocoresses v. W.S. Wasserman Co.*, 190 A. 607, 613 (Del. Super. 1937) (noting the proposition that "principles [of estoppel] are applied in courts of law, as well as in courts of equity, is now beyond question"). The

_____

such as duress, fraud and illegality, which had once been cognizable only in equity, were familiar defenses to a legal action by the end of the eighteenth century.") (quoting Fleming James, Jr. et al., *Civil Procedure* § 8.2, at 415 (4th ed. 1992)); *see also USH Ventures v. Glob. Teleystems Gp., Inc.*, 796 A.2d 7, 14 (Del. Super. 2000) ("[E]quitable defenses generally, a long time ago, worked their way into purely legal cases." ).

Supreme Court of the United States has recognized that fact repeatedly.[45] Authoritative

treatises acknowledge it as well.[46]

---

[45] *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014) (describing estoppel as "a defense long recognized as available in actions at law"); *Wehrman v. Conklin*, 155 U.S. 314, 327 (1894) (noting that "an estoppel in pais was an available defense to an action at law"); *Kirk v. Hamilton*, 102 U.S. 68, 78 (1880) ("The doctrine of equitable estoppel is, as its name indicates, chiefly, if not wholly, derived from courts of equity, and as these courts apply it to any species of property, there would seem no reason why its application should be restricted in courts of law."); *see also Weber v. Hertzell*, 230 F. 965, 967 (8th Cir. 1916) ("It has been held by this court that such estoppels can be pleaded in a law case. The same has been held by the Supreme Court of the United States. And the same rule has been announced in many Circuit Court of Appeals decisions from other circuits and by state Supreme Courts." (citations omitted)).

[46] 2 Pomeroy, *supra*, § 802, at 1636–38 ("The doctrine of equitable estoppel is pre-eminently the creature of equity. It has however, been incorporated into the law, and is constantly employed by courts of law at the present day in the decision of legal controversies. . . . [I]t is administered in the same manner, and in conformity with the same rules . . . ."); *id.* § 804, at 1642 ("Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, *both at law and in equity*, from asserting rights which might perhaps have otherwise existed . . . .") (emphasis added)); Dobbs, *Law of Remedies*, *supra*, § 2.4(4), at 76 (explaining that "[b]ecause estoppel and waiver are substantive defenses that reach all remedies, both legal and equitable, they are applicable 'at law.'"); *cf.* Pound, *supra*, at 33 ("A conspicuous example of the acquisition of a legal shell by an equitable principle is furnished by the law of estoppel. We now regard precedent as at least of equal weight with the equities of the case on questions of equitable estoppel. It may be said that estoppel is an equitable principle borrowed by the law, and that its fate is an incident of the general absorption of rules of equity by the law. But other equitable doctrines are going the same way."); Dobbs, *Law of Remedies*, *supra*, § 13.2(5), at 866–67 ("Equitable estoppel rules originated in equity but are now applied in legal actions as well.").

There was a limited estoppel defense which originated in the common law courts and which only applied in narrow circumstances. 2 Pomeroy, *supra*, § 802, at 1635 (stating that traditional common-law estoppel was "technical and strict" and applied only to deeds, records, and certain matters *in pais*, or not in writing). The equitable courts developed a much more robust estoppel defense, and "[b]y the eighteenth century, the common law had adopted equity's version of estoppel and it is this *equitable* adaptation that accounts for

Fraud is another defense that originated in equity.[47] Until the development of assumpsit in the 1700s, "there was no effective remedy at law for fraud except in the narrow field of the old action for deceit, and no defense of fraud in contract cases." Walsh, *supra*, § 106, at 492–93 n.8. But courts at law soon became comfortable with granting relief on the basis of fraud, and by the 1800s, fraud in the inducement "was recognized as a defense to simple contracts."[48] It took somewhat longer for fraud to be recognized as a defense to formal contracts under seal.[49] It is now bedrock doctrine that both courts at law and courts

---

most cases in the present day." T. Leigh Anenson, *The Triumph of Equity: Equitable Estoppel in Modern Litigation*, 27 Rev. Litig. 377, 385–86 (2008) (emphasis added).

[47] *See USH Ventures*, 796 A.2d at 18; *Equity Like Law*, *supra*, at 464; *see also* 5 W.S. Holdsworth, *A History of English Law* 292 (2d ed. 1937) (noting that the common law courts "had no adequate machinery for trying questions of fraud," but that "the power of the chancellor to examine the defendant and other witnesses, made the court of Chancery a very competent tribunal to deal with" questions of fraud, mistake, accident, and forgery); Walsh, *supra*, § 106, at 492–93 n.8 (explaining that in the fourteenth and fifteenth centuries, "property obtained by fraud could be recovered in equity").

[48] Gegan, *supra*, at 848; *see, e.g.*, *Seaman v. Fonereau* (1743) 2 Strange, 1183, 93 Eng. Rep. 1115 (KB) (holding that an insurance policy was "void" where an insured did not disclose a letter to insurer regarding the true state of a ship; explaining that because "these are contracts upon chance, each party ought to know all the circumstances"); *see also* Walsh, *supra*, §106, at 492 ("Apart from the[] cases of [specialty contracts], the right to rescind at law has existed since the development of assumpsit as an alternative to the recovery of damages in the action for fraud and deceit."). Over time, however, the defense of fraud in the inducement became available at law for both sealed and unsealed contracts.

[49] Ames, *Equitable Defences*, at 51–52 (noting that as late as 1894, decisions of the United States "disallow[ed] the defence of fraud in an action at law upon a specialty," but that "nearly all, if not all of the State decisions . . . have lost their force by reason of statutory changes, so that the obligor is no longer required to resort to equity for relief"); Edwin H. Abbot, Jr., *Fraud as a Defence at Law in Federal Courts*, 15 Colum. L. Rev. 489, 505 (1915) ("It may be added that both in England and in the States the doctrine that

of equity have jurisdiction to hear claims and defenses concerning fraud.[50] The Delaware

Superior Court routinely recognizes fraud as both a claim and a defense in actions at law.[51]

By contrast, equitable defenses that emerged solely as defenses against requests for

equitable relief are generally not available in response to legal claims. The two primary

---

fraud in inducement is no defence of law to a sealed instrument has been swept away either by statute or decision."); *see Mason v. Ditchbourne*, 174 Eng. Rep. 158, 1 M. & Rob. 459, 460 (1835) (rejecting a defense of fraud; "You may perhaps be relieved in equity: but in a court of law it has always been my opinion that such a defence is unavailing, when once it is shewn that the party knew perfectly well the nature of the deed which he was executing."); *see also* Jack B. Jacobs, *The Uneasy Truce Between Law and Equity in Modern Business Enterprise Jurisprudence*, 8 Del. L. Rev. 1, 4 (2005) (noting that at early common law "law courts refused to recognize fraud as a defense to an action on a sealed instrument").

[50] Walsh, *supra*, § 106, at 496 ("It is generally stated that the right to rescind for fraud developed in equity, and the adopting of it at law is simply another illustration of the growth of law through equity."). Walsh posits that despite the general consensus, "it may fairly be claimed that the right of rescission developed both at law and in equity." *Id.* at 497. He suggests that with the merger of law and equity, "the question is purely academic." *Id.* In a state like Delaware that has maintained the distinction, the question still has salience.

[51] *USH Ventures*, 796 A.2d at 18; *see ITW Glob. Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2015 WL 3970908, at *6–7 (Del. Super. June 24, 2015) (denying motion to dismiss a claim for fraudulent inducement); *First Fed. Sav. Bank v. CPM Energy Sys. Corp.*, 1988 WL 116401, at *1 (Oct. 25, 1988) (stating that it is "clear that an affirmative defense of fraud in the inducement can be raised in a suit on a contract in this Court"); *see also Arctic Roofings v. Travers*, 32 A.2d 559, 561 (Del. 1943) ("In the absence of unusual circumstances, a claim for damages, resulting from fraud on the part of the plaintiff, in inducing a contract sued on, may be asserted by the defendant, by way of counterclaim and recoupment in the same action."); *cf. Novipax Hldgs. LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *14 (Del. Super. Nov. 28, 2017) ("This Court has twice held that a claim for rescission or recessionary damages separates a fraudulent inducement claim from breach of contract damages."). *See generally* Del. Super. Ct. R. 9(b) ("In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake shall be stated with particularity.").

examples are laches and unclean hands. The former is generally regarded as only available

to address equitable claims.[52] The latter remains unsettled, and although the Court of

Chancery decisions discussed above state that it is only available in equity, there is no real

consensus about whether the defense should be available in actions at law or whether, as a

practical matter, it already is available under functional equivalents like *in pari delicto*.[53]

---

[52] *See Petrella*, 572 U.S. at 678 ("[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation."); *see also SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328 (2017) (discussing *Petrella*); *Kraft*, 145 A.3d at 974 ("Laches is an equitable doctrine rooted in the maxim that equity aids the vigilant, not those who slumber on their rights. . . . A party guilty of laches will be prevented from enforcing a claim in equity."); *Gen. Video Corp. v. Kertesz*, 2008 WL 5247120, at *30 (Del. Ch. Dec. 17, 2008) ("Laches is an equitable principle that operates to prevent the enforcement of a claim in equity where a plaintiff has delayed unreasonably in bringing suit to the detriment of the defendant or third parties." (quoting Wolfe & Pittenger, *supra*, § 11.05)); Dobbs, *Law of Remedies*, *supra*, § 2.4(4), at 76 ("Courts have routinely referred to laches as an equitable defense, that is, a defense to equitable remedies but not a defense available to bar a claim of legal relief."); *Laches*, Black's Law Dictionary (11th ed. 2019) ("The doctrine of laches is an instance of the exercise of the reserved power of equity to withhold relief otherwise regularly given where in the particular case the granting of such relief would be unfair or unjust."). At times, "delay in pursuing a right might well qualify as an estoppel or even a waiver or abandonment of a right, as courts sometimes recognize." Dobbs, *supra*, § 2.4(4), at 76 (footnotes omitted). In cases where the delay amounts to an estoppel or waiver, then the delay would be a defense to a legal claim. *Id.*

[53] *Compare* T. Leigh Anenson, *Announcing the "Clean Hands" Doctrine*, 51 U.C. Davis L. Rev. 1827, 1851 (2018) ("Historically, the defense applied to all equitable relief, but only equitable relief."), Wolfe & Pittenger, *supra*, § 15.01 ("Other defenses, among them laches, unclean hands, and the balancing of equities, remain more equitable in nature and generally cannot be asserted as defenses in purely legal actions."), *and* Dobbs, *Law of Remedies*, *supra*, § 2.4(2), at 71 ("If the [unclean hands defense] is really an appeal to equitable discretion [and not an appeal to generate a rule of law], then it should apply only to bar equitable remedies. It should be dropped entirely if it is asserted as a defense against a legal remedy."), *with Cummings v. Wayne Cnty.*, 533 N.W.2d 13, 14 (Mich. Ct. App.

#### d. The Availability Of Acquiescence In Actions At Law

The specific question raised by this case is whether acquiescence is available to defeat a claim at law. Acquiescence is a "special form" of estoppel. Dobbs, *Handbook*, *supra*, § 2.3, at 44. As discussed above, estoppel is one of the original forms of equitable affirmative relief that is now available in actions at law. Like estoppel generally, the defense of acquiescence has "worked over into law and [is] now regularly used in purely legal cases." *Id.*

Delaware decisions recognize the availability of acquiescence to claims at law. Numerous decisions of the Delaware Superior Court have recognized the availability of acquiescence and addressed the defense when considering legal claims.[54]

---

1995) ("The authority to dismiss a lawsuit for litigant misconduct is a creature of the 'clean hands doctrine' and, despite its origins, is applicable to both equitable and legal damages claims."), T. Leigh Anenson, *Limiting Legal Remedies: An Analysis of Unclean Hands*, 99 Ky. L.J. 63 & n.62 (2010) (collecting authorities to support the proposition that "[c]ourts from seven states have declared the doctrine of unclean hands available in an action at law."), *and* Zechariah Chafee, Jr., *Coming into Equity with Clean Hands*, 47 Mich. L. Rev. 877, 878 (1949) ("I propose to show that the clean hands doctrine . . . ought not to be called a maxim of equity because it is by no means confined to equity . . . .").

[54] *See, e.g.*, *Devine v. MHC Waterford Ests., L.L.C.*, 2017 WL 4513511, at *3 (Del. Supr. Oct. 10, 2017) (addressing whether the Delaware Superior Court could grant summary judgment for defendants on the basis that "the equitable doctrine of acquiescence bar[red] [the plaintiff's] breach of contract claim"; denying summary judgment because "[w]hether [plaintiff's] breach of contract claim is estopped by acquiescence is a disputed issue of fact for the jury"); *Mizel v. Xenonics, Inc.*, 2007 WL 4662113, at *7 (Del. Supr. Oct. 25, 2007) (denying summary judgment on defendant's claim that a plaintiff's "action at law for breach of contract is barred by the equitable defense of acquiescence" because of genuine disputes of material fact; holding that "[i]n this circumstance, the question as to whether [plaintiff] acquiesced must be reserved for the jury"); *In re PNC Del. v. Berg*, 1997 WL 720705, at *4 (Del. Super. Oct. 22, 1997) ("But, however one characterizes the

102

XRI is thus incorrect to assert broadly that equitable defenses are unavailable in actions at law and cannot be invoked when a legal claim proceeds in the Court of Chancery. In the case of acquiescence, the defense is available, and Holifield properly raised it in this action.

### 3. *CompoSecure II* And A Contractual Specification Of Incurable Voidness

The other hurdle that Holifield must clear to rely on the defense of acquiescence is *CompoSecure II*. Under the reasoning of that decision, if parties to a contract specify that a noncompliant act is "void," then the act is void *ab initio* with all of the consequences attendant to that status under the common law. Pertinent to this litigation, that means a party may not deploy equitable defenses such as waiver, estoppel, acquiescence, or unclean hands to defeat the claim of breach and defend the contractually noncompliant act. In short, the act is incurably void.

*CompoSecure II* is a Delaware Supreme Court precedent, and this court is bound to follow it. Accordingly, under the reasoning of *CompoSecure II*, Holifield cannot invoke the defense of acquiescence to defeat XRI's claim for breach of the No Transfer Provision. As a matter of contract, the Blue Transfer is incurably void.

---

behavior of the [b]ank, whether it be in terms of waiver, acquiescence, estoppel, abandonment, or novation, the evidence is overwhelming that the [b]ank forewent its claim on the contract rights . . . ."); *Mead v. Collins Realty*, 75 A.2d 705, 708 (Del. Super. 1950) ("[T]he thought of one party to a contract with full knowledge of the facts deliberately excusing some minor breach in performance and thereafter bringing an action for damages is repugnant. The Restatement bars a right of action in such case and, more importantly, the decisions of this State are in accord."); *see also USH Ventures*, 796 A.2d at 19 ("[T]he equitable doctrine of acquiescence has been applied by this court.").

### a. The *CompoSecure II* Decision

In *CompoSecure II*, a manufacturer of credit cards (CompoSecure) entered into a contract with a sales organization (CardUX) to promote its metal card products (the "Sales Agreement"). The Sales Agreement provided for CardUX to receive a fifteen percent commission on sales to a list of "Approved Prospects," without requiring CardUX to establish any connection between its efforts and a sale to earn a commission. The resulting bright-line rule created situations in which either side might receive a windfall. On the one hand, CardUX would receive a commission for every sale to an Approved Prospect, even if its efforts did not contribute to the sale. On the other hand, CompoSecure would not have to pay a commission for any sale to a non-Approved Prospect, even if CardUX's efforts contributed to the sale. *See CompoSecure I*, 2018 WL 660178, at *1.

Just two months after signing the Sales Agreement, CompoSecure received a massive order for an Approved Prospect. CompoSecure's CEO immediately realized that CardUX was entitled to a commission, but she and her management team did not want to pay. They did not believe that CardUX had done anything to generate the sale, and the size of the commission made the bright-line rule seem unfair. CardUX insisted on its commission. *Id.* at *2, 14–17

Four months later, after hiring litigation counsel, CompoSecure took the position that CardUX was not entitled to a commission because CompoSecure had never properly authorized its CEO to enter into the Sales Agreement in the first place. *Id.* at *18. In making this argument, CompoSecure conspicuously sought to rely on its own failures as a basis to escape the bargain it had made. *Id.* at *19.

In a post-trial decision, the trial court found that CompoSecure had not taken the internal steps necessary to authorize the Sales Agreement properly. The trial court found that notwithstanding those failures, CompoSecure had ratified the agreement by conduct. In making this finding, the trial court reasoned that any defect in CompoSecure's authorization of the Sales Agreement was voidable, not void. *Id.* at *26. The court reached this conclusion because it viewed CompoSecure as having the power to enter into the Sales Agreement under the LLC Act. *Id.* The question was not whether Delaware as sovereign had conferred the necessary power on CompoSecure, but rather whether CompoSecure's representatives had properly caused CompoSecure to exercise that authority. The latter was an issue of voidability, meaning that CompoSecure could provide the necessary authority *ex post facto* through ratification and that CardUX could raise equitable defenses in response to CompoSecure's claim. *Id.*

The trial court determined that CompoSecure had ratified the Sales Agreement by conduct. In reaching that conclusion, the trial court viewed the issue as involving the scope of authority that a principal had granted to an agent. The parties had selected New Jersey law to govern their relationship in the Sales Agreement, and the trial court therefore applied New Jersey law in holding that CompoSecure had ratified the grant of authority. The trial court did not view the issue as involving a question of internal ratification under Delaware law. *Id.* at *1, *27–29.

On appeal, CompoSecure emphasized a provision in its LLC agreement that had not played a center-stage role at the trial level. That provision—the "Restricted Activities Provision"—called for the board of managers of CompoSecure (the "CompoSecure

105

Board") to adopt an annual budget and an annual business plan. The provision further stated that except as set forth in the annual budget or the annual business plan, CompoSecure could not undertake any action that fell within a list of "Restricted Activities" without "the prior approval of the [CompuSecure] Board and Investors (and during the Earnout Period, the Class A Majority) . . . ." *CompoSecure II*, 206 A.3d at 814. The provision concluded that "any action taken in contravention of the foregoing shall be void and of no force or effect whatsoever." *Id.* CompoSecure argued on appeal that the Sales Agreement fell within the Restricted Activities Provision and hence was "void," not voidable, because it had not received prior approval from the CompoSecure Board, the Investors, or the Class A Majority. *Id.* at 814–15. CompoSecure was still seeking to escape its bargain by invoking its own internal failures, but CompoSecure argued more clearly that because of the language of the Restricted Activities Provision, its failures did not matter: the Sales Agreement was void *ab initio* with the consequences that CardUX could neither claim that the agreement had been ratified nor invoke equitable defenses.

The trial court opinion had found that the Sales Agreement was voidable, not void, so the use of the term "void" in the Restricted Activities Provision understandably caught the Delaware Supreme Court's attention. At oral argument, the justices asked whether the contractual specification of voidness would be a "game-changer" if the Sales Agreement fell within the scope of the Restricted Activity Provision. *Id.* at 816. CardUX's counsel agreed that it would be a game-changer, thereby accepting the premise that a contract's use of the term "void" carried the full implications of a common law determination that an act was void *ab initio*. *Id.* CardUX's counsel did not argue that a contractual specification of

106

voidness should be treated differently and should not give rise to the same consequence of incurable voidness as the violation of a restriction imposed by the state.

In its opinion, the Delaware Supreme Court "reluctantly" noted its agreement with the parties "that, if it applies, the Restricted Activities Provision would render the Sales Agreement void." *Id.* at 811. Elsewhere in the decision, the high court explained that it reached that conclusion based on the plain language of the word "void":

> We agree that, if the Restricted Activities Provision were to apply, the plain language of the provision would render the Sales Agreement void, and therefore incapable of being ratified. The common law rule is that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling within the power of a corporation, though not properly authorized, and are subject to equitable defenses. Ordinarily, the Sales Agreement would be voidable for failure to comply with the Restricted Activities Provision. But, given the plain language of the Restricted Activities Provision—"void and of no force or effect whatsoever"—its application would trump the common law rule and render the Sales Agreement void and incapable of being ratified.

*Id.* at 816–17 (footnotes omitted). Reiterating that "[b]oth sides now agree on appeal, as do we, that the 'void' language . . . could change the outcome," the Delaware Supreme Court remanded the case to the trial court for further proceedings. *Id.* at 819.

On remand, the trial court found factually that the Sales Agreement did not qualify as a Restricted Activity, rendering the Restricted Activities Provision inapplicable. The trial court also reiterated its findings that all three groups whose approvals were required under the Restricted Activities Provision in fact supported the Sales Agreement and would have provided the formal approvals had anyone flagged the issue at the time. CompoSecure thus was plainly invoking its own technical failure to satisfy the formal requirements of the Restricted Activities Provision in an inequitable effort to escape from the Sales Agreement.

107

*CompoSecure III*, 2019 WL 2371954, at \*1, 5; *accord CompoSecure I*, 2018 WL 660178, at \*6–8, \*13–14. But the trial court did not engage with the concept of contractual voidness, which constituted the law of the case. The only question on remand was whether the Sales Agreement fell within the scope of the Restricted Activities Provision. The trial court held that it did not and, given the law of the case, did not engage with the doctrinal implications of contractual voidness. *CompoSecure III*, 2019 WL 2371954, at \*5. On the case's second trip to the Delaware Supreme Court, the senior tribunal affirmed the trial court's finding that the Sales Agreement did not fall within the Restricted Activities Provision. *CompoSecure IV*, 213 A.3d at 1205.

The *CompoSecure II* decision thus held that when an agreement states that a noncompliant act is "void," then the plain language of that provision trumps the common law and requires that a court deem the act void *ab initio*. In two decisions, this court has taken the same view. In a decision pre-dating *CompoSecure II*, this court held that stock issuances that did not comply with a stockholders agreement were incurably void because the stockholders agreement specified that any noncompliant issuances were "null and void *ab initio*." *Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs., Inc.*, 2018 WL 658734, at \*2 (Del. Ch. Feb. 1, 2018). In a decision post-dating *CompoSecure II*, this court held that a transfer of a member interest in an LLC was incurably void when made without the prior written unanimous consent of the managers, because the LLC agreement stated that any noncompliant transfer was "null and void." *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at \*1 (Del. Ch. June 27, 2019). The court held that under *CompoSecure II*, the transferring member could not invoke the equitable

defenses of laches, waiver, equitable estoppel, ratification, and acquiescence to defeat the claim of breach. *Id.* at \*4. Other decisions have acknowledged that *CompoSecure II* is binding precedent. *See Symbiont.io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at \*43 n.25 (Del. Ch. Aug. 13, 2021); *In re Coinmint, LLC*, 261 A.3d 867, 891 & nn.150–51 (Del. Ch. 2021).

This court must follow *CompoSecure II*. Under that decision, Holifield cannot rely on the defense of acquiescence to defeat XRI's claim for breach of the No Transfer Provision.

### b. The Transfer Back Provision

In an effort to avoid the implications of *CompoSecure II*, Holifield argues that the Contractual Voidness Provision, with its use of the term "void," is not the provision that governs the Blue Transfer. Instead, Holifield points to a different provision, which states:

> If at any time following a Transfer of Units or other Company Interests to a Permitted Transferee such Permitted Transferee ceases to be a Permitted Transferee of the Transferor of such Units or other Company Interests, at such time such Units or other Company Interests automatically shall be deemed to have been Transferred back to such Transferor.

JX 1 § 8.01(e) (the "Transfer Back Provision"). Under this provision, if a Permitted Transferee subsequently fails to qualify as a Permitted Transferee, then the transfer is not "void." Instead, the erstwhile Permitted Transferee "automatically shall be deemed" to have transferred the units back to the original member. Holifield argues that because the Transfer Back Provision does not use the word "void," the doctrine of acquiescence can defeat a deemed transfer of the Disputed Units from Blue back to Holifield.

109

The plain language of the Transfer Back Provision applies when the transferee met the definition of a Permitted Transferee at the time of transfer, then subsequent events caused the Permitted Transferee to cease to qualify. Thus, for example, if a third party came to own some or all of the Permitted Transferee such that it no longer was under the control of the transferring member, then the Transfer Back Provision would govern.

Before the Transfer Back Provision can apply, there must be an initial transfer that satisfies the Permitted Transferee Exception. For that purpose, the validity of the Blue Transfer must be measured as of June 6, 2018, when the Blue Transfer became effective and the Assurance Loan closed. This decision has held that as of that date, Blue could not qualify as a Permitted Transferee because the Blue Transfer could not meet the Without Consideration Requirement.

Holifield tries to slip into the Transfer Back Provision by arguing that the Blue Transfer and Assurance Loan were separate transactions such that Blue originally qualified as a Permitted Transferee, then only lost that status (to the extent the court reaches that conclusion) when the Assurance Loan closed. This decision has held that the Blue Transfer and the Assurance Loan must be treated as a single transaction. This is not a case where a material event happened months or years after the Blue Transfer and resulted in Blue no longer meeting the requirements for a Permitted Transferee.

The transactional provision that governs the validity of the Blue Transfer is thus the Contractual Voidness Provision, not the Transfer Back Provision. The Contractual Voidness Provision uses the term "void," and it therefore implicates the principle of contractually specified incurable voidness recognized in *CompoSecure II*.

110

### 4. The Possibility Of A Different Approach

Under CompoSecure *II*, XRI can avoid the consequences of a transaction notwithstanding its acquiescence. For a court of equity, that is an uncomfortable outcome, and it provides an impetus to explore a different approach. Under that different approach, the consequence of incurable voidness would be reserved for acts that violate limitations that the state has imposed, in its capacity as sovereign, on the actions that parties can legitimately take. When parties have gone outside the boundaries that the state has set, it makes sense that the state would treat the impermissible act as if it never occurred. But just as parties cannot agree contractually to other remedies that only the state can impose, such as criminal sanctions, parties would not be able to agree contractually to an outcome of incurable voidness. No matter what words the parties used in a contract, the noncompliant act would be voidable, not void. A court still could determine that the act was invalid, but parties would be able to raise equitable defenses to defeat that result. Parties could not use the word "void" to contract out of equity.

In proposing this approach, this decision starts by drawing on authorities that pre-dated *CompoSecure II*. Those decisions suggested that a contractual specification of voidness would not have the effect of making a noncompliant act incurably void and that a party could raise equitable defenses to defeat the claim. Because of how the issue of contractual voidness arose in *CompoSecure II*, the Delaware Supreme Court did not have the benefit of a meaningful presentation of those authorities.

This decision next considers the limited instances in which courts historically have deemed acts void *ab initio*. Those instances involve situations where the parties exceeded

111

the bounds of the authority conferred by the state, not where they breached a private contractual arrangement. The discussion also considers the significant consequences of determining that an act is void *ab initio*, which makes the act incurably void. Such consequences can have negative implications for third parties and can enable actors to benefit from their own malfeasance, misfeasance, or nonfeasance. The discussion also considers how Delaware has retreated from the concept of incurable voidness in its corporate law, largely because of the significant consequences that attend a void act. Similar considerations counsel against re-energizing the concept of incurable voidness by authorizing it contractually.

This decision then considers contractual principles under which parties generally cannot constrain the remedial flexibility of a court or insulate their agreement from the effects of their subsequent conduct. These doctrines suggest that parties should not be able to use a word like "void" to lock in the consequences of noncompliance and force a court to grant what is effectively a decree of rescission.

After that, this decision considers the lack of consistency in how courts, legislatures, and parties have used the term "void" and its linguistic cousins, such as null and void, void *ab initio*, voidable, invalid, ineffective, without effect, and the like. Although it is possible to assert that the term "void" has a clearly understood meaning, a range of authorities indicates that the term "void" is not used with precision and that courts, legislatures, and parties often equate "void" with "voidable."

Finally, this decision considers the implications of parties being able to contract out of equity. The Delaware Supreme Court has interpreted the Delaware Constitution as

112

providing for a system of equity, and even the General Assembly faces limits on its ability to limit equity's reach. That reality suggests that private parties should not be able to achieve that result by using a particular word.

This decision is not suggesting that the reasoning in *CompoSecure II* is wrong.[55] To the contrary, the contractual analysis conducted in *CompoSecure II* is one possible approach that emphasizes the text of an agreement, and the analysis follows straightforward contractarian principles. This decision respectfully suggests that when other considerations are taken into account, there is a preferable path. Rather than enforcing a contractual specification of incurable voidness, a court would treat the breach of a contractual provision as making a noncompliant act voidable, regardless of the language that the provision used. In litigation over the contractually defective act, a party could invoke both common law contractual defenses and equitable defenses in an effort to defeat the contractual claim of breach. Outside of litigation, parties could fix noncompliant acts prophylactically or retrospectively by entering into settlements, taking ratifying action, waiving their claims, or through other voluntary means. A court likewise could find that

---

[55] Doubtless there will be those who seek to portray this decision as making that claim. It can seem advantageous to a party disfavored by a decision to portray it as an affront, and XRI could play that card. The media also benefits from playing up controversy, because controversy generates clicks. I hope that this proposal will be viewed as part of an ongoing dialogue between the Delaware Supreme Court and the trial courts, in which the trial courts not only apply controlling authority, but also report back to the Delaware Supreme Court on how the resulting legal principles operate in practice.

the parties had reached such an agreement orally or by conduct. Parties would not be able to contract out of equity by using a particular word.

This approach only would apply to a *contractually* noncompliant act. An act that violated positive law or which contravened a fundamental public policy would continue to be void *ab initio*. The latter type of act exceeds the limits on voluntary action that the state has imposed in its capacity as sovereign when establishing the boundaries of the legal landscape within which parties can act. When parties have gone outside the bounds of what the state permits, the state can declare the result void *ab initio* and treat the act as if it never existed. But the remedy of incurable voidness only would be imposed in that setting and not because a party breached a limitation in a private agreement. *See generally* Jesse A. Schaefer, *Beyond A Definition: Understanding the Nature of Void and Voidable Contracts*, 33 Campbell L. Rev. 193, 208 (2010) (arguing for a similar regime in which an act only would be void *ab initio* if it violated a provision intended to benefit the state or society in general, with violations of contractual limitations only resulting in a transaction being voidable).

The discussion of an alternative direction is admittedly dictum.[56] It represents one trial judge's suggestion regarding a preferable approach. No one should be misled and think

---

[56] I considered the alternative of setting forth these views in a law review article or speech, as the Delaware Supreme Court once suggested. *See Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1220 (Del. 2012). It seemed to me, however, that to the extent a trial judge wished to suggest an alternative approach that the Delaware Supreme Court might consider, a judicial opinion that can be reviewed by the Delaware Supreme Court provides an appropriate and efficient vehicle. *See, e.g., In re TerraForm Power, Inc.*

114

that this decision is purporting to declare a rule of law different from what the Delaware Supreme Court announced in *CompoSecure II*. Unless and until the Delaware Supreme Court says otherwise, *CompoSecure II* is the law of Delaware, and this decision follows it. *Cf. Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 167 (Del. 2002) (expressing concern that dictum in trial court opinion "should not be ignored because it could be misinterpreted in future cases as a correct rule of law" and "could be relied upon adversely by courts, commentators and practitioners in the future").

### a.  Authorities Pre-Dating *CompoSecure II*

Before *CompoSecure II*, there were indications that Delaware law would not enforce a contractual specification of incurable voidness. Authorities pre-dating *CompoSecure II* suggested that Delaware law would permit parties to raise equitable defenses, notwithstanding the use of the term "void" in a contract.

One such authority is *Eureka VIII LLC v. Niagara Falls Holdings. LLC*, 899 A.2d 95 (Del. Ch. 2006). While serving as a member of this court, Chief Justice Strine

---

*S'holders Litig.*, 2020 WL 6375859, at *1 (Del. Ch. Oct. 30, 2020) (Glasscock, V.C.) (recommending that Delaware Supreme Court revisit the holding of *Gentile v. Rosette*, 906 A.2d 91 (Del. 2006)) (subsequent history omitted); *In re Cox Commc'ns, Inc. S'holder Litig.*, 879 A.2d 604, 642–48 (Del. Ch. 2005) (Strine, V.C.) (recommending that Delaware Supreme Court revisit and tweak the regime for controller squeeze-outs under *Kahn v. Lynch Commc'ns Sys.*, 638 A.2d 1110 (Del. 1994)); *Agostino v. Hicks*, 845 A.2d 1110, 1121 (Del. Ch. 2004) (Chandler, C.) (recommending that Delaware Supreme Court craft new test for distinguishing between direct and derivative actions); *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967–70 (Del. Ch. 1996) (Allen, C.) (recommending change in the law's approach to the duty of oversight). In the event that there is an appeal, the Delaware Supreme Court will be able to consider this proposal and the parties' arguments regarding it, without needing to consult an external source.

considered the claim that a series of transfers by a member of an LLC breached an anti-transfer provision in the LLC agreement, which provided that "[a]ny purported Transfer in violation of this Article 9 shall be void *ab initio*, and shall not bind the Company." *Id.* at 100. In analyzing whether two of the transfers violated the anti-transfer provision for failure to obtain the company's consent, the Chief Justice considered the implications of a factual dispute about whether company counsel informed the transferring member that the company's consent was not required. The Chief Justice noted that the parties had briefed the issue in terms of waiver, but he observed the statement also could give rise to an estoppel. He also noted that although the company had the right to consent to a transfer, "an authorized statement [by the company's] agent that its consent was not required might preclude it from enforcing this right." *Id.* at 108 n.25. The Chief Justice likewise observed that an authorized statement might be viewed as effecting an oral modification of the transfer restriction, notwithstanding a provision in the LLC agreement which required that amendments be in writing, because such a provision itself can be modified or waived orally. *Id.* at 109. The Chief Justice found that he did not need to reach these issues because other transfers were plainly noncompliant, but it is evident that he did not view the contractual reference to "void *ab initio*" as precluding consideration of those defenses.

To defend the claim of breach involving the noncompliant transfers, the transferring member raised the equitable defense of laches. *Id.* at 113 n.38. The Chief Justice again did not view this equitable defense as unavailable merely because the transfer restriction stated that any noncompliant transfer would be "void *ab initio*." He analyzed the defense and found that it did not raise a triable issue of fact that precluded summary judgment. *Id.* He

116

also noted that "[t]o the extent that [the transferring member] has thrown up other equitable defenses, they are not discussed because the analysis in this opinion demonstrates their lack of force." *Id.* Thus, he did not view the other equitable defenses as unavailable either.

Finally, as a remedy for the two undisputed breaches, the Chief Justice did not hold that the transfers were incurably void *ab initio*, as the transfer restriction provided. Instead, the plaintiff proposed that the noncompliant transfers result in the transferee receiving an assignee interest, shorn of any governance rights, and the Chief Justice regarded that remedy as "entirely fitting and non-punitive." *Id.* at 114. He did not require the transferee to forfeit its economic interest as an assignee. *Id.*

Another such authority is *Genger v. TR Investors, LLC*, 26 A.3d 180 (Del. 2011). There, the majority stockholder in a corporation (the Trump Group) argued that certain transfers of shares from a minority stockholder (Genger) to a trust were void *ab initio* because Genger had failed to comply with the transfer restrictions in a stockholders agreement. *Id.* at 187. The agreement required that the party wishing to transfer or sell its shares give notice to the other stockholders who had a right of first refusal. The agreement provided that any transfer that did not comply with these provisions "would automatically be deemed invalid and void." *Id.* at 184; *see TR Invs., LLC v. Genger* (*Genger I*), 2010 WL 2901704, at *4 (Del. Ch. July 23, 2010) (quoting a section of agreement as providing that "[a]ny attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void"), *aff'd*, 26 A.3d 180 (Del. 2011).

Genger argued that he gave oral notice of the transfers and that the Trump Group had acquiesced in the transfers. Alternatively, he argued that the Trump Group had ratified

117

the transfers through subsequent transactions. *Genger*, 26 A.3d at 184. Serving as the trial judge while a member of this court, Chief Justice Strine analyzed the affirmative defenses of laches, acquiescence, and ratification. *Genger I*, 2010 WL 2901704, at *14–18. He did not view those doctrines as unavailable because the stockholders agreement stated that a noncompliant transfer was "void." He found that Genger had failed to carry his burden of proving laches, acquiescence, or ratification as to the transfers as a whole, but he found that a transaction in which the Trump Group purchased some of the transferred shares from the transferee had the effect of ratifying that portion of the noncompliant transfer. *Id.* at *17–18.

On appeal, the Delaware Supreme Court affirmed the trial court's rulings. *Genger*, 26 A.3d at 195–96. The high court acknowledged that "[r]atification is an equitable defense" and explained that the ratifying act can be either "express or implied through a party's conduct." *Id.* at 195. Like the trial court, the Delaware Supreme Court did not hold that the use of the word "void" in the anti-assignment provision meant that the noncompliant transfers were void *ab initio* such that equitable defenses or ratification could not apply. *Id.* at 195–96.

Another such authority is *Paul v. Chromalytics Corp.*, 343 A.2d 622 (Del. Super. 1975). The case involved the sale of a business, and the seller received promissory notes from the buyer for a portion of the consideration. The purchase agreement contained an anti-assignment provision that specified that "any assignment of this Agreement or the rights hereunder by [the seller] without the written consent of [the buyer] shall be void." *Id.* at 625. The seller purported to assign the promissory notes to a third party without the

118

consent of the buyer, and the assignee sought to enforce the notes. *Id.* Chief Justice Christie, then serving on the Delaware Superior Court, did not hold that the reference to a noncompliant transfer being "void" caused the assignment to be void *ab initio*. He explained that the violation of "a valid and unwaived non-assignability provision" instead gave the non-breaching party "the prerogative to resist or even nullify the assignment." *Id.* at 626. The *Paul* decision thus treated the noncompliant assignment as voidable, in the sense that the counterparty could seek to nullify it, and recognized that the challenge to the noncompliant assignment could be waived. The *Paul* decision did not regard the assignment as incurably void.

The *Paul* decision also accepted that the breaching party could invoke the defense of acquiescence. The assignee who sought to enforce the notes argued that the buyer had "acquiesced in and relied upon the assignment, thereby waiving any objections it might have had." *Id.* The court accepted that a waiver was possible, but held that none of the actions that the buyer took were sufficiently clear, distinct, or unequivocal to amount to waiver. *Id.* The court further held that although the seller could invoke the anti-assignment clause "as a protective shield to resist the claims of [the assignee]," the clause did not affect the validity of the transaction as between the assignor and assignee. Thus, the assignee could sue the assignor of the notes to recover any amounts that the assignor obtained from the obligor. *Id.*

Because of the manner in which the issue of contractually specified voidness arose in *CompoSecure II*, the high court did not have the benefit of meaningful briefing on these authorities. At the trial level, the parties' post-trial briefs did not cite *Eureka* or *Paul*. *See*

119

C.A. No. 12524-VCL, Dkts. 142, 146, 149, & 151. Both sides cited *Genger*, but only for the general definition of ratification; they did not discuss how the decision treated a transaction that failed to comply with a contractual provision that used the word "void." *See* C.A. No. 12524-VCL, Dkts. 149 & 151. The same was true on appeal. No one cited *Eureka* or *Paul*, and the parties only cited *Genger* for the general definition of ratification. *See* Appeal No. 177, 2018, Dkts. 10, 19–20. And because CardUX's counsel conceded that a contractual specification of voidness would cause the noncompliant act to be void *ab initio*, there was no need for the senior tribunal to look beyond counsel's concession or the use of the word "void" in the Restricted Activities Provision. The existence of these earlier authorities suggests that a different approach is possible.[57]

---

[57] Authorities outside of Delaware are split. Many decisions have declined to equate the use of the word "void" with void *ab initio* and have chosen instead to treat the noncompliant act as voidable. *See, e.g.*, *Fletcher v. United States,* 303 F. Supp. 583, 586 (N.D. Ind. 1967) ("'Null and void' as here used means that the contract is voidable at the election of the seller."); *Metro. Life Ins. Co. v. Hall*, 12 S.E.2d 53, 60–61 (Ga. 1940) ("[W]e think the phrase 'null and void' should be construed to mean voidable."); *Becker v. Becker*, 416 A.2d 156, 162 (Vt. 1980) (construing the words "null" and "void" "to mean voidable only"); *Marshall v. Porter*, 80 S.E. 350, 351 (W. Va. 1913) ("We do not think the words 'null and void' should be construed literally. When these words are employed in contracts of this kind they are generally construed to mean that the contract is voidable at the election of the party in whose favor they were inserted, in this case the vendor. It is evident from their conduct that these words in the contract were so construed by the parties thereto." (citing 5 Words and Phrases, 4867)); *see also State v. Powell,* 924 N.W.2d 533 (Iowa Ct. App. 2018) ("Here, the terms of the [plea] agreement stated that certain actions by Powell would render the agreement 'null and void.' We think it evident that when the parties used the phrase 'null and void,' they meant that the agreement was merely voidable by the State if Powell picked up additional charges before sentencing, not that the agreement would become void from its outset."). Other courts, however, have treated the noncompliant act as incurably void. *See, e.g.*, *In re Kang*, 664 F. App'x 336, 340–41 (4th Cir. 2016) (holding under Virginia law that transfer in violation of operating agreement which stated that a

### b. Considerations Based On The Law Governing Voidness

A second set of considerations takes into account two takeaways from the law governing voidness. The first is that courts have limited the situations in which an act will be declared incurably void as a result of violations of positive law or fundamental public policy; in other words, limitations imposed by the state in its capacity as sovereign. The second is that the consequences of determining an act "void *ab initio*" are inflexible, far-reaching, and often harsh. They can have implications for third parties and enable contracting parties to take advantage of their own nonfeasance, misfeasance, or malfeasance. These considerations suggest that a prudent course would be to limit the ability of parties to opt contractually for an exclusive remedy of incurable voidness.

The distinction between void and voidable acts arises in multiple areas of law. One prominent area is the domain of contracts. Delaware is a pro-contractarian state, but certain agreements remain "so egregiously flawed that they are void at the outset." *PHL Variable*

---

noncompliant transfer was "null and void," rendered the transfer "without legal effect" and not subject to equitable defenses such as estoppel); *Abdullatif v. Choudhri*, 561 S.W.3d 590, 610 (Tex. App. 2018) (holding that where limited partnership agreement provided that a noncompliant transfer was "null and void *ab initio*," the term had "its plain, ordinary, and generally accepted meaning" under which the attempted transfer "never has any effect and never binds any party"; further holding that "[u]nder the plain, ordinary, and generally accepted meaning of this term, a party cannot give life to a null and void attempted transfer by ratifying, confirming, or consenting to the attempted transfer or by purporting to waive its nullity"). Still other decisions have stated that a noncompliant transfer was void, but without reaching the question of whether equitable defenses could be invoked to defeat the contractual claim. *See In re Innocenti, LLC,* 2016 WL 3483228, at *12 (Bankr. N.D. Cal. June 20, 2016); *W.R. Huff Asset Mgmt. Co. v. William Soroka 1989 Tr.*, 2009 WL 606152, at *17 (D.N.J. Mar. 9, 2009); *Kapila v. Deutsche Bank AG (In re Louis J. Pearlman Enters., Inc.)*, 398 B.R. 59, 65 (Bankr. M.D. Fla. 2008).

*Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1067 (Del. 2011). Under the common law, those bargains deemed void *ab initio* were "those opposed to positive law, those which are contrary to morality and those which offend public policy."[58] Consistent with this summary, the Delaware Supreme Court has stated that "contracts that offend public policy or harm the public are deemed void," *PHL Variable*, 28 A.3d at 1067, and the Delaware Superior Court has summarized the applicable principles as follows: "As a general rule, agreements against public policy are illegal and void. . . . [P]ublic policy may be determined from consideration of the federal and state constitutions, the laws, the decisions of the courts, and the course of administration."[59]

The consequences of finding a contract void *ab initio* are serious. Under Delaware law, "[a] court may never enforce agreements void *ab initio*, no matter what the intentions of the parties." *Id.* at 1067. Parties cannot ratify or fix a void contract, which is "deemed incapable of confirmation upon the maxim, '*Quod ab initio non valet, in tractu temporis non convalescit.*'" Story, *supra*, § 306, at 296. Loosely translated, the maxim means, "That

---

[58] 1 Williston, *supra*, § 12:1; *accord id.* § 1:20; *see* 2 Pomeroy §§ 931–39 (identifying types of contracts that were illegal under the common law as violative of public policy).

[59] *Sann v. Renal Care Ctrs. Corp.*, 1995 WL 161458, at *5 (Del. Super. Ct. Mar. 28, 1995) (citation omitted). The Restatement (Second) of Contracts does not use the concept of illegality. *See* Restatement (Second) of Contracts, *supra*, § 178. It frames the question as whether a particular term or promise is unenforceable on grounds of public policy, stating that it will be "if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." *Id.* The Restatement identifies seven factors for courts to consider when conducting the balancing. *Id.*

which is not valid in the beginning does not become valid by time." Because of the significant implications of incurable voidness, courts are understandably reluctant to impose that consequence. *See* 1 Williston, *supra*, § 1:20. "By contrast, a voidable contract is a common occurrence in the law." *Id.* Among other examples, the bias in favor of voidability has led to holdings that contracts which a party could not agree to because of infancy, that were executed under duress, or which are infected by fraud or mistake were voidable rather than void. *Id.*

The throughline that unites these concepts is that a contract that is void *ab initio* contravenes limitations imposed by the state as sovereign. The state establishes the meets and bounds of the legal environment in which parties can contract. When parties leave that domain, they have exceeded their authority, and their promise is both void from the outset and incurably so.[60] When a party has breached a permissible provision in a private

---

[60] Not all contracts that exceed the bounds of law are void *ab initio*. When classifying illegal contracts, courts historically distinguished between a bargain that was *malum in se*, meaning that the contract was egregiously wrong, and a bargain that was *malum prohibitum*, meaning that the contract merely violated a regulatory prohibition. *See* 3 Eric M. Holmes, Corbin on Contracts § 9.27 (Joseph Perillo, ed., rev. ed. 1996); 7A Fletcher, *supra*, § 3582, at 164 ("[Illegal contracts] are . . . sometimes classified as (1) *malum prohibitum*, *i.e.*, prohibited either by general statute, the charter, or the state or federal constitution or (2) *malum in se*, *i.e.*, against public policy or good morals."). *See generally Validity of Contracts Which Violate Regulatory Statutes*, 50 Yale L.J. 1108 (1941) ([C]ontracts involving *malum in se* were wholly void, while those involving merely *malum prohibitum* were not."). Both exceed the authority granted by the state, but only a contract that is *malum in se* is so egregiously wrong as to be invariably void *ab initio*. Depending on the nature of the contract and the prohibition, a court may treat a contract that is *malum prohibitum* as voidable and permit the injured party to pursue a remedy. 17A Am. Jur. 2d Contracts § 298 (Aug. 2022 update); *see* 8 Williston, *supra*, § 19:46 ("[I]n determining what validity, if any, a forbidden contract has, it is often important to consider

agreement, the party is liable for the consequences of the breach, but the party has not exceeded the bounds of what the law permits. The violation is therefore voidable, but not void *ab initio*. *See generally* Schaefer, *supra*, at 208 (drawing this distinction).

Entity law is a second domain where the law of voidness comes into play. The principles are most fully developed in the law of corporations, where the basic distinction between void and voidable acts resembles the test for contracts. Stated generally, void acts are those the corporation itself "has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy." *Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000). Voidable acts, by contrast, are within the power or capacity of the corporation and not fundamentally contrary to public policy, but which were not properly authorized, effectuated, or implemented by the proper corporate decision-makers. *See id.*

A Delaware corporation is a legal entity created by the state through an exercise of sovereign power.[61] By virtue of Delaware's exercise of its sovereign authority, a Delaware corporation comes into existence and gains the power to act in the world. A Delaware

how far and for what reason the prohibited transaction is wrongful since the courts will endeavor to deal with the transaction so as to give effect to the fundamental purpose of the legislature and to the public policies underlying its enactments. Accordingly, some contracts, considered *malum prohibitum*, have been found enforceable as not violating the public policy underlying those statutes.").

[61] 8 *Del. C.* § 108.

corporation only can wield the powers that the state provides,[62] and the Delaware General Corporation Law ("DGCL") identifies both general[63] and specific powers[64] that a Delaware corporation possesses. An act that an entity lacks authority to take is *ultra vires* and void, in the sense that the act exceeds the authority that the state has granted.

As the sovereign whose exercise of authority gives rise to the corporation, Delaware can also impose limitations on the manner in which a corporation exercises the power and authority that it possesses, such as by requiring that corporate representatives take certain steps, in a specified order, to accomplish a given act. For example, Section 251 of the DGCL imposes statutory requirements before a corporation can exercise its power to merge, including an initial resolution by the board of directors approving the merger, followed by a favorable stockholder vote. *See* 8 *Del. C.* § 251(c). The steps must occur in that order, otherwise the merger is void. *See Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996).

The constitutive document that creates the corporation and these powers is not an ordinary private contract among private actors. It is a multi-party contract among the corporation, the stockholders, other corporate organs such as its directors and officers, and

---

[62] *Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del. 1930); *accord Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 636 (1819) ("[A corporation] possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence.").

[63] *See* 8 *Del. C.* § 121.

[64] *See* 8 *Del. C.* §§ 122–23.

the State of Delaware.[65] The certificate of incorporation always incorporates by reference the limitations imposed by the DGCL,[66] and it may only contain provisions authorized by the DGCL.[67] The certificate of incorporation can only be amended in compliance with the DGCL.[68] A limitation on corporate authority set forth in the certificate of incorporation, or procedures for exercising corporate power specified in the certificate of incorporation, are therefore limitations that the corporation has agreed to with the state.

---

[65] *STARR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders."); *Lawson*, 152 A. at 727 ("[T]he charter of a corporation is a contract both between the corporation and the state and the corporation and its stockholders. It is not necessary to cite authorities to support this proposition.").

[66] 8 *Del. C.* § 121(b) ("Every corporation shall be governed by the provisions and be subject to the restrictions and liabilities contained in this chapter."); *id.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation."); *see STARR Surgical*, 588 A.2d at 1136 ("[I]t is a basic concept that the General Corporation Law is a part of the certificate of incorporation of every Delaware company."); *Fed. United Corp. v. Havender*, 11 A.2d 331, 333 (Del. 1940) ("It is elementary that [the DGCL's] provisions are written into every corporate charter.").

[67] *See Berlin v. Emerald P'rs*, 552 A.2d 482, 488 (Del. 1988) ("In examining the provisions of a certificate of incorporation, courts apply the rules of contract interpretation. . . . Nevertheless, the contract rights of the stockholders of the corporation are also subject to the provisions of the [DGCL]."); *see also Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders . . . ."); *In re Activision Blizzard, Inc.*, 124 A.3d 1025, 1050 & n.11 (Del. Ch. May 20, 2015) (collecting authorities).

[68] *See* 8 *Del. C.* §§ 241–42.

Because the state as sovereign plays a role in each of these ways, each provides a potential avenue by which a corporation may be deprived of authority to act. A corporate act may be void because the act exceeds the powers granted by the state.[69] Or a corporate act may be void because the charter either deprives the corporation of a power that it otherwise would possess or fails to take advantage of a permissive grant of power that the DGCL authorizes.[70] Or a corporate act may be void because the pertinent corporate

---

[69] Today, it is unlikely that a corporate act would be void because of the absence of authority conferred by the state. *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 439–42 (Del. Ch. 2020) (discussing concept and sources of corporate power and authority). The DGCL retains only three limitations on corporate capacity or power. *Id.* at 442 (citing 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* §§ 2.4–2.6 (3d ed. & supp. 2020-2), Westlaw (database updated 2020)). First, with specified exceptions, no corporation formed under the DGCL after April 18, 1945, may confer academic or honorary degrees. 8 *Del. C.* § 125. Second, no corporation formed under the DGCL can exercise banking power. *Id.* § 126(a). Third, a Delaware corporation that is designated as a private foundation under the Internal Revenue Code cannot fail to comply with certain tax provisions, unless its charter provides that the restriction is inapplicable. *Id.* § 127.

[70] On the first point, see *Applied Energetics,* 239 A.3d at 442, which states that "a corporation retains the ability to introduce uncertainty about its capacity or power by including provisions in its charter that disavow particular powers or forbid the corporation from entering into particular lines of business or engaging in particular acts." (citing 1 Balotti & Finkelstein, *supra*, § 2.1)). On the second point, see *Waggoner v. Laster*, 581 A.2d 1127, 1136–37 (Del. 1990), holding that stock was incurably void *ab initio* because the provision in the corporate charter giving the board blank check authority to issue preferred stock did not encompass the issuance of preferred stock with super-majority voting rights, despite the DGCL authorizing a corporation to claim that power.

127

decision-makers failed to comply with statutory or charter-based requirements specifying the manner in which the state permits the corporation to exercise its powers.[71]

Void acts create serious difficulties because of a "domino effect" in which one defective corporate act can infect subsequent acts. *See* C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 Bus. Law. 393, 402 (2014); *Olson v. EV3*, 2011 WL 704409, at *11 (Del. Ch. Feb. 21, 2011) (same). So significant are the problems created by incurable voidness that the General Assembly amended the DGCL to establish two alternative procedures by which either the corporation or this court could establish the validity of certain types of corporate acts—defined by statute as "defective corporate acts"—that otherwise would be incurably void. *See* 8 *Del. C.* §§ 204 & 205. Section 204 is "a 'self-help' provision that allows the board of directors, by following specified procedures, to validate a defective corporate act." Bigler & Zeberkiewicz, *supra*, at 402. Section 205 is a judicial mechanism under which identified parties can "petition the Delaware Court of Chancery to enter an order validating or invalidating, as the case may be, the defective act." *Id.*

---

[71] *See, e.g.*, *STAAR Surgical*, 588 A.2d at 1137 (holding that failure to comply with statutory requirements for authorizing stock rendered issuance of shares void *ab initio*). *See generally* C. Stephen Bigler & Seth Barrett Tillman, *Void or Voidable?—Curing Defects in Stock Issuances Under Delaware Law*, 63 Bus. Law. 1109 (2008).

As with contracts that are void *ab initio*, corporate acts that are void *ab initio* historically could not be fixed.[72] Except through the statutory self-help mechanism now authorized by Section 204, parties still cannot fix a void act consensually, such as through ratification.[73] Parties now can make use of Section 204, or seek judicial relief under Section 205, but those sections are complicated, and the effort is not costless. A party cannot defeat the challenge to a void act by asserting equitable defenses in litigation. *See STARR Surgical*, 588 A.2d at 1137; *Waggoner*, 581 A.2d at 1137.

A determination that an act is void *ab initio* also can have significant effects on third parties, particularly where the act in question involves an assignment of contract rights or a transfer of property. A bona fide purchaser for value ordinarily has the right to retain property, notwithstanding an unknown defect in the title of the seller.[74] If the noncompliant transaction is voidable, then that legal principle can readily apply, but if the transfer is void

---

[72] *See, e.g.*, *Liebermann v. Frangiosa*, 844 A.2d 992, 1004 (Del. Ch. 2002) ("[O]ur case law has refused to overlook the statutory invalidity of stock even in situations when that might generate an inequitable result."); *Superwire.com, Inc. v. Hampton*, 805 A.2d 904, 909 n.17 (Del. Ch.2002) (rejecting equitable defenses on the grounds that the court "cannot give any effect to void shares even in the context of an equitable defense" (emphasis in original)).

[73] *See Michelson v. Duncan,* 407 A.2d 211, 219 (Del. 1979) (explaining that voidable acts can be ratified but void acts cannot); *Triplex Shoe Co. v. Rice & Hutchins, Inc.*, 152 A. 342, 347–48 (Del. 1930) (rejecting attempt to validate invalid stock issuance through exchange offer).

[74] *See, e.g.*, *Flemming v. Thompson*, 343 A.2d 599, 600 (Del. 1975); *see* 6 *Del. C.* §§ 8-302, 8-303 (establishing protected purchaser defense for purchase of securities without notice of a defect).

*ab initio*, the transaction becomes a nullity, and the bona fide purchaser defense is unavailable. *See MBKS Co. v. Reddy*, 924 A.2d 965, 973–74 (Del. Ch. 2007), *aff'd*, 945 A.2d 1080 (Del. 2008).[75]

The potential for an act to be void *ab initio* likewise enables a party who was responsible for the defect to take advantage of their own nonfeasance, misfeasance, or even malfeasance. That was the case in *CompoSecure II*, where CompoSecure itself failed to obtain the necessary approvals, even though the decision-makers would have readily granted them at the time of contracting, then attempted to take advantage of that fact to invalidate the Sales Agreement. The Delaware Supreme Court therefore noted that it was remanding the case "reluctantly" for further consideration of the Restricted Activities Provision, because "the trial court made a persuasive case that the equities do not favor CompoSecure[,] CompoSecure admitted at oral argument that the Sales Agreement was a

---

[75] The *MBKS* decision involved a sale of stock and discussed these issues under the protected purchaser defense established by Article 8 of the Uniform Commercial Code. *See* 6 *Del. C.* § 8-302. The protected purchaser exception is not an issue for the LLC interests in this case because Article 8 provides that an LLC interest is not a security unless it is traded on a securities exchange or meets other requirements. *See id.* § 8-103. Article 8 also contains an exception to the protected purchase defense, which states that "[a] purchaser of a limited interest acquires rights only to the extent of the interest purchased." *Id.* § 8-302(b); *see id.* § 8-302 cmt. 1 ("Subsection (a) provides that a purchaser of a certificated or uncertificated security acquires all rights that the transferor had or had power to transfer. This statement of the familiar 'shelter' principle is qualified by the exceptions that a purchaser of a limited interest acquires only that interest, subsection (b), and that a person who does not qualify as a protected purchaser cannot improve its position by taking from a subsequent protected purchaser, subsection (c)."). Although these statutory provisions limit the effect of the issue for LLCs, the broader problem with void transfers remains, as does the risk of a contractual specification of voidness resulting in a transfer being deemed void *ab initio*.

'bad contract,' and the Vice Chancellor's opinion is rife with findings suggesting that CompoSecure consistently attempted to avoid its obligations under that agreement." *CompoSecure II*, 206 A.3d at 811 (footnotes omitted). Chief Justice Strine worried about that being the case in *Eureka*, where the company told the member that its consent was not required, then contended that its lack of consent rendered the noncompliant transfer void. *Eureka*, 899 A.2d at 108 & n.25. And under the general rule that parties cannot ratify or fix void acts themselves, a party could expressly agree to the ratification of an act that was incurably void as a matter of contract, then later renege on that agreement on the theory that the violation was incurably void and the agreement accordingly irrelevant.

Voidable acts, by contrast, raise none of these issues. Because the entity's actions did not contravene limitations imposed by the sovereign, the entity had the power to take the pertinent actions and simply did so ineffectively. A party thus can invoke equitable defenses to defeat a challenge to a voidable act.[76] Parties also can fix voidable acts after the fact through means such as ratification.[77]

Likely because of the major consequences of a declaration of incurable voidness, our law has moved steadily away from imposing it. The concept of a lack of corporate power that could give rise to an act being void *ab initio* was an "oft-recurring theme" in the "formative years of corporation law in the 19th and early 20th centuries," when parties

---

[76] *See Klaassen*, 106 A.3d at 1047; *Nevins v. Bryan*, 885 A.2d 233 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005).

[77] *See Michelson*, 407 A.2d at 219.

131

frequently invoked the *ultra vires* doctrine to challenge the validity of corporate action. 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 11.01, at 11-10 (2019). One of the goals of the major revision to the DGCL that took place in 1967 was to eliminate questions about corporate power and de-fang the *ultra vires* doctrine. *Id.* § 11.01, at 11-1. The adoption of Sections 204 and 205 of the DGCL represents a further step toward eliminating these historical legacies. *See generally Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (discussing *ultra vires* doctrine), *abrogated on other grounds by El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016).

To date, Delaware decisions have applied similar concepts to LLCs. *See Coinmint*, 261 A.3d at 890. Thus, if an LLC lacks the statutory power to engage in a particular act, then the act is void *ab initio*. *Id.* at 900–02. As with a Delaware corporation, it is unlikely that an LLC would lack statutory power, because the LLC Act broadly imbues LLCs with the power and authority to take action. *See* 6 *Del. C.* § 18-106(b); Symonds & O'Toole, *supra*, § 2.08. But as with corporations, LLCs can re-introduce uncertainty about their powers by voluntarily limiting the actions that the LLC can take or the powers that it can exercise. An LLC agreement may permit the LLC only to serve a limited purpose, such as pursuing a single business opportunity. Symonds & O'Toole, *supra*, § 2.09[B]. An LLC agreement may eliminate the entity's power to merge or consolidate,[78] forgo the power to

---

[78] 8 *Del. C.* § 18-209(h).

transfer, domesticate, or continue in another jurisdiction,[79] or foreclose the power to convert into another entity.[80] More generally, an LLC agreement may exclude the power or authority to take other types of actions. Symonds & O'Toole, *supra*, § 2.09[B]. "For example, the LLC agreement might specifically state that the company has no power to issue notes bearing interest at a rate in excess of a stipulated rate, or that it has no power to incur any indebtedness at all." *Id.*

The question then becomes whether, in the presence of such a limitation, the unauthorized action should be void *ab initio* or simply voidable. In my view, there is no need to transplant the full scope of corporate voidness doctrine into the world of LLCs.[81] If the action is one that the state has deemed permissible and which the parties to the LLC agreement have eschewed, then the act should be voidable, not void *ab initio*.[82] Doubtless

---

[79] 8 *Del. C.* § 18-213(h).

[80] 8 *Del. C.* § 18-216(i).

[81] *See CML V, LLC v. Bax*, 6 A.3d 238, 249–50 (Del. Ch. 2010) (declining to replicate corporate doctrine of creditor derivative standing in LLCs; noting that "there is nothing absurd about different legal principles applying to corporations and LLCs"), *aff'd*, 28 A.3d 1037 (Del. 2011); *see also Twin Bridges*, 2007 WL 2744609, at *19 ("Because the conceptual underpinnings of the corporation law and Delaware's [alternative entity] law are different, courts should be wary of uncritically importing requirements from the DGCL into the [alternative entity] context.").

[82] *See Coinmint*, 261 A.3d at 890–91 (recognizing the general rule that action which an LLC has the power to take, but which "fails to adhere to provisions of a limited liability company agreement, is voidable, not void."); *see also CompoSecure II*, 206 A.3d at 817 ("Ordinarily, the Sales Agreement would be voidable for failure to comply with the Restricted Activities Provision.").

133

in many cases a court still would invalidate the voidable act, leading to the same result, but that outcome would not be foreordained by a contractual specification.[83]

To my mind, a determination that an act is void *ab initio* only should be available under traditional circumstances, namely when the act exceeds the authority granted by the state. *See* Schaefer, *supra*, at 208 (arguing for this approach). Only acts that violate the limitations imposed by the state should lead to that result.

---

[83] As with Sections 204 and 205 of the DGCL, the General Assembly has taken a step in this direction by adopting Section 18-106(e) of the LLC Act. The synopsis to the amendment states that its purpose is "to provide a rule different from the rule applied in *CompoSecure II, L.L.C. v. Cardux*, *LLC*, 206 A.3d 807 (Del. 2018), and *Absalom Absalom Trust v. Saint Gervais LLC*, 2019 WL 2655787 (Del. Ch. June 27, 2019), that acts or transactions determined to be void generally may not be ratified." Del. S.B. 114 syn., 151st Gen. Assem. (2021). Section 108(e) provides that

> Any act or transaction that may be taken by or in respect of a limited liability company under this chapter or a limited liability company agreement, but that is void or voidable when taken, may be ratified (or the failure to comply with any requirements of the limited liability company agreement making such act or transaction void or voidable may be waived) by the members, managers or other persons whose approval would be required under the limited liability company agreement.

6 *Del. C.* § 18-106(e). The statutory amendment is a half-loaf in that it gives those in control of the LLC a route to fixing defective acts that otherwise would be incurably void, but it does not provide a means of relief for other parties. It does not, for example, empower a court to find ratification or waiver by conduct. There is also no path for judicial validation of a defective act analogous to Section 205 of the DGCL. By the time a dispute arises, it is unlikely that those in control of the LLC will take action to help their adversary by curing the defect. A party like CardUX in *CompoSecure II*, the plaintiffs in *Southpaw* and *Absalom Trust*, or Holifield in this case remains vulnerable to the full implications of a determination that an act is void *ab initio*. The better approach is to treat these acts as voidable.

134

### c. Considerations Based On Contract Law

A third set of considerations flow from contract law. An LLC agreement is a

contract and is interpreted like other contracts.[84] Given this baseline, it follows that a claim

---

[84] *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008) (describing LLCs as "creatures of contract"); *accord, e.g.*, *Henson v. Sousa*, 2015 WL 4640415, at *1 (Del. Ch. Aug. 4, 2015) ("LLCs, as this Court has repeatedly pointed out, are creatures of contract."); *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract . . . .").

More properly, LLCs are *primarily* creatures of contract. *See In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract . . . ."). To that end, I have stressed that "[t]he adverb 'primarily' is important and should not be overlooked." *Godden*, 2018 WL 3998431, at *7 n.17. That is because there are "core attributes of the LLC" that are not contractual and which "only the sovereign can authorize, such as its separate legal existence, potentially perpetual life, and limited liability for its members." *In re Carlisle Etcetera LLC*, 114 A.3d 592, 605 (Del. Ch. 2015); *accord Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 809 (Del. Ch. 2020) ("A Delaware LLC is 'a separate legal entity' created through Delaware's sovereign power as a state."); *see Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *17 & n.193 (Del. Ch. May 31, 2022) (discussing entity attributes that only a sovereign can authorize); *Coinmint,* 261 A.3d at 908–10 (discussing the role of the sovereign in authorizing an LLC and declining to dissolve an LLC domiciled in Puerto Rico); *see* 6 *Del. C.* §§ 18-201, 18-303. An LLC agreement cannot be an exclusively private contract among its members "precisely because the LLC has powers that only the State of Delaware can confer." *Carlisle*, 114 A.3d at 606; *see Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659–63 (Del. Ch. 2012); *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849–56 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012). Professor Mohsen Manesh has identified a baker's-dozen reasons why LLCs are not wholly contractual and only partially creatures of contract. *See* Mohsen Manesh, *Creatures of Contract: A Half-Truth About LLCs*, 42 Del. J. Corp. L. 391 (2018). *See generally* Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup To Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 460–71 (2009) (identifying historical, jurisprudential, and policy reasons why LLCs should not be regarded as purely contractual entities); Sandra K. Miller, *The Best of Both Worlds: Default Fiduciary Duties and Contractual Freedom in Alternative Business Entities*, 39 J. Corp. L. 295, 315–24 (2014) [hereinafter *The Best of Both Worlds*] (reviewing empirical studies and

for breach of an LLC agreement generally should be subject to the same substantive defenses that ordinarily are available in an action for breach of contract. Equitable defenses ordinarily are available in an action for breach of contract. So are defenses such as ratification and waiver that are generally available at law as well as in equity. Those defenses likewise should be available in an action for breach of an LLC agreement.

Another consideration is whether parties should be able to use a reference to contractually noncompliant actions being "void" to lock in a contractual outcome. Delaware contract law does not permit that result. "[A] written agreement does not

---

presenting data about alternative entity agreements that undermine premises of purely contractarian approach).

A critic of the approach that this decision proposes might suggest that to argue for the availability of equitable defenses on the ground that LLCs are contractual entities disregards the reality that LLCs are not wholly contractual. The opposite is true. An approach under which contractual limitations result in noncompliant acts being voidable rather than void recognizes that LLCs are *primarily* contractual and that parties do not have unfettered authority to specify whatever they want in their LLC agreements. Parties to an LLC agreement have broad contractual freedom, but there are limits. *See* Manesh, *supra*, at 420–24 (identifying non-contractible features of an LLC agreement). An approach under which parties cannot compel a court to enforce an exclusive and mandatory remedy of incurable voidness for a contractual breach comports with the existence of some limits on the contractual freedom that parties have under the LLC Act. It is the fully contractarian position that overstates the case, because whatever one's views might historically have been on the matter, the General Assembly in 2013 adopted an amendment to the LLC Act inconsistent with the purely contractarian view. *See* H.B. 126, 147th Gen. Assemb. (Del. 2013) (amending 6 *Del. C.* § 18-1104 to provide that "[i]n any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern"); *The Best of Both Worlds*, at 314 (noting that the debate over the purely contractual status of LLCs "was resolved by legislation that was signed into law on June 30, 2013"). *See generally Carlisle*, 114 A.3d at 605–06.

necessarily govern all conduct between contracting parties until it is renounced in so many words. The reason for this is that the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit." *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972). Thus, notwithstanding a contractual provision stating that a contract cannot be modified except in writing, a court may find that the parties modified their obligations orally, by conduct, or through waiver.[85] Likewise, notwithstanding a contractual provision that states that no party can waive any rights under an agreement, a court may find that a right has been waived.[86]

---

[85] *Pepsico*, 297 A.2d at 33; *accord Coinmint*, 261 A.3d at 900 (concluding that under *Pepsico*, the anti-waiver provision in an LLC agreement "cannot preclude CLT's defenses of waiver, estoppel, and acquiescence"); *Good v. Moyer*, 2012 WL 4857367, at *6 (Del. Super. Oct. 10, 2012) (denying motion to dismiss that relied on no-oral amendment clause; finding it reasonably conceivable that the provision was waived or modified by conduct or based on further assurances); *Katz v. Adjustable Steel Prod. Co.*, 1989 WL 64072, at *3 (Del. Super. June 14, 1989) (denying motion for summary judgment that relied on no-oral amendment clause; holding that there was evidence sufficient to give rise to a question of fact as to whether the parties amended or waived the provision through an oral agreement).

[86] *CPC Mikawaya Hldgs., LLC v. MyMo Intermediate, Inc.*, 2022 WL 2348080, at *13 (Del. Ch. June 29, 2022) ("Delaware courts recognize that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision." (cleaned up)); *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *29 n.273 (Del. Super. Ct. July 29, 2021) ("[C]ontractually afforded protections against waivers themselves may be waived if facts so indicate."); *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *28 (Del. Ch. Apr. 2, 2007) (explaining that "the law is clear that non-waiver clauses are not iron-clad protections" and do not fully supersede the doctrines of waiver and estoppel); *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) (same); *see, e.g.*, *Rehoboth Mall Ltd. P'ship. v. NPC Int'l, Inc.*, 953 A.2d 702, 705 (Del. 2008) (concluding as a matter of law that the landlord waived its right to use a tenant's late rent payments as

Applying these principles, this court has held that the express provisions in an LLC agreement—there an integration clause and an anti-waiver provision—did not prohibit the court's consideration of post-contracting promises, communications, or modifications to the agreement. *Coinmint*, 261 A.3d at 897. The court held that the ability of a court to consider post-contracting activity applies "no matter the analytical vehicle; whether couched in terms of waiver, acquiescence, or other fact-specific inquiry, the outcome would be the same." *Id.* at 900. As discussed above, the Delaware Superior Court applied these concepts to an anti-assignment clause in a commercial contract for the sale of a business. *Paul*, 343 A.2d at 625. Although the anti-assignment clause specified that any noncompliant assignment "shall be void," the Delaware Superior Court treated a noncompliant assignment as voidable and subject to the defense of acquiescence. *Id.*

These authorities suggest that parties should not be able to use the word "void" to lock in a contractual arrangement and insulate it from the implications of their subsequent actions. Reading a contractual deployment of the word "void" to require that a court treat the noncompliant act as "void *ab initio*" gives parties a ready-made way to do just that. For example, parties could circumvent *Pepsico*, *Paul*, and the Delaware precedents governing

---

a basis not to renew the lease where the landlord accepted the late payments and allowed the tenant to remain in possession for five years after the alleged breach).

Parties cannot even lock in a contractual choice of law. Under appropriate circumstances, a court will not be bound by and can override the contractual specification. *See Restatement (Second) of Conflict of Laws* §§ 6, 188 (1971).

no-oral-modification and no-waiver clauses simply by revising the provisions to say "any modification not in writing is void" or "a waiver not in writing is void."[87]

Yet another contractual consideration is that parties to a contract generally cannot dictate the remedy (if any) that a court will award, particularly when the remedy sounds in equity.[88] Thus, there is no right to specific performance; even when a contractual provision

---

[87] I acknowledge that there are additional considerations for formal, written LLC agreements. Like contracts generally, LLC agreements present themselves with varying levels of formality. Under the LLC Act an LLC agreement can be "written, oral or implied." 6 *Del. C.* § 18-101(7). An LLC agreement is also not subject to the statute of frauds. *Id.* And it need not consist of a single document; it can be a combination of written agreements, oral agreements, and implied understandings. *See* Symonds & O'Toole, *supra*, § 4.02[A] & [C][1]. The same is true for amendments, which can be written, oral, or implied and need not take any specific form. *Id.* § 4.06[B] & [C]. At the same time, the LLC Act states that if an LLC agreement provides for a manner of amending the agreement, then "it may be amended only in that manner or as otherwise permitted by law." 6 *Del. C.* § 18-302(e). Given this statutory language, there is a stronger argument for enforcing limitations on the parties' ability to modify their agreements when the contract is a formal LLC agreement. *See* Symonds & O'Toole, *supra*, § 4.06[A][2]. But what the LLC Act gives, it also takes away, and the LLC Act states that if an LLC agreement imposes conditions on the effectiveness of an amendment, then the persons for whose benefit such conditions were intended may waive them. 6 *Del. C.* § 18-302(e). In terms of inalterable lock-in, an LLC agreement thus ends up in a place not so far from an ordinary commercial agreement.

I also acknowledge that the concepts of contractual formality, amendment, and waiver do not fully overlap with the availability of equitable defenses. One could have a formal agreement that precludes amendments not in writing, yet still permit a party to invoke equitable defenses. The more general point is the law's resistance to inalterable contractual lock-in, which a rule of contractually specified incurable voidness permits.

[88] *See* Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1794 (2022) (discussing the inherently equitable nature of equitable remedies and interventions).

provides for it, the remedy remains subject to the discretion of the court.[89] A party likewise

has no right to an injunction, which always remains a matter of judicial discretion, even

when a contractual provision states that injunctive relief is available or contains a

stipulation to the existence of irreparable harm.[90] A party's agreement to a remedial

provision of this sort is *sufficient* to support the issuance of the remedy, but it does not

obligate the court to award the remedy.[91] And absent clear and specific language, parties

cannot specify an exclusive remedy that eliminates a court's ability to award other

remedies.[92] Nor can a contract insulate itself from challenge by eliminating a court's ability

to award relief such as rescission or reformation, which affect the contractual provisions

themselves.

---

[89] *See, e.g.*, *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) ("Specific performance, of course, is a form of relief available at the discretion of the court."). *See generally Specific performance of a contract as a matter of right*, 65 A.L.R. 7 (1930 & Supp.); 71 Am. Jur. 2d Specific Performance § 130 (Aug. 2022 update).

[90] *Pomilio v. Caserta,* 215 A.2d 924, 925 (Del. 1965); *see Kan. City S. v. Grupo TMM, S.A.,* 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) (stipulation as to irreparable harm); *see also Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, 2022 WL 3025587, at *6 (Del. Ch. Aug. 1, 2022) (explaining that a contractual provision waiving the requirement of an injunction bond "does not bind the Court").

[91] *See In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *72 (Del. Ch. Sept. 28, 2021) ("The parties' contractual agreement to that remedy is sufficient, standing alone, to support awarding it. That said, a contractual remedy does not bind the court . . . .") (citing *Gildor*, 2006 WL 4782348, at *11 (specific performance); *Kan. City. S.*, 2003 WL 22659332, at *5 (injunction), and *Dover Assocs. Joint Venture v. Ingram*, 768 A.2d 971, 974 (Del. Ch. 2000) (receiver)).

[92] *Gotham P'rs, L.P.*, 817 A.2d at 176.

The law of contracts also places limitations on the ability of parties to contract for certain remedies. For example, a court generally will not enforce a contractual provision aimed at punishing or penalizing the breaching party, rather than compensating the non-breaching party.[93] The common law also resists outcomes that result in a forfeiture.[94]

Some remedies are simply beyond the power of parties to specify. Notwithstanding the importance of private ordering, it would go too far for parties to agree that a breach of a specific provision would constitute a felony, then expect the state to enforce that bargain. Nor could parties specify a remedy of imprisonment. Only the state can impose those remedies, and only for conduct that exceeds the limits of what the state permits.

These principles apply even to LLCs, where Delaware's contractarian approach has particular force. The LLC Act articulates a policy of giving "maximum effect to the

---

[93] *See* Restatement (Second) of Contracts, *supra*, § 355 (barring recovery of punitive damages as remedy for breach of contract); *id.* § 356(1) ("A [contract] term fixing unreasonably large liquidated damages is unenforceable . . . as a penalty."); *see also Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) (analyzing whether a liquidated damages provision constituted "a 'penalty' . . . inserted into a contract that serves as a punishment for default, rather than a measure of compensation for its breach" and explaining that "if a [contract] provision is considered a penalty, it is void as against public policy and recovery is limited to actual damages"); *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 48 (Del. 1997) (determining whether termination fee cast as a liquidated damages provision represented an unjustified penalty).

[94] *See Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635, 637 (Del. Ch. 1970) ("Equity . . . abhors a forfeiture."); *see Garrett v. Brown*, 1986 WL 6708, at *8 (Del. Ch. June 13, 1986) ("Forfeitures are not favored and contracts will be construed to avoid such a result."), *aff'd*, 511 A.2d 1044 (Del. 1986); *Clements v. Castle Mortg. Serv. Co.*, 382 A.2d 1367, 1370 (Del. Ch. 1977) ("Forfeiture as such is highly disfavored by the courts, including those of Delaware.").

principle of freedom of contract and to the enforceability of limited liability company agreements." 6 *Del. C.* § 18-1101(b). The LLC Act also expressly authorizes an LLC agreement to specify the remedy that will apply in the event of breach. *See id.* § 18-306. Notably, in a departure from common law principles, the LLC Act authorizes LLC agreements to provide for remedies that would be unavailable in a standard commercial contract, most notably penalties and forfeitures.[95]

These aspects of the LLC Act provide strong support for enforcing a remedy specified in an LLC agreement, but they do not establish a regime under which parties can force a court to award a specific remedy, irrespective of the facts and the role of judicial discretion.

> The parties to the limited liability company agreement do not enjoy unrestrained liberty. Maximizing freedom of contract and enforceability of limited liability company agreements is an important principle underlying the [LLC Act], but undoubtedly there are limits to this principle The policy of the statute is to give "maximum," not "absolute," effect to freedom of contract and enforceability.

Symonds & O'Toole, *supra*, § 4.09[E]; *accord id.* § 1.03[A][3] (noting that the policy of the LLC Act "is to implement contractual freedom to 'maximum effect,' not absolute effect"). Even in an LLC agreement, parties cannot contract for Shylock's remedial pound of flesh. Nor can they mandate that a breaching member donate a kidney. The LLC Act

---

[95] *See* 6 *Del. C.* §§ 18-306, 18-502(c). *See generally Cellular Tel.*, 2021 WL 4438046, at *72–74 (discussing parallel provisions of Delaware Revised Uniform Partnership Act).

thus calls for placing additional weight on the contractual scale, but there are still some provisions that go too far.

Even under the LLC Act, contractually specified incurable voidness should be regarded as a step too far. The LLC Act does not declare that in litigation over an LLC agreement, a court cannot consider equitable defenses, nor does it authorize parties to provide for that result. To the contrary, the LLC Act recognizes that the statute operates against a backdrop of common law, including principles of equity.[96]

Under a regime in which parties can specify in a contract that a noncompliant act is "void," with the consequence that the act is incurably void *ab initio*, parties can contract for and require the court to grant the exclusive and mandatory remedy of rescission.[97] That

---

[96] 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."). Commentary to an analogous provision in the Revised Uniform Partnership Act ("RUPA") states:

> The principles of law and equity supplement RUPA unless displaced by a particular provision of the Act. . . . These supplementary principles encompass not only the law of agency and estoppel and the law merchant mentioned in the UPA, but all of the other principles listed in UCC Section 1-103: the law relative to capacity to contract, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other common law validating or invalidating causes, such as unconscionability.

RUPA § 104 cmt. *See generally* Robert S. Summers, *General Equitable Principles Under Section 1-103 of the Uniform Commercial Code*, 72 Nw. U. L. Rev. 906 (1978).

[97] *Cf. Epps v. 4 Quarters Restoration LLC*, 872 N.W.2d 412, 426 (Mich. 2015) (interpreting statute forbidding unlicensed homebuilders from contracting with consumers; noting that if noncompliant contracts were deemed void, then "a homeowner defrauded by an unlicensed builder has but a single remedial option: he or she can seek to undo the

143

is a particularly striking result, as rescission is a remedy derived from equity where standard equitable principles apply and equitable defenses are available. *See Gotham P'rs, L.P.*, 817 A.2d at 174. Just as permitting parties to use the word "void" to lock in a contractual arrangement and insulate it from the implications of the parties' subsequent actions runs contrary to contractual principles, so too does permitting parties to use the word "void" to lock in a mandatory and exclusive remedy. These considerations suggest that Delaware law should not follow a fully textualist approach under which the use of the word "void" in a contractual provision renders noncompliant conduct incurably void.

### d.     Considerations Based On Clarity Of Meaning

The penultimate category of considerations takes into account the degree to which the word "void" truly has a plain and unambiguous meaning that properly should be enforced. It is possible to declare that "void" is a term of art with an established meaning. The real question is whether parties actually view the term that way and bargain accordingly. To the extent they do not, then a plain meaning analysis becomes a trap for the unsophisticated or unwary and a boon for parties who can pay for lawyers expert enough to use the magic word.

A range of authorities suggests that parties, courts, and legislatures do not regard the term "void" as having a settled meaning of "void *ab initio*." One commentator summarizes the results of a broad review of the legal landscape as follows:

---

transaction and restore the *status quo ante*"; concluding that noncompliant contracts should be voidable rather than void).

144

The law is littered with confusion when it comes to the concept of voidness. Though some legal scholars trivialize the distinction between "void" and "voidable" as little more than a trap for amateurs, the reality is that this seemingly simple distinction has been causing grief for judges and lawyers since before the existence of the United States. The question of whether a contract, conveyance, or other legal act is void or voidable can sometimes be dispositive of an entire case; yet, for hundreds of years, the courts have lamented that "[t]he distinction between void and voidable is not as distinctly defined as could be wished." As a result, "[c]ourts have used the words 'void,' 'voidable,' 'invalid' and 'unenforceable' imprecisely" or even interchangeably. The courts' linguistic looseness in this context is somewhat understandable; in most cases, the distinctions between the different types of invalidity are largely theoretical, and proper classification would have no practical effect on a case's outcome. However, in a small minority of cases, the void/voidable distinction is the central issue; in those cases, courts have no choice but to attempt to make sense of the confusion in order to come to judgment.

Schaefer, *supra*, at 194–95. Other authorities make similar observations.[98]

---

[98] *See, e.g.*, *Fumai v. Levy*, 1998 WL 42297, at *3 (E.D. Pa. Jan. 16, 1998) (observing that there is "more than a little confusion surrounding the terms 'void contract,' 'voidable contract,' and 'unenforceable contract'"); *In re Est. of Foiles*, 338 P.3d 1098, 1101 (Colo. Ct. App. 3rd 2014) ("There has been historic confusion about the use of the terms 'void' and 'voidable.'"); *McGarry v. Vill. of Wilmette*, 135 N.E. 96, 98 (Ill. 1922) ("The word 'void' has been used so frequently by the courts, without carefully distinguishing whether it was intended to mean absolutely void or merely voidable, that the decisions and authorities must be examined with care in order to ascertain the meaning in which the word was used by the court in the particular case decided.") (citations omitted); *Yannuzzi v. Com., State Horse Racing Comm'n*, 390 A.2d 331, 332 (Pa. Commw. 1978) ("The word 'void' is not always used with technical precision."); *see also Larkin v. Saffarans*, 15 F. 147, 152 (W.D. Tenn. 1883) ("[W]hat is only voidable is often called void."); 17A Am. Jur. 2d *Contracts* § 9, Westlaw (database updated Aug. 2022) ("confusion has resulted from the fact that a contract is sometimes said to be void although it is only voidable"); *Restatement (Third) Restitution & Unjust Enrichment* § 32 cmt. a ("The fact that a particular contract is described by statute or regulation as 'illegal,' 'unenforceable,' or 'void' is merely the beginning, not the conclusion, of the inquiry. . . ."); *Void*, Black's Law Dictionary (11th ed. 2019) ("the word [void] is often used and construed as bearing the more liberal meaning of 'voidable'"). *See generally* Nancy S. Kim, *Relative Consent and Contract Law*, 18 Nev. L.J. 165, 195 (2017) ("The distinction

Delaware has not been immune. In 2014, the Delaware Supreme Court overruled a series of decisions that had used the word "void," noting that "[r]egrettably, in writing those opinions, the authors may have been less than precise in their use of the terms 'void' and 'voidable.'" *Klaassen*, 106 A.3d at 1046. As I have noted, a similar laxity has infected the use of the Latinism *ultra vires*, which Delaware decisions (including my own) have sometimes deployed as a fancy synonym for "invalid." *See Carsanaro*, 65 A.3d at 653.

In light of these ambiguities, courts have not invariably sought to enforce the plain meaning of the word "void," even when it appears in a statute. For example, Section 29(b) of the Securities Exchange Act provides an example of a statute where the term "void" had been interpreted to mean voidable. It flatly states that "[e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void . . . ." 15 U.S.C. § 78cc(b). But rather than enforcing a rule of incurable voidness, courts generally bar a guilty party from enforcing the contract against an innocent party, while permitting the innocent party to elect whether or not to enforce the contract. 69A Am. Jur. 2d Sec. Reg. § 842 (May 2022 update). Other courts have reached similar conclusions when interpreting other statutes that use the word "void."[99]

_____

between 'void' and 'voidable' has confused many law students, attorneys, judges and more than a few legislators."); Abraham J. Levin, *The Varying Meaning and Legal Effect of the Word "Void,"* 32 Mich. L. Rev. 1088, 1094 (1933) ("Efforts to distinguish between 'void' and phrases having a like meaning are not helpful since the approach is through definition rather than by an effort to seek out the principles governing the operation of the words.").

[99] *See, e.g.*, *U.S. for Use of Pan-Caribe Const. Co. v. Peco Int'l, S.A.*, 243 F. Supp. 250, 253 (D.C.Z. 1965) ("The Canal Zone statute in question, although using the word

Given the lack of a clear and consistent usage for the word "void," a contracting party might well believe that the term has the same generic connotations as "invalid" or "ineffective," namely a result where the noncompliant action would be presumptively invalid from the outset, but where the breaching party would have the opportunity to establish a defense. Parties also may expect that they would be able to fix a noncompliant act consensually, which incurable voidness does not permit (although which the LLC Act fixed for purposes of LLC agreements through the mechanism of Section 18-108(e)). It is understandable that after a dispute arises, positions would harden, and litigators would see the tactical advantages of a rule of incurable voidness. It is also possible that repeat players who find themselves in the position of more frequently being able to invoke the doctrine would favor it. But it is difficult to think that *ex ante*, operating from behind the equivalent of a Rawlsian veil of ignorance, parties would want to go so far as to disable themselves from ratifying or otherwise fixing a problem if they agreed that it needed to be fixed, or

'void', when read in its entirety is discovered to mean only that the contract is voidable. The courts have frequently had to make this determination."); *Jones v. Zoning Bd. of Adjustment of City of Pittsburgh*, 224 A.2d 205, 208 (Pa. 1966) ("Ivy contends that as used in the zoning ordinance under consideration, the word 'void' means 'voidable.' We agree . . . ."); *Yannuzzi*, 390 A.2d at 332 (observing that there are "innumerable cases in which the word 'void' when used in statutes, ordinances, and in a variety of other contexts has been interpreted to mean 'voidable.'"); *see also Griffin v. Coca-Cola Refreshments USA, Inc.*, 989 F.3d 923, 935 (11th Cir.) (interpreting anti-assignment clauses in benefit plans that rendered assignments of benefits "void"; treating assignments as voidable rather than void where they were "not illegal" and "do not contravene public policy"; permitting invocation of equitable defenses including waiver), *cert. denied sub nom. Griffin v. Delta Air Lines, Inc.*, 142 S. Ct. 75, 211 L. Ed. 2d 14 (2021).

give up any ability to argue that the actual events surrounding the breach should provide a defense.

Delaware generally strives to avoid having outcomes turn on the use of magic words, but if a word is to have talismanic effect, it should be clear to parties just what that meaning is so that parties can knowingly bargain for and accept those consequences. There are ample reasons to think that the word "void" and its close cousins lack the necessary semantic clarity to bear the weight of a rule of incurable contractual voidness.

### e. Considerations Based On The Constitutional Preservation Of A System Of Equity

The final category of considerations is unique to Delaware, where Article IV, Section 10 of the Delaware Constitution provides that this court "shall have all the jurisdiction and powers vested by the laws of this State in the Court of Chancery." Del. Const. art. IV, § 10. The Delaware Supreme Court has held that this provision vested in the Court of Chancery "all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies," except "where a sufficient remedy exists at law." *DuPont v. DuPont*, 85 A.2d 724, 727 (Del. 1951). In light of this provision, the high court held that the General Assembly cannot enact legislation that reduces this court's jurisdiction below the constitutionally established minimum, unless there is an adequate remedy at law. *Id.* at 729. As the Delaware Supreme Court explained, Article IV, Section 10 was

> intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity. They secured them for the relief of the people. This conclusion is in complete harmony with the underlying theory of written constitutions. Its result is to establish by the

148

> Judiciary Article of the Constitution the irreducible minimum of the judiciary. It secures for the protection of the people an adequate judicial system and removes it from the vagaries of legislative whim.

*Id. See generally* Lyman Johnson, *Delaware's Non-Waivable Duties*, 91 B.U. L. Rev. 701, 702, 716-18 (2011).

The existence of this constitutional guarantee of a tribunal to administer the remedies and principles of equity raises a question about the extent to which parties should be able to contract out of that system. There is an odd disconnect between a constitutional system in which even the General Assembly faces limitations on its ability to limit equity's reach, but parties can foreclose this court's ability to consider equitable defenses by using the word "void" in an agreement. The disconnect is not insurmountable. Delaware recognizes the ability to waive important rights, be they constitutional or statutory,[100] so it

---

[100] *See Baio v. Com. Union Ins. Co.*, 410 A.2d 502, 508 (Del. 1979) ("Clearly, our legal system permits one to waive even a constitutional right . . . and, a fortiori, one may waive a statutory right.") (citations omitted); *see, e.g.*, *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1211, 1216 (Del. 2021) (enforcing stockholders agreement that provided for contractual waiver of statutory appraisal rights); *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989) (holding that an arbitration clause in a contract effectuated a valid waiver of the constitutional right to a jury trial); *Manti Hldgs., LLC v. Authentix Acq. Co.*, 2019 WL 3814453, at *4 (Del. Ch. Aug. 14, 2019) (concluding "that waiver of appraisal rights is permitted under Delaware law, as long as the relevant contractual provisions are clear and unambiguous"); *Tang Capital P'rs, LP v. Norton*, 2012 WL 3072347, at *7 (Del. Ch. July 27, 2012) (holding that the plaintiff contractually waived its rights to seek a receivership under Section 291 of the DGCL); *Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch. 2005) (holding that the plaintiff waived her right to statutory partition by contract, noting that "[b]ecause it is a statutory default provision, it is unsurprising that the absolute right to partition might be relinquished by contract, just as the right to invoke § 273 to end a joint venture or to seek liquidation may be waived in the corporate context"); *Red Clay Educ. Ass'n v. Bd. of Educ. of Red Clay Consol. Sch. Dist.*, 1992 WL 14965, at *6 (Del. Ch. Jan. 16, 1992) (holding that a provision in a collective bargaining agreement

is possible to envision a regime in which the ability to appeal to equity is freely waivable. The concept of contractually incurable voidness takes a significant step in that direction. In my view, however, other regimes are preferable and more consistent with the role for equity that the Delaware Supreme Court has historically envisioned.

### f. A Recap Of The Proposed Regime

Based on the foregoing considerations, this decision respectfully suggests a retreat from the concept of contractually specified incurable voidness. The proposed regime would restrict determinations that acts were void *ab initio* to those acts that contravene limitations imposed by the state, not agreements by private parties. That rule would apply regardless of the language used in the parties' contract.

Under this approach, incurable voidness still would have considerable range in the world of entity law. An act that violated an entity statute, such as a provision of the DGCL, would remain incurably void unless validated under Section 204 or 205. The same would be true for an act that contravened limitations in or exceeded the powers authorized by the certificate of incorporation.

For purposes of LLCs, Delaware would follow a regime that would closely resemble what Chief Justice Strine seemed to anticipate in *Eureka* and which both he and the Delaware Supreme Court deployed in *Genger*. A claim that an act violated a provision in an LLC agreement would not result in the act being incurably void, even if the LLC

constituted an effective waiver of negotiation right under unfair labor practices statute).

agreement used language to that effect. Instead, a party could defeat the claim for breach by making an affirmative factual showing sufficient to constitute waiver, acquiescence, estoppel, or similar defenses.

> **g.      The Implications Of The Proposed Regime For A Violation Of A Corporate Bylaw**

Candor obligates me to identify another implication of the reasoning set forth above. One of the decisions highlighted in the preceding sections is the Delaware Supreme Court's opinion in *Klaassen.* As the trial judge in that case, I parsed through a series of decisions that had used the word "void" to describe an action taken at a board meeting where the court found that the scheduling of the meeting or the presentation of business at the meeting either (i) was inequitable or (ii) violated a provision in the corporation's bylaws. Having surveyed the cases, I offered the following:

> The foregoing authorities suggest that Delaware law distinguishes between (i) a failure to give notice of a board meeting in the specific manner required by the bylaws and (ii) a contention that the lack of notice was inequitable. In the former scenario, board action taken at the meeting is void. In the latter scenario, board action is voidable in equity, so equitable defenses apply. This distinction fits with the general rule that the stockholders, through bylaws, may dictate the process that directors use to manage the corporation, so long as the restrictions are not so onerous as to interfere with the board's power to manage the corporation under Section 141(a). It also recognizes that traditionally, when a board took action in contravention of a mandatory bylaw, the board action was treated as void.

*Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *19 (Del. Ch. Oct. 11, 2013) (footnotes omitted; subsequent history omitted). On appeal, the Delaware Supreme Court affirmed the aspect of the rule that was at issue, agreeing that "board action taken in violation of equitable principles is voidable, not void." *Klaassen*, 106 A.3d at 1046. The

151

high court did not need to address the observation regarding a mandatory bylaw, which was not at issue in the case.

Having reviewed the *Klaassen* opinions in connection with this decision, I no longer believe that my comment regarding a mandatory bylaw reflects how our law should work. The comment reflected my best effort at the time to harmonize the conflicting cases. Nevertheless, the same considerations that I believe warrant revisiting the doctrine of contractually specified incurable voidness call for treating action taken in violation of a bylaw as voidable, not void (as long as it was action that the corporation otherwise had authority to take under the DGCL and in compliance with its certificate of incorporation).[101] The bylaws are not the organic document through which the state creates the entity and imbues it with authority, so its terms do not constitute limitations imposed by the state on the raw corporate power that the entity can wield. "The bylaws of a Delaware corporation constitute part of a binding broader contract among the directors, officers and stockholders formed *within* the statutory framework of the Delaware General Corporation Law." *Hill Int'l Inc. v. Opportunity P'rs L.P.*, 119 A.3d 30, 38 (Del. 2015)

---

[101] *See Applied Energetics*, 239 A.3d at 435–43 (holding that action which sole director took in the absence of sufficient directors to supply a quorum was voidable, not void, and could be validated under Section 205 of the DGCL); *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 462 (Del. Ch. 2012) (holding that call of special board meeting by an individual director, despite lack of authority to call a meeting under the bylaws, was voidable not void); *see also In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *48 (Del. Ch. Feb. 12, 2018) (holding that issuance of units in violation of LLC agreement was voidable, not void), *aff'd in part, rev'd in part on other grounds sub nom. Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482 (Del. 2019).

(emphasis added). Bylaws operate *within* the state-imposed framework; they do not demarcate the state-imposed boundaries. Like contracts, bylaws can be amended by implication through a course of conduct by the intra-corporate actors who otherwise would have authority to amend them. *See Applied Energetics*, 239 A.3d at 430–32 (collecting authorities). And although there is a split of authority on the issue, cases have held that an action taken in violation of a bylaw is subject to ratification or to the invocation of equitable defenses.[102] Bylaws that a party can amend and which benefit that party can be waived.[103]

A bylaw does not rise to the level of a limitation imposed by the state. A bylaw violation is not something that should be incurable. Accordingly, the considerations I have proffered lead me not only to recommend respectfully the reconsideration of *CompoSecure II*, but also to revisit my own comment in *Klaassen*.

### III.   CONCLUSION

The Blue Transfer violated the No Transfer Provision. Under the Contractual Voidness Provision and the reasoning of *CompoSecure II*, the Blue Transfer is void *ab initio*. The Blue Transfer is therefore incurably void, and Holifield cannot defeat the claim

---

[102] *See, e.g.*, *Nevins*, 885 A.2d at 246; *Lofland v. DiSabatino*, 1991 WL 138505 (Del. Ch. July 25, 1991) (holding that defective notice of annual meeting rendered director election voidable, not void).

[103] *See, e.g.*, *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *10, *16–18 (Del. Ch. Feb. 14, 2022) (considering whether board had an obligation to waive an advanced notice bylaw). *See generally* 8 Fletcher, *supra*, § 4200; 18A Am. J.2d Corporations § 271 (Aug. 2022 update); 18 C.J.S. Corporations § 162 (Aug. 2022 update).

of breach or the relief XRI seeks by invoking the doctrine of acquiescence. Holifield has always owned the Disputed Units. Blue has never owned any interest in the Disputed Units.

Although the law requires this result, it is contrary to the equities of the case. If Holifield could invoke the doctrine of acquiescence, then the court would find that XRI was barred from asserting its claim that the Blue Transfer violated the No Transfer Provision. The court would declare that Blue received an assignee interest in the Disputed Units as a result of the Blue Transfer.

Within ten days, the parties will submit a final order that has been agreed as to form. If there are issues that remain to be addressed before this action can be brought to a close at the trial level, then in lieu of submitting an agreed-upon form of final order, the parties will submit a joint letter that identifies the issues that remain and proposes a procedure for resolving them.